**Case No. 16-1967**

───────────────

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

──────────────

MICHELLE TROTTER,
Plaintiff-Appellant,

v.

7R HOLDINGS, LLC, LUIS A. RUBI GONZALEZ, M/Y OLGA
Defendants-Respondents

───────────────────

Appeal from United States District Court of the Virgin Islands, St. Thomas
Civil Case No. 3:14-cv-0099 CVG RM
(Honorable Curtis V. Gomez)

───────────────────

**JOINT APPENDIX**
**Volume II (JA00026 - JA00225)**

───────────────────

Thomas F. Friedberg, Esq. (VI Bar No. 1006)
Sarah L. Bunge, Esq. (VI Bar 1014)
**LAW OFFICES OF FRIEDBERG & BUNGE**
610 West Ash Street, Suite 1400
P.O. Box 6814
San Diego, CA 92166-0814
Telephone: (619) 557-0101
Attorneys for Plaintiff and Appellant,
MICHELLE TROTTER

# TABLE OF CONTENTS

**Volume I.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA000001 to JA000025**

**Volume II.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA000026 - JA000225**

## VOLUME I

Notice of Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000001

Judgment by the Hon. Curtis J. Gomez.. . . . . . . . . . . . . . . . . . . . . . . . JA000003

Memorandum Opinion by the Hon. Curtis J. Gomez. . . . . . . . . . . . . . . JA000005

## VOLUME II

Docket of the District Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000026

Complaint for Damages.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000029

Motion to Dismiss for Forum *Non Conveniens*. . . . . . . . . . . . . . . . . . . JA000036

Affidavit of Luis A. Rubi. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000054

Affidavit of Captain Bernard Calot.. . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000056

Affidavit of Andrew M. Thorp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA000059

Opposition to Motion to Dismiss for Forum *Non Conveniens*. . . . . . . . JA000119

Declaration of Michelle Trotter in Opposition to Motion
   To Dismiss for Forum *Non Conveniens*. . . . . . . . . . . . . . . . . . . . . . JA000140

Notice of Request for Judicial Notice in Support of Opposition
   To Motion to Dismiss for Forum *Non Conveniens*. . . . . . . . . . . . . . JA000145

Defendants' Reply to Plaintiff's Opposition to Defendants' Motion
   To Dismiss for Forum *Non Conveniens*. . . . . . . . . . . . . . . . . . . . . . JA000161

APPEAL

# District Court of the Virgin Islands
## District of the Virgin Islands (St. Thomas Division)
## CIVIL DOCKET FOR CASE #: 3:14-cv-00099-CVG-RM

Trotter v. 7R Holdings, LLC et al
Assigned to: District Judge Curtis V. Gomez
Referred to: Magistrate Judge Ruth Miller
Case in other court: 16-01967
Cause: 46:688 Jones Act

Date Filed: 11/19/2014
Date Terminated: 03/30/2016
Jury Demand: Plaintiff
Nature of Suit: 340 Marine
Jurisdiction: Federal Question

**Plaintiff**

**Michelle Trotter**                           represented by   **Thomas F. Friedberg**
                                                                Law Offices of Friedberg & Bunge
                                                                610 W. Ash, Ste. 1400
                                                                San Diego, CA 92101
                                                                619-557-0101
                                                                Fax: 619-557-0560
                                                                Email: tom@lawofficefb.com
                                                                *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**7R Holdings, LLC**                           represented by   **Jennifer Quildon Miller-Brooks**
                                                                Hanilton, Miller & Birthisel, LLP
                                                                150 SE SECOND AVE
                                                                STE. 1200
                                                                Miami, FL 33131
                                                                305-379-3686
                                                                Fax: 305-379-3690
                                                                Email: jmiller@hamiltonmillerlaw.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Luis A. Rubi Gonzalez**                      represented by   **Jennifer Quildon Miller-Brooks**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**M/Y Olga**                                   represented by   **Jennifer Quildon Miller-Brooks**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
| --- | --- | --- |

JA000026

| | | |
|---|---|---|
| 11/19/2014 | 1 | COMPLAINT *For Damages; Demand for Jury* against 7R Holdings, LLC, M/Y Olga, Luis A. Rubi Gonzalez ( Filing fee $ 400 receipt number 0391-530919.)filed by Michelle Trotter. (Attachments: # 1 Civil Cover Sheet, # 2 Summons - 7R HOLDINGS, LLC, # 3 Summons - LUIS A. RUBI GONZALEZ, # 4 Summons - M/Y OLGA) (Friedberg, Thomas) (Entered: 11/19/2014) |
| 12/01/2014 | 2 | Summons Issued as to M/Y Olga. (KAB) (Entered: 12/01/2014) |
| 12/01/2014 | 3 | Summons Issued as to Luis A. Rubi Gonzalez. (KAB) (Entered: 12/01/2014) |
| 12/01/2014 | 4 | Summons Issued as to 7R Holdings, LLC. (KAB) (Entered: 12/01/2014) |
| 01/27/2015 | 5 | MOTION for Extension of Time to File Response/Reply as to 1 Complaint, by Defendants 7R Holdings, LLC, M/Y Olga, Luis A. Rubi Gonzalez. (Attachments: # 1 Text of Proposed Order) (Miller, Jennifer) (Entered: 01/27/2015) |
| 01/28/2015 | 6 | ORDER granting 5 Motion for Extension of Time to File Response to complaint: Responses due by 3/2/2015 (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Miller, Ruth) (Entered: 01/28/2015) |
| 01/29/2015 | 7 | SUMMONS Returned Executed by Michelle Trotter. 7R Holdings, LLC served on 1/12/2015, answer due 2/2/2015. (Friedberg, Thomas) (Entered: 01/29/2015) |
| 01/29/2015 | 8 | SUMMONS Returned Executed by Michelle Trotter. M/Y Olga served on 1/12/2015, answer due 2/2/2015. (Friedberg, Thomas) (Entered: 01/29/2015) |
| 01/29/2015 | 9 | SUMMONS Returned Executed by Michelle Trotter. Luis A. Rubi Gonzalez served on 1/12/2015, answer due 2/2/2015. (Friedberg, Thomas) (Entered: 01/29/2015) |
| 03/02/2015 | 10 | Second MOTION for Extension of Time to File Answer re 6 Order on Motion for Extension of Time to File Response/Reply *to Plaintiff's Complaint* by Defendants 7R Holdings, LLC, M/Y Olga, Luis A. Rubi Gonzalez. (Attachments: # 1 Text of Proposed Order) (Miller, Jennifer) (Entered: 03/02/2015) |
| 03/03/2015 | 11 | ORDER granting 10 Motion for Extension of Time to Answer: 7R Holdings, LLC answer due 3/6/2015; M/Y Olga answer due 3/6/2015; Luis A. Rubi Gonzalez: answer due 3/6/2015. No further extensions will be granted. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Miller, Ruth) (Entered: 03/03/2015) |
| 03/06/2015 | 12 | MOTION to Dismiss *FOR FORUM NON CONVENIENS* by Defendants 7R Holdings, LLC, M/Y Olga, Luis A. Rubi Gonzalez. (Attachments: # 1 Affidavit of Luis A. Rubi-Gonzalez, # 2 Affidavit of Captain Calot, # 3 Affidavit of Andrew Thorp, # 4 Exhibit to Affidavit of Andrew Thorp) (Miller, Jennifer) (Entered: 03/06/2015) |
| 03/18/2015 | 13 | MOTION for Extension of Time to File Response/Reply as to 12 MOTION to Dismiss *FOR FORUM NON CONVENIENS Plaintiff's Unopposed Motion to Extend Time to File Opposition to Defendants' Motion for Forum Non Conveniens* by Plaintiff Michelle Trotter. (Attachments: # 1 Text of Proposed Order) (Friedberg, Thomas) (Entered: 03/18/2015) |
| 03/20/2015 | 14 | ORDER granting 13 Motion for Extension of Time to File Response re 12 MOTION to Dismiss FOR FORUM NON CONVENIENS: Responses due by 4/3/2015 (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Miller, Ruth) (Entered: 03/20/2015) |
| 03/27/2015 | 15 | Opposition to Motion re 12 MOTION to Dismiss *FOR FORUM NON CONVENIENS Plaintiff's Opposition to Motion to Dismiss for Forum Non Conveniens* filed by Plaintiff Michelle Trotter. (Attachments: # 1 Affidavit of Michelle Trotter, # 2 Notice of Request |

| | | for Judicial Notice in Support of Opposition to Motion to Dismiss for Forum Non Conveniens, # [3] Exhibit A - Notice of Request for Judicial Notice in Support of Opposition to Motion to Dismiss for Forum Non Conveniens, # [4] Exhibit B - Notice of Request for Judicial Notice in Support of Opposition to Motion to Dismiss for Forum Non Conveniens) (Friedberg, Thomas) (Entered: 03/27/2015) |
|---|---|---|
| 04/07/2015 | [16] | MOTION for Extension of Time to File Response/Reply as to [15] Opposition to Motion,, by Defendants 7R Holdings, LLC, M/Y Olga, Luis A. Rubi Gonzalez. (Attachments: # [1] Text of Proposed Order) (Miller, Jennifer) (Entered: 04/07/2015) |
| 04/07/2015 | 17 | ORDER granting in part and denying in part [16] Motion for Extension of Time to File Response/Reply re [12] MOTION to Dismiss *FOR FORUM NON CONVENIENS* Replies due by 4/14/2015.(This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (Miller, Ruth) (Entered: 04/07/2015) |
| 04/14/2015 | [18] | REPLY to re [15] Opposition to Motion,, filed by Plaintiff Michelle Trotter filed by Defendants 7R Holdings, LLC, M/Y Olga, Luis A. Rubi Gonzalez. Responses due by 4/27/2015 (Attachments: # [1] Exhibit Jury Act, 1914, 19 & 20 Geo., c. 36, # [2] Exhibit Evidence (Proceedings in Foreign Jurisdictions), 1988, c.24, # [3] Affidavit OF CAPTAIN BERNARD CALOT) (Miller, Jennifer) (Entered: 04/14/2015) |
| 03/30/2016 | [19] | (CVG) Memorandum Opinion (NAW) (Entered: 03/30/2016) |
| 03/30/2016 | [20] | Judgment (CVG)(NAW) (Entered: 03/30/2016) |
| 04/17/2016 | [21] | NOTICE OF APPEAL as to [19] Order, [20] Order, Terminate Motions by Michelle Trotter. Filing fee $ 505, receipt number 0391-609350. (Friedberg, Thomas) (Entered: 04/17/2016) |
| 04/25/2016 | [22] | ACK SHORT RECORD received & assigned USCA Case Number 16-1967 re [21] Notice of Appeal filed by Michelle Trotter. (KAB) (Entered: 04/26/2016) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/30/2016 16:01:14 | | | |
| **PACER Login:** | tfriedberg | **Client Code:** | trotter |
| **Description:** | Docket Report | **Search Criteria:** | 3:14-cv-00099-CVG-RM |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

1

2

3                    **IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**

4                    **DIVISION OF ST. THOMAS AND ST. JOHN**

5    MICHELLE TROTTER,                    │ **CIVIL CASE NO.  3:14-cv-0099**

6              Plaintiff,                 │ **COMPLAINT FOR DAMAGES**

7         v.                             │ **JURY TRIAL DEMANDED**

8    7R HOLDINGS, LLC, LUIS A. RUBI       │ **Action Filed : November 19, 2014**
     GONZALEZ, M/Y OLGA,                 │ **Trial Date    : None set**

9              Defendants.

10

11        Plaintiff, MICHELLE TROTTER, hereby alleges as follows:

12                              **JURISDICTION/VENUE**

13        1.      Plaintiff, MICHELLE TROTTER, is a resident of the State of Florida.

14        2.      Plaintiff is informed and believes, and based thereupon alleges, that defendant, 7R

15   HOLDINGS, LLC, LUIS A. RUBI GONZALEZ, are residents or business entities operating out of

16   Puerto Rico, and at the time of this incident, are, and were, operating sailing charters from the Island

17   of St. Thomas, within the Territory of the United States Virgin Islands.

18        3.      The M/Y OLGA  is a vessel owned and operated by 7R HOLDINGS, LLC, LUIS A.

19   RUBI GONZALEZ, and, at the time of this incident, was operating from the Island of St. Thomas,

20   within the Territory of the United States Virgin Islands.

21        4.      This suit herein arises and is within the Admiralty and Maritime jurisdiction of the

22   above-entitled court pursuant to the Jones Act,  46 U.S. Code § 30104, et seq.,  and under the

23   General Maritime Laws, and is for personal injuries and for damages and sums to be paid therefore

24   arising out of plaintiff's employment as a crew member aboard M/Y OLGA; and that Plaintiff,

25   MICHELLE TROTTER, is a seaman within the designation of persons permitted to suit herein

26   without furnishing bond, or pre-payment of, or making deposit to secure fees, and costs for entering

27   into and prosecuting suits conforming with the provision of 28 U.S. C. Section 1916.

28   / / /

_____

JA000029

### FIRST CAUSE OF ACTION
**(Unseaworthiness)**

5.     Plaintiff realleges paragraph 1 through 4 and incorporates the same by reference as a part hereof as though fully set forth herein.

6.     Plaintiff is informed and believes, and based thereupon alleges, that at all times herein mentioned, Defendants, 7R HOLDINGS, LLC, LUIS A. RUBI GONZALEZ, and each of them, owned, operated, maintained, entrusted, and controlled the vessel, M/Y OLGA, and at the time of this incident, was operating the vessel M/Y OLGA from the Island of St. Thomas, within the Territory of the United States Virgin Islands.

7.     Plaintiff is further informed and believes, and based thereupon alleges that at the present time or during the pendency of this suit, the above-named Defendant vessel will be in the jurisdiction of this Court.

8.     That at all times herein mentioned, plaintiff was employed on the vessel, owned by the Defendants, and each of them, as a chef on board the M/Y OLGA, and was in fact a member of the crew of the vessel; that this action is prosecuted by virtue of the provision of 46 U.S.C. Section 30104, et seq., and under the General Maritime Law.

9.     That at all times herein, mentioned, there was and still is in force and effect an Act of Congress known as the Merchant Marine Act, approved June 5, 1920, C.250, 41 State. 1007, 46 U.S.C. § 688, and codified on October 6, 2002, as 46 USC § 30104, otherwise known as the Jones Act.

10.     Plaintiff is informed and believes, and based thereupon alleges, that on or about December 26, 2012,  M/Y OLGA was engaged in maritime operations on navigable waters starting in St. Thomas, United States Virgin Islands. The M/Y OLGA then proceeded to the Marriott at Scrub Island in the British Virgin Islands, where the vessel tied up at the dock so that Plaintiff could get certain spices for the vessel from the kitchen at Scrub Island. The stairs that Plaintiff was required to traverse in order to discharge her duties as a chef aboard the M/Y OLGA had uneven rise and runs, did not have a handrail and were in a dangerous condition so that persons using the stairs were likely to misstep or sustain injuries. Plaintiff was required to ascend and descend the stairs in order

- 2 -

JA000030

1   to perform her necessary duties. While descending the stairs, Plaintiff misstepped due to the uneven

2   rise and runs and lack of a handrail, resulting in Plaintiff falling and sustaining severe and

3   debilitating injuries and damages, as herein alleged.

4         11.   Plaintiff is informed and believes, and based thereupon alleges, the Captain of the

5   M/Y OLGA knew, or should have known of the dangerous condition of the stairs due to prior visits

6   to Scrub Island, and that Plaintiff was not warned of, or provided with, alternative access by the

7   vessel to the kitchen at Scrub Island to obtain the spices in order to discharge her necessary duties.

8         12.   Plaintiff is informed and believes, and based thereupon alleges, that since Plaintiff

9   was required to ascend and descend the stairs in order to discharge her necessary duties and the

10  condition of the stairs represented a dangerous condition due to the uneven rise and runs and lack

11  of a handrail, that the doctrine of unseaworthiness applies since the route to the kitchen that Plaintiff

12  was required to use by Defendants, and each of them, was an extension of the vessel which Plaintiff

13  was required to traverse in order to perform her duties for the vessel. Plaintiff is informed and

14  believes, and based thereupon alleges, that under the doctrine of unseaworthiness, Defendants, and

15  each of them, had a duty not to expose its seamen to an unseaworthy condition and the set of stairs

16  Plaintiff was required to use represented an unseaworthy condition of the vessel.

17        13.   As a direct and proximate result of the unseaworthiness of the vessel of Defendants,

18  and each of them, as hereinabove alleged, Plaintiff, MICHELLE TROTTER, was hurt and injured

19  in her health, strength and activity, in all parts of her body, and sustained shock and injury to her

20  nervous system and person, all of which injuries have caused and continue to cause plaintiff great

21  mental, physical and nervous anxiety, and pain and suffering.  Plaintiff, MICHELLE TROTTER, is

22  informed and believes and thereon alleges, that these injuries will result in some permanent disability

23  to plaintiff, all to her general damage, in an amount to be proven at time of trial.

24        14.   As a further direct and proximate result of the unseaworthiness of the vessel of

25  Defendants, and each of them, as hereinabove alleged, Plaintiff, MICHELLE TROTTER, was

26  required to, and did, employ physicians, surgeons and therapists to treat and care for her and did

27  sustain expenses for such medical treatment and care, hospitalization, medicine, and for other and

28  further medical and incidental care, for which plaintiff has incurred liability in an amount as yet

- 3 -

1   unascertained.  Plaintiff, MICHELLE TROTTER, prays leave of Court to amend and/or supplement

2   this Complaint to insert the actual and reasonable value of all medical and incidental expenses when

3   same have been ascertained, or to prove same at time of trial.

4         15.    Plaintiff, MICHELLE TROTTER, is informed and believes, and based thereupon

5   alleges, that as a further direct and proximate result of the unseaworthiness of the vessel of

6   Defendants, and each of them, as hereinabove alleged, she will necessarily require additional medical

7   care, hospitalization, medicines, and other and further medical attention in the future and will incur

8   liability therefrom.  Plaintiff, MICHELLE TROTTER, prays leave of Court to amend and/or

9   supplement this Complaint to insert the actual and reasonable value of all said additional medical

10  and incidental expenses when same have been ascertained, or to prove same at time of trial.

11        16.    As a further direct and proximate result of the unseaworthiness of the vessel of

12  Defendants, and each of them, as hereinabove alleged, plaintiff, MICHELLE TROTTER, became

13  incapacitated and was prevented from following her usual occupation for an undetermined period

14  of time; and as a result thereof, said plaintiff suffered a loss of earnings and earning capacity and

15  ability and other financial losses in an undetermined amount.  Plaintiff, MICHELLE TROTTER,

16  prays leave of Court to amend and/or supplement this Complaint to include the exact amount of said

17  loss of earnings and earning capacity and ability when ascertained, or to prove same at time of trial.

18  <div align="center">**SECOND CAUSE OF ACTION**</div>
<div align="center">**(Negligence)**</div>

19

20        17.    Plaintiff realleges paragraphs 1 through 16, and incorporates the same as a part hereof

21  as though fully set forth herein.

22        18.    Plaintiff is informed and believes that the direct and proximate cause of her injuries

23  and damages, as mentioned above, was the negligence of Defendants, and each of them, in requiring

24  Plaintiff to ascend and descent a set of stairs at Scrub Island to obtain necessary supplies for the

25  vessel that Defendants, knew, or should have known, were in a dangerous condition. The conduct

26  of Defendants, and each of them, in requiring Plaintiff to ascend and descend a set of stairs in a

27  dangerous condition as part of her employment duties aboard the M/Y OLGA was negligent and

28  careless, thereby causing injuries and damages to Plaintiff, as herein alleged.

<div align="center">- 4 -</div>

JA000032

19.     As a direct and proximate result of the negligence and carelessness of Defendants, and each of them, as hereinabove alleged, plaintiff, MICHELLE TROTTER, was hurt and injured in her health, strength and activity, in all parts of her body, and sustained shock and injury to her nervousness system and person, all of which injuries have caused and continue to cause Plaintiff great mental, physical and nervous anxiety, and pain and suffering.   Plaintiff, MICHELLE TROTTER, is informed and believes, and based thereupon alleges, that these injuries will result in some permanent disability to plaintiff, all to her general damage, in an amount to be proven at time of trial.

20     As a further direct and proximate result of the negligence and carelessness of Defendants, and each of them, as hereinabove alleged, Plaintiff, MICHELLE TROTTER, was required to, and did, employ physicians, surgeons and therapists to treat and care for her and did sustain expenses for such medical treatment and care, hospitalization, medicines and for other and further medical and incidental care, for which plaintiff has incurred liability in an amount as yet unascertained. Plaintiff, MICHELLE TROTTER, prays leave of Court to amend and/or supplement this Complaint to insert the actual and reasonable value of all medical and incidental expenses when same have been ascertained, or to prove same at time of trial.

21.     Plaintiff, MICHELLE TROTTER, is informed and believes, and based thereupon alleges, that as a further direct and proximate result of the negligence and carelessness of Defendants, and each of them, as hereinabove alleged, she will necessarily require additional medical care, hospitalization, medicines, and other and further medical attention in the future and will incur liability therefrom.   Plaintiff, MICHELLE TROTTER, prays leave of Court to amend and/or supplement this Complaint to insert the actual and reasonable expenses when same have been ascertained, or to prove same at time of trial.

22.     As a further direct and proximate result of the negligence and carelessness of Defendants, and each of them, as hereinabove alleged, plaintiff, MICHELLE TROTTER, became incapacitated and was prevented from following her usual occupation for an undetermined period of time; and as a result thereof, said plaintiff suffered a loss of earnings and earning capacity and ability and other financial losses in an undetermined amount.  Plaintiff, MICHELLE TROTTER,

Plaintiff's Complaint for Damages and Demand for Jury Trial

JA000033

1  prays leave of Court to amend and/or supplement this Complaint to include the exact amount of said

2  loss of earnings and earning capacity and ability when ascertained, or to prove same at time of trial.

3  <div align="center">**THIRD CAUSE OF ACTION**
**(Maintenance and Cure)**</div>

4

5  23.  Plaintiff realleges paragraphs 1 through 22, and incorporates the same as a part hereof

6  as though fully set forth herein.

7  24.  On or about the above time and place, while Defendants' vessel was on navigable

8  waters, Plaintiff became injured while in the service of the vessel.

9  25.  Upon Plaintiff's becoming injured, it became the duty of Defendants, and each of

10  them, to pay Plaintiff the expenses of her maintenance and cure and wages until Plaintiff reached

11  maximum possible cure, which Defendants, and each of them, have neglected to pay.

12  26.  That by reason of Defendants refusal and failure to pay maintenance and cure,

13  Plaintiff has incurred damages, and has also incurred attorney's fees and costs, in an amount

14  presently unknown and Plaintiff is therefore entitled to attorney's fees and costs and interest thereon,

15  all in an amount to be proven at time of trial.  Plaintiff is informed and believes, and based thereupon

16  alleged, that she will suffer further damages in an amount which is not known at this time, and she

17  prays leave to insert the same when fully ascertained.

18  27.  Plaintiff is further informed and believes, and based thereupon alleges, that

19  Defendants failure and refusal to pay maintenance and cure was arbitrary, capricious, malicious,

20  willful, oppressive and therefore entitles plaintiff to an award of punitive damages and attorney's

21  fees and costs in an amount to be proven at time of trial.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

<div align="center">- 6 -

Plaintiff's Complaint for Damages and Demand for Jury Trial</div>

1    WHEREFORE, Plaintiff prays judgment against Defendants, and each of the, as follows:

2        1.    For general damages, all in an amount to be proven at the time of trial;

3        2.    For medical and related expenses, past, present and future, all in an amount to be

4    proven at the time of trial;

5        3.    For loss of earnings or earning ability, past, present and future, all in an amount to be

6    proven at the time of trial;

7        4.    For maintenance and cure, all in an amount to be proven at time of trial;

8        5.    For attorney's fees, all in an amount to be proven at time of trial;

9        6.    For exemplary and punitive damages, all in an amount to be proven at time of trial;

10       7.    For a trial by jury pursuant to Rule 38, Federal Rules of Practice;

11       8.    For costs of suit incurred herein; and

12       9.    For such other and further relief as this Court deems just and proper.

13   Dated : November 19, 2014        **LAW OFFICES OF FRIEDBERG & BUNGE**

14
                                      By: *s/ THOMAS F. FRIEDBERG, ESQ.*
15                                        THOMAS F. FRIEDBERG, ESQ. (VI#1006)
                                          Attorneys for Plaintiff, MICHELLE TROTTER
16                                        610 West Ash Street, Suite 1400
                                          P.O. Box 6814
17                                        San Diego, California 92101
                                          TEL : (619)557-0101
18                                        FAX:  (619)557-0560
                                          "tom@lawofficefb.com"
19

20                            **DEMAND FOR JURY**

21       Plaintiff hereby demands a jury trial pursuant to Rule 38, of the Federal Rules of Practice.

22   Dated : November 19, 2014        **LAW OFFICES OF FRIEDBERG & BUNGE**

23
                                      By: *s/ THOMAS F. FRIEDBERG, ESQ.*
24                                        THOMAS F. FRIEDBERG, ESQ. (VI#1006)
                                          Attorneys for Plaintiff, MICHELLE TROTTER
25                                        610 West Ash Street, Suite 1400
                                          P.O. Box 6814
26                                        San Diego, California 92101
                                          TEL : (619)557-0101
27                                        FAX:  (619)557-0560
                                          "tom@lawofficefb.com"
28

- 7 -

Plaintiff's Complaint for Damages and Demand for Jury Trial

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

MICHELLE TROTTER,      )
                               )
         Plaintiff,      )
vs.                          )     Civil No. 3:14-cv-0099
                               )
7R HOLDINGS, LLC, LUIS A. RUBI  )     JURY TRIAL DEMANDED
GONZALEZ, M/Y OLGA,      )
                               )
                               )
                               )
         Defendants.    )
_____)

**DEFENDANTS' MOTION TO**
**DISMISS FOR FORUM *NON CONVENIENS***

     Defendants, 7R HOLDINGS, LLC, LUIS A. RUBI GONZALEZ, and M/Y

OLGA (collectively "Defendants"), by and through undersigned counsel and

pursuant to applicable Federal Rule of Civil Procedure 12(b)(3), hereby files their

Motion to dismiss for Forum *Non Conveniens* and states as follows:

**SUMMARY OF FACTS**

     This case arises out of an alleged personal injury suffered by Plaintiff,

Michelle Trotter on board a sailing charter operated by Defendants 7R Holdings,

LLC and Luis A. Rubi Gonzalez while the M/Y Olga was docked at the Marriott at

Scrub Island in the British Virgin Islands on or about December 26, 2012. Plaintiff

is an American citizen who was hired in the British Virgin Islands to work as a chef

on board the M/Y Olga. The M/Y Olga is registered in the British Virgin Islands.

The charter contract for which Plaintiff was employed was to begin in Shroud

Island in the British Virgin Islands. Prior to starting work, Plaintiff flew in to St.

Civil No. 3:14-cv-0099

Thomas, U.S., Virgin Islands. However, Plaintiff's contract was scheduled to begin in the British Virgin Islands, 3 days after her arrival in St. Thomas. Plaintiff was allegedly injured aboard Defendant's yacht while in the seas of the British Virgin Islands and was transported to Peebles Hospital of the British Virgin Islands accompanied M/Y Olga deckhand Patricio Ramirez, a Mexican resident and was treated for her alleged injuries.

## STATEMENT OF FACTS

1.  Plaintiff is an American citizen. (Compl. ¶ 1.)

2.  Defendant, 7R Holdings, LLC has no ownership interest in the M/Y Olga. 7R Holdings, LLC is a limited liability company with its principal place of business in San Juan, Puerto Rico. (Rubi Aff. ¶ 2, Ex. 1.) 7R Holdings, L.L.C. agrees to submit itself to the jurisdiction of the BVI and to accept service in the BVI in the matter of *Michelle Trotter vs. 7R Holdings, LLC, Luis A. Rubi Gonzalez, and M/Y Olga.*

3.  Luis A. Rubi is a Puerto Rico citizen and is a Director of 7R Holdings, LLC. (Rubi Aff. ¶ 1, Ex. 1.)

4.  M/Y Olga is a charter yacht owned by 7R Charters Limited and is registered in the British Virgin Islands and does not operate any charters out of or in to St. Thomas, U.S. Virgin Islands. (Rubi Aff. ¶5, Ex. 1; Calot Aff. ¶4, Ex. 2)

5.  On December 1, 2012, Captain Bernard Calot ("Calot") hired Plaintiff as a freelance chef on the M/Y Olga for a 10-day charter sailing out of the British Virgin Islands. (Calot Aff. ¶ 7, Ex. 2.)

2

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000037

6. At Plaintiff's request, she was flown in to St. Thomas, U.S. Virgin Islands.

7. At Plaintiff's request, she boarded the M/Y Olga on December 22, 2012, at Yacht Haven Marina, in St. Thomas, where the M/Y Olga had docked for provisioning on its way to the British Virgin Islands from Puerto Rico. (Calot Aff. ¶ 8, Ex. 2)

8. On December 22, 2012, the M/Y Olga departed St. Thomas and sailed to Scrub Island, British Virgin Islands. (Calot Aff. ¶ 9, Ex. 2.)

9. Between December 26, 2012 and January 5, 2013, the M/Y Olga did not sail within the navigable waters of St. Thomas, U.S. Virgin Islands. (Calot Aff. ¶ 10, Ex. 2.)

10. According to Plaintiff, she was allegedly injured aboard the Defendant's vessel on December 26, 2012 while it was docked at Scrub Island in the British Virgin Islands. (Compl. ¶ 10.)

11. Plaintiff was transported to Peebles Hospital in Tortola, British Virgin Islands and treated for her injuries. (Calot Aff. ¶, Ex. 13, Ex. 2.)

12. Any witnesses to Plaintiff's alleged fall, are likely to be employees of the Scrub Island Resort, Spa & Marina, in the British Virgin Islands.

13. Deckhand Patricio Ramirez, who accompanied Plaintiff to the hospital is a Mexican resident. (Calot Aff. ¶ 11, Ex. 2.)

14. The crewmembers onboard the M/Y Olga have no contacts within the U.S. Virgin Islands and are not subject to the jurisdiction of the U.S. Virgin Islands.



HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

Civil No. 3:14-cv-0099

15.    Besides Defendants employees, Peebles Hospital personnel who treated Plaintiff in the British Virgin Islands have knowledge of this incident and the treatment received by Plaintiff.

16.    Co-Defendant Luis A. Rubi, an indispensable party, has no contacts within the U.S. Virgin Islands and is not subject to the jurisdiction of the U.S. Virgin Islands.  (Rubi Aff. ¶ 1, Ex. 1.)

17.    There are no known witnesses in St. Thomas, U.S. Virgin Islands.

## MEMORANDUM OF LAW

### A. Defendant's Motion to Dismiss for Forum *Non Conveniens* is Properly Granted

A motion to dismiss for *forum non conveniens* is a motion to dismiss for improper venue, pursuant to Federal Rule for Civil Procedure 12(b)(3).  *See Lipcon v. Underwriters at Lloyd's London*, 148 F.3d 1285, 1290 (11th Cir. 1998).  A plaintiff's choice of forum should only be disturbed once the court, having taken into account several private and public interest factors, finds that the burden on the defendant and the Court warrants dismissal. *See Windt v. Qwest Communs. Int'l, Inc.,* 529 F.3d 183, 192 (3d Cir .2008); *See also Piper Aircraft Co. v. Reyno,* 454 U.S. 238, 255 (1981).  However, when the plaintiff's choice of forum is not his home forum, "the presumption in the plaintiff's favor 'applies with less force,' for the assumption that the chosen forum is appropriate is in such cases 'less reasonable.'" *Piper Aircraft Co.,* 454 U.S., at 255-56.  Moreover, as a general rule, the preferred forum is that which is the center of the accused activity." *S.C. Johnson & Son, Inc. v. Gillette Co.,* 571 F.Supp. 1185, 1187–88 (Ill.1983).

4

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000039

In considering a motion to dismiss for *forum non conveniens*, the Court must consider the following factors: (1) Plaintiff's choice of forum; (2) Defendant's preference; (3) where the claim arose; (4) convenience to the parties; (5) convenience to witnesses; (6) location of books and records; (7) practical considerations that could make the trial easier, more expeditious or less expensive; (8) congestion of possible forum; and (9) familiarity of the court with the applicable law in diversity cases.

Here, several factors warrant dismissal of this action and the filing of this matter in the British Virgin Islands: (1) Plaintiff's injury occurred in the British Virgin Islands; (2) Defendant's employee-witnesses, excluding Plaintiff are residents of the British Virgin Islands; (3) most records or books regarding the incident would be located in the British Virgin Islands; (4) the records or books not located in the British Virgin Islands would have to be mailed/shipped, regardless of the forum; (5) following Plaintiff's injury, she was treated by doctors and nurses in Peebles Hospital in Tortola, British Virgin Islands; (6) the familiarity of the BVI court system with its own laws; and (7) the U.S. Virgin Islands' citizens and courts have little interest in a case involving parties and events that have no nexus to the U.S. Virgin Islands. Not even Plaintiff's counsel is from the U.S. Virgin Islands.

While transfer of an action is appropriate in most instances when there is a more convenient forum available, dismissal of an action on forum *non conveniens* grounds is appropriate when the more convenient forum is a foreign country. *See 14D Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3828 (3d ed. 2012); See generally American Dredging v. Miller,* 510

5

**HAMILTON, MILLER & BIRTHISEL, VI P.C.**
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

U.S. 443 (1994); *Campbell v. Bridgeview Marina, Ltd.,* 347 F. Supp. 2d 458 (D. Mich. 2004); *Holmes v. Energy Catering Servs., LLC,* 270 F. Supp. 2d 882 (D. Tex. 2003). Further, the Supreme Court of the United States has held, "the common-law doctrine of *forum non conveniens* 'has continuing application [in federal courts] only in cases where the alternative forum is abroad'. . ." *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.,* 549 U.S. 422, 430, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007) (quoting *American Dredging Co. v. Miller,* 510 U.S. 443, 449, n. 2, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994)).

    **1.    Dismissal of Plaintiff's Complaint is warranted under the doctrine of *forum non conveniens.***

    An action is properly dismissed under the doctrine of *forum non conveniens* when a "plaintiff's chosen forum would impose a heavy burden on the defendant or on the court" and where plaintiff is unable to offer any specific reasons of convenience supporting his choice of forum. *Piper Aircraft Co.*, 454 U.S. 235; *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947); *Sibaja*, 757 F.2d 1215. The U.S. Supreme Court has established the following framework for dismissing a suit under the doctrine of *forum non conveniens*:

> As a prerequisite the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all or relevant factors of private interest, weighing in the balance, a strong presumption against disturbing a plaintiff's initial forum choice. If the trial judge finds this balance of private interest at or near equipoise, he must then determine whether or not factors of public interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that

6

JA000041

> the plaintiffs can reinstate that their suit in the alternative forum without undue inconvenience or prejudice.

*Piper Aircraft Co. v. Reyno,* 454 U.S. 238, 255 (1981); *La Seguridad v. Transytur Line,* 707 F. 2d 1304, 1307 (11th Cir. 1983), citing *Pain v. United Techs Corp.*, 637 F. 2d 775, 784-85 (D.C. Cir.), *cert denied*, 454 U.S. 1128 (1981); *McCennan v. AM Eurocopter Corp.* 245 F.3d 403, 424 (5th Cir. 2001); *Sydow v. Acheson & Co.*, 81 F. Supp. 2d 758, 768 (S.D. Tex. 2000); *Baris v. Sulpicio Lines,* 932 F.2d 1540, 1550-51 (5th Cir. 1991); *Syndicate 420 at Lloyd's London v. Early AM Insur. Co.*, 796 F.2d 821, 827 (5th Cir 1986).

### a)    Availability of Alternate Forum

An adequate alternative forum exists where "defendant is amenable to process in the other jurisdiction." *Gulf Oil Corp.*, 330 U.S. at 506 – 07; *Piper Aircraft Co.*, 454 U.S. at 255. Courts have described this test as not a "high hurdle." *Carnival Cruise Lines, Inc. v. Wartsila AB*, 159 B.R. 984, 990 (S.D. Fla. 1993). Ordinarily, a defendant's submission to the jurisdiction of an alternative forum renders that forum available for purposes of *forum non conveniens* analysis. *See Veba-Chemie A.G. v. M/V Getafix,* 711 F.2d 1243, 1245 (5th Cir. 1983); *Aguinda v. Texaco, Inc.,* 142 F. Supp. 2d 534, 539 (S.D.N.Y. 2001); *see also In re Union Carbide Corp. Gas Plant Disaster,* 809 F.2d 195, 203 – 04 (2d Cir. 1987) (affirming dismissal for *forum non conveniens* that was conditioned upon defendant's consent to personal jurisdiction in India; such conditions "are not unusual and have been imposed in

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000042

Civil No. 3:14-cv-0099

numerous cases where the foreign court would not provide an adequate alternative in the absence of such a condition.").

The BVI courts constitute an "adequate" forum for this litigation. Defendants initially emphasize that courts considering this issue hold that "an adequate forum need not be a perfect forum." *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001). Rather, an alternative forum qualifies as "adequate" as long as the parties will be treated fairly and will not be deprived of all remedies there. *See Sydow*, 81 F. Supp. 2d at 768; *see also Piper Aircraft Co.*, 454 U.S. at 254 n.22 (noting that "[i]n rare circumstances … where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative"); *Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 393 – 94 (5th Cir. 1983) (explaining that a foreign forum is inadequate if conditions there "plainly demonstrate that the plaintiffs are highly unlikely to obtain basic justice therein"). Put another way, the remedy provided by the foreign forum qualifies as inadequate only when it amounts to "no remedy at all." *Piper Aircraft Co.*, 454 U.S. at 254. Thus, only the most perilous obstacles to conducting litigation, evidenced by a complete absence of due process in the alternative forum, will render that forum inadequate. *See, e.g., Sangeorzan v. Yangming Marine Transp. Co.*, 951 F. Supp. 650, 653-54 (S.D. Tex. 1997) (deciding that, where defendant was 48% percent owned by the Taiwanese government, Taiwan was not an adequate alternative forum); *Sablic v. Armada Shipping Aps*. 973, F. Supp. 745, 748 (S.D. Tex. 1997) (finding that extreme political and military instability in the war-torn region,

8

JA000043

coupled with a large backlog of cases, rendered Croatian courts inadequate); *Cabiri v. Assasie-Gyimah,* 921 F. Supp. 1189, 1199 (S.D.N.Y. 1996) (denying dismissal where Ghanian plaintiff, who had political asylum status, had well-founded fear of prosecution if he brought action alleging torture by Ghanian official in Ghanian courts).

Defendant has presented the Declaration of Hazel-Ann Thorp an attorney in the BVI. BVI allows and provides for just compensation to plaintiff. (Ex. "3,"Thorp Decl.). Additionally, the process includes the right to take discovery and to appeal. (Ex. "3" Thorp Decl.). Attorney Thorp also opines that a BVI court would take jurisdiction of the case and provide an adequate forum. (Ex. "3," Thorp Decl.). Thus, and as set forth in greater detail within Attorney Thorp Declaration, the BVI provides not just an adequate forum, but just and fair forum for Plaintiff's action. (Ex. "3," Thorp Decl.).

Moreover, this Court previously ruled in *Hoffman v. Rosewood Hotels and Resorts, LLC d/b/a Rosewood Little Dix Bay and B&B Yacht Services, Ltd., Case No.: 3:12-cv-00086-CVG-RM (DE 34, p. 12)*, that "the judicial system of the British Virgin Islands would recognize *Hoffman's* claim" of negligence as the Eastern Caribbean Supreme Court, which the BVI is a part of, "adopted the common law of the United Kingdom, and recognizes the claim of negligence as well as the common law defenses to it." *Id.*

Finally, to the extent Plaintiff argues that the BVI is not an adequate forum because (1) there are no jury trials; (2) she cannot compel attendance of witnesses or

<div align="center">9</div>

JA000044

production of documents located outside BVI; (3) depositions are not allowed except when a witness is unavailable for trial; or that (4) court reporters are not used in BVI courts, courts have found that "some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." *Borden, Inc. v, Meiji Milk Prods., Co., Ltd.,* 9191 F.2d 822, 829 (2d Cir. 1990). Citing *Borden* and other similar cases, this Court noted in *Hoffman* that "at least one other federal court has previously found an adequate alternative forum to exist in the British Virgin Islands." *See, Hoffman (DE 34, p. 12),* citing, *Saud v. PIA Invs. Ltd.*, No. 07 civ. 5603 (NRB), 2007 WL 4457441, at *3 (S.D.N.Y. Dec. 14, 2007) (finding no evidence "to suggest that the British Virgin Islands courts lack general competency" or that "the remedies available … are unsatisfactory"). *See, Hoffman (DE 34, p. 12).* Based upon the foregoing, the BVI is an adequate forum and this case could therefore be adequately litigated in a BVI court.

**b)    Private interest factors**

The second part of the analysis under the doctrine of *forum non conveniens* requires a court to weigh the private interests of the parties in trying the case in this forum rather than in the BVI. In analyzing the private interest factors, a court should consider: (1) the relative ease of access to proof; (2) the availability of compulsory process of willing and unwilling witnesses; (3) the costs of obtaining attendance of willing witnesses; (4) the ability to view the premises; (5) the enforceability of a judgment; and (6) all other practical problems that make trial of

**HAMILTON, MILLER & BIRTHISEL, VI P.C.**
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000045

Case: 18-1967 Document: 003112396005 Page: 23 Date Filed: 09/01/2018

Civil No. 3:14-cv-0099

a case easy, expeditious and inexpensive. *See Gulf Oil Co.*, 330 U.S. at 508. When evaluating the private interest factors, "the district court must scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are critical, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action." *Van Cuwenberghe v. Biard*, 486 U.S. 517, 528 (1988). This inquiry does not necessarily involve extensive investigation. *Id.* We address these factors below.

### (1)    The relative ease of access to proof.

In this case, the majority, if not all of the evidence is in the BVI. All alleged active tortfeasors and the location of the incident is in the BVI. The vessel at issue and site of the alleged incident is, again, in the BVI. In short, there are no witnesses in the USVI and there is no evidence in the USVI.

### (2)    The availability of compulsory process of willing and unwilling witnesses.

In this case, any witnesses residing in the BVI are not subject to the personal jurisdiction of this court and cannot be compelled to appear for depositions or for trial. In contrast, those same witnesses are subject to the BVI courts and authorities, which can compel their attendance to give evidence in the case. (Ex. "3," Thorp Decl.). Accordingly, Plaintiffs' choice of venue would deprive the Defendants of any live testimony of the individuals with knowledge involving the alleged incident. This testimony will only come from individuals in the BVI that are not parties to this lawsuit.

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000046

**(3)   The cost of obtaining attendance of willing witnesses.**

The costs to obtain testimony of witnesses in the USVI will be substantial given the sheer volume of people involved.  Even at this early stage, it is clear that a significant amount of discovery will need to take place in the BVI, where the incident at issue allegedly occurred.  Moreover, it is more than just discovery about what happened that day or at that time, but also about the yacht itself.

Additionally, attendance at trial cannot be ignored.  In addition to the expenses associated with conducting a significant amount of discovery in the BVI, there will be further and substantial costs to have witnesses, assuming they are willing, transported to, housed and fed in the USVI in order to appear for trial. This says nothing of the costs associated with compelling the unwilling, who probably could never be compelled to attend trial in the USVI.

Thus, maintaining the case in the USVI results in needless and substantial increased fees and costs, including but not limited to: (1) the need for international service of process; (2) the need to retain counsel here and in the BVI; and (3) the need to involve BVI courts and authorities.  In contrast, if suit were dismissed and filed in the BVI, the BVI courts would have jurisdiction over Defendants for purposes of this suit and for the purpose of compelling witnesses to appear and provide testimony, and to compel production of evidence.

**(4)   The ability to view the premises.**

As to the ability to view the premises (i.e., to the extent a vessel could be considered premises), this factor weighs in favor of dismissal.  The accident did not

12

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000047

Civil No. 3:14-cv-0099

occur on any premises, it occurred on a vessel which was docked in the waters of the BVI and is registered in the BVI. Thus, all physical evidence is located in the BVI.

**(5)     The enforceability of a judgment.**

This factor should also be interpreted in favor of dismissal because Plaintiff will be able to enforce a judgment, if any.

**(6)     All other practical problems that make trial of a case easy, expeditious and inexpensive.**

As discussed above, virtually all of the witnesses and evidence are in the BVI. Further, all documentary and physical evidence concerning the incident is in the BVI. Significantly, there is no witness and no evidence in the USVI. Thus, the private interest factors weigh heavily in favor of dismissal.

**c)     Public interest factors weigh in favor of dismissal**

If the balance of private interests is in, or near, equipoise, the court must then determine whether factors of public interest tip the balance in favor of a trial in a foreign forum. *See Morse*, 2001 WL 34874967 at *6, citing *Pain v. United Technologies Corp.*, 637 F.2d 775, 784 (D.C. Cir.1980). The public interest factors considered in a *forum non conveniens* analysis include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies resolved at home; (3) the interest in having a trial in a forum that is at home with law that must govern the case, rather than forcing a court in another forum to deal with unnecessary problems of conflicts of law or in application of foreign law; and (4) the unfairness of burdening citizens in an unrelated forum with jury duty. *See Gulf Oil Corp.*, 330 U.S. at 508-509. Although the balance of private

13

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000048

Civil No. 3:14-cv-0099

interests sufficiently weighs in favor of dismissal of this suit, an analysis of the public interest factors further supports this conclusion.

The courts of the U.S. Virgin Islands apply the choice-of-law rules as set forth in the Restatement (Second) of Conflicts of Laws. *BA properties, Inc. v. Aetna Cas. & Sur. Co.*, 273 F.Supp.2d 673, 680 (D.V.I. 2003). 1 V.I.C.§ 4. Section 146 provides in pertinent part:

> In an action for personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in section 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Only in rare cases is a jurisdiction other than that in which the conduct and injury occurred more significant. *Id.* Considering the aforementioned with the other factors set forth more fully herein, easing administrative difficulties could occur only if this case was dismissed and brought in the BVI.

"Ordinarily, great deference is accorded a plaintiff's choice of forum, but the amount of deference due is less when the plaintiff is foreign." *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 633 (3d Cir. 1989), citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Where, as here, the Plaintiff is an American citizen, her home forum is a United States Court. *See Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146(2d Cir. 2000). By choosing the District Court in the U.S. Virgin Islands, Plaintiff has chosen her home forum. Generally, this choice would be entitled to great deference and there would be a strong presumption of convenience. *See Lony*, 886 F.2d at 633; *Windt*, 529 F.3d

14

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000049

at 190 (citation omitted). However, this presumption can be overcome where a balancing of the private and public interest factors weighs in favor of an alternate forum. *Windt,* 529 F.3d at 190. "If the balance of these factors indicates that trial in the chosen forum would result in oppression or vexation to the defendant out of all proportion to the plaintiff's convenience, the district court may, in its discretion, dismiss the case on forum non conveniens grounds." *Id.*

Here, an American citizen is suing foreign Defendants, for personal injuries allegedly sustained on a chartered vessel in the BVI. As in *BA Properties*, these factors support dismissal. Based on the allegations of the Complaint and the application of the above stated factors to the present case, it is apparent that BVI law would be applied to this matter, as the incident occurred in the BVI, the vessel is registered in the BVI, Plaintiff was hired in the BVI, the conduct allegedly causing the injury occurred in the BVI, the place where the relationship between the parties is centered is in the BVI, and nearly all proper parties and witnesses are domiciled, reside, have nationality in BVI, conduct business in the BVI and or have agreed to submit to the jurisdiction there.

The *BA Properties* court cited to a number of factors that demonstrate the difficulties in addressing conflicts and governing law issues, all of which except for sovereign immunity issues, apply here. Furthermore, as the Court noted in *Hoffman*:

> the Second Restatement of conflict of Laws provides: the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has

JA000050

Civil No. 3:14-cv-0099

a more significant relationship … to the occurrence and the parties ….

*See Hoffman (DE 34, p. 20),* citing Restatement (Second) of Laws § 146 (1971).  Here, there is simply no nexus between the alleged negligent conduct and Plaintiff's chosen forum, the District of the Virgin Islands.  Thus, under the Virgin Islands choice-of-law rules, BVI law would apply.  As this court found in *Hoffman,* "[i]ndeed it would appear that litigating this claim before this Court would serve only to create 'unnecessary problems in conflict of laws, or in the application of foreign law,' (internal citation omitted), particularly when the proposed alternative jurisdiction is the very source of the governing law." *Hoffman* (DE 34, p.p. 20-21). Accordingly, the conflict of law analysis weighs in favor of dismissal.

Finally, the citizens of the USVI should not be burdened with jury duty where the substantial weight of interests lies with the BVI.  In similar circumstances, United States courts have held that where a controversy arose in a foreign country, jurors in the United States should not be forced to decide issues with little relation to the forum nor should such cases be permitted to delay the trials of cases involving local concerns.  *Perez Y. Coampania, S.A. v. Triton Pacific Maritime Corp.,* 647 F. Supp. 556, 560 (S.D. Tex. 1986).

## Conclusion

Here, Defendants request dismissal of this action in the U.S. Virgin Islands, as the British Virgin Islands is a more appropriate forum to litigate this matter. Further, Plaintiff will have difficulty proving that she will be legally slighted by litigating this matter in the British Virgin Islands instead of the U.S. Virgin

16

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

Islands. In support of the applicability of the laws of the British Virgin Islands in this matter, Defendants submit an affidavit detailing the BVI justice system and Plaintiff's ability to obtain a judgment in the BVI, attached as Exhibit "3".

Defendants have provided sufficient information to enable this court to balance the parties' interests. Such evidence weighs in favor of dismissal. Accordingly, Defendant's Motion to Dismiss for Forum *Non Conveniens* is properly granted.

**WHEREFORE**, Defendants, **7R HOLDINGS, LLC, LUIS A. RUBI GONZALEZ, and M/Y OLGA,** by and through their undersigned counsel, and based on the foregoing facts, law and argument, and under the applicable Federal Rules of Civil Procedure, respectfully requests the Honorable Court grant their Motion, and enter an Order dismissing Plaintiff's Complaint, and for such further relief this Honorable Court deems just and necessary.

Respectfully submitted,

/s/ Jennifer Quildon Miller
Jennifer Quildon Miller, Esq.
V.I. Bar No. 1109
Hamilton, Miller & Birthisel, VI P.C.
Counsel for Rosewood Hotels and Resorts, L.L.C.
Mailing Address:
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
Telephone 305-379-3686
Telefax 305-379-3690

17

JA000052

Civil No. 3:14-cv-0099

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 6, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing was served on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.


/s/ Jennifer Quildon Miller
Jennifer Quildon Miller

## SERVICE LIST

Thomas F. Friedberg, Esq.
*Counsel for Plaintiff*
Law Offices of Friedberg & Bunge
610 West Ash Street, Suite 1400
P.O. Box 6814
San Diego, CA 92101
Telephone: 619-557-0101
Facsmile: 619-557-0560
Email:  tom@lawofficefb.com

18

**HAMILTON, MILLER & BIRTHISEL, VI P.C.**
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA  33131 • 305-379-3686 • FAX 305-379-3690

**JA000053**

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

MICHELLE TROTTER,

        Plaintiff,

      Civil No.: 3:14-cv-00099

vs.

      ACTION FOR DAMAGES

7R HOLDINGS, LLC, LUIS A.
RUBI GONZALEZ, M/Y OLGA

      JURY TRIAL DEMANDED

      Defendants.

_____/

### AFFIDAVIT OF LUIS A. RUBI GONZALEZ

I, LUIS A. RUBI GONZALEZ, certify as follows based on my personal knowledge and declare the truth of the facts stated below.

1.    I am a Director of 7R Holdings, LLC, and am a resident of Puerto Rico. Neither I nor 7R Holdings, LLC have any contacts with or do business in St. Thomas, U.S. Virgin Islands.

2.    7R Holdings, LLC's principal place of business is in San Juan, Puerto Rico.

3.    I am making this affidavit in support of 7R Holdings, LLC, Luis A. Rubi Gonzalez and M/Y Olga's Motion to Dismiss for Forum *Non Conveniens*.

4.    M/Y Olga is a charter yacht owned by 7R Charters Limited and is registered in the British Virgin Islands.

5.    Neither 7R Charters Limited nor M/Y Olga operate any charters out of or in to St. Thomas, U.S. Virgin Islands.

6.    7R Charters Limited is held by 7R Holdings, LLC. I am a Director of 7R Charters Limited.

7.    7R Holdings, LLC has no direct ownership interest in M/Y Olga.

8.    Captain Bernard Calot is the Captain of M/Y Olga and was so employed at the time of the incident alleged in the Complaint.

9.     I am not aware of any witnesses or evidence regarding the alleged incident in the Complaint who are in the U.S. Virgin Islands.


FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  February _26_, 2015          _____

LUIS A. RUBI GONZALEZ

_ 2799 _

SWORN TO AND SUBSCRIBED before me this _26_ day of February, 2015,

by _Luis A. Rubi Gonzalez_, who is personally known to me or ~~who has produced~~

_____ as identification.



Notary Seal

_____

Notary Public

My Commission expires:



IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

MICHELLE TROTTER,

      Plaintiff,

vs.

7R HOLDINGS, LLC, LUIS A.
RUBI GONZALEZ, M/Y OLGA

      Defendants.

_____/

Civil No.: 3:14-cv-00099

ACTION FOR DAMAGES

JURY TRIAL DEMANDED

## AFFIDAVIT OF CAPTAIN BERNARD CALOT

I, CAPTAIN BERNARD CALOT, certify as follows based on my personal knowledge and declare the truth of the facts stated below.

    1.     I am the Captain of M/Y Olga. I have worked in this capacity for eight and one-half years. I am employed by 7R Charters Limited, a British Virgin Islands company. 7R Charters Limited is held by 7R Holdings, LLC.

    2.     I am making this affidavit in support of 7R Holdings, LLC, Luis A. Rubi Gonzalez and M/Y Olga's Motion to Dismiss for Forum *Non Conveniens*.

    3.     M/Y Olga is a charter yacht owned by 7R Charters Limited and is registered in the British Virgin Islands.

    4.     Neither 7R Charters Limited nor M/Y Olga does not operate any charters out of or in to St. Thomas, U.S. Virgin Islands

    5.     7R Holdings, LLC has no direct ownership interest in the M/Y Olga.

    6.     I am a resident of Montreal, Canada, and I have knowledge of the alleged incident in the Complaint in this matter and the circumstances surrounding this alleged incident.

    7.     I hired Plaintiff Michelle Trotter as a freelance chef on the M/Y Olga for a 10-day charter sailing out of the British Virgin Islands.

JA000056

8. At Plaintiff's request, she boarded the M/Y Olga on December 22, 2012, at Yacht Haven Marina, in St. Thomas, where the M/Y Olga had docked for provisioning on its way to the British Virgin Islands from Puerto Rico.

9. On December 22, 2012, the M/Y Olga departed St. Thomas and sailed to Scrub Island, British Virgin Islands.

10. Between December 26, 2012 and January 5, 2013, the M/Y Olga did not sail within the navigable waters of St. Thomas, U.S. Virgin Islands.

11. Furthermore, the other crew members of the M/Y Olga, have knowledge of this alleged incident and the circumstances surrounding this alleged incident, including:

      a. Deckhand Patricio Ramirez, is a resident of Mexico;
      b. Chief Stewardess Sara Herrera, is a resident of Mexico;
      c. Second Stewardess Khajeewan Kongtup, is a resident of Thailand;
      d. Mate David Mc-Coy, is a resident Fort Lauderdale, Florida.

12. Additionally, I believe that employees of the Scrub Island Resort, Spa & Marina, in the British Virgin Islands, have knowledge of this alleged incident and the circumstances surrounding this alleged incident.

13. Following the alleged incident, Plaintiff was transported to Peebles Hospital in Tortola, British Virgin Islands and treated for her alleged injuries. The Peebles Hospital personnel have knowledge of this alleged incident and Plaintiff's alleged injuries.

14. Between December 26, 2012 and January 5, 2013, the M/Y Olga did not sail within the navigable waters of St. Thomas, U.S. Virgin Islands.

15. I am not aware of any witnesses or evidence regarding the alleged incident in the Complaint who are in the U.S. Virgin Islands.

FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 2 6, 2015

CAPTAIN BERNARD CALOT
M/Y OLGA

SWORN TO AND SUBSCRIBED before me this _26_ day of February, 2015,

by _Bernard Calot_____, who is personally known to me or who has produced

_Drivers License_____ as identification.



_____
Galla M. Gumadlas
Notary Public

Notary Seal  **GALLA M. GUMADLAS**
MY COMMISSION # FF199427
**EXPIRES February 15, 2019**
(407) 398-0153    FloridaNotaryService.com

My Commission expires: Feb. N, 2019

# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| MICHELLE TROTTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No.:    3:14-cv-00099 |
| | ) | |
| vs. | ) | |
| | ) | ACTION FOR DAMAGES |
| 7R HOLDINGS, LLC, LUIS A. RUBI | ) | |
| GONZALEZ, M/Y OLGA., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

### Affidavit of Andrew M Thorp

I, Andrew M Thorp, of Craigmuir Chambers, Road Town, Tortola, Britambers, Road Town, Tortola, British Virgin Islands **MAKE OATH** and state as follows:

1. I obtained a Diploma at the Chester College of Law having graduated with a Bachelor of Laws Degree from the University of Nottingham (LLB) Hons in 1994.

2. I am a Partner in the law firm of Harneys Westwood & Riegels, Craigmuir Chambers, Road Town, Tortola, British Virgin Islands ("Harneys") and Head of the Litigation and Insolvency Department.

3. I have been practicing as a Solicitor of the Eastern Caribbean Supreme Court in its jurisdiction in the British Virgin Islands (hereinafter "the BVI") since 2005.

4. I am also qualified as a solicitor of the Supreme Court of England and Wales, enrolled in 1998.

5. For approaching a decade, I have advised major international law firms, banks, investment funds and trust companies on all aspects of BVI contentious law.

6. I do cross-border work and have a particular interest in international asset tracing and preservation. Much of my focus is on pre-emptive remedies including freezing orders, provisional liquidator appointments and discovery orders, often against a background of fraud. I have been instructed on successful asset retrieval matters across Asia, the CIS and South America on behalf of various banks and insolvency professionals, most recently in July 2013, by a major Russian bank leading teams from Harneys'BVI and Cyprus offices in the successful retrieval of collateral.

7. Since the onset of the global financial crisis, I have been at the forefront of developing insolvency law in the BVI. I successfully led the legal teams in the seminal hedge fund cases of Barfield Nominees v Westford Special Situations Fund Limited and Aris Multi-Strategy Lending Fund Ltd v Quantek Opportunity Fund, Ltd that have set the BVI apart and defined the status of creditors and the ability of hedge funds to continue in the face of illiquidity. Most recently, I led the successful appeal in Monarch Pointe Ltd (in liquidation) that decided the order of distribution of assets in BVI liquidations.

8. I have recently pioneered a number of cross-border protocols between court appointed officers and have advised on restructuring and corporate rescue procedures. I am Chairman of RISA (Restructuring and Insolvency Professionals Association) in the British Virgin Islands and a member of COMBAR and the Chancery Bar Association.

9. I am also experienced in tort and personal injury litigation. Most notably, I acted on the English class action against the United States drug producer Merck & Co, which ultimately contributed to the withdrawal of the Vioxx pharmaceutical drug.

10. I have been asked to prepare this Affidavit on certain aspects of the laws of the British Virgin Islands in support of the motion by Defendants 7R HOLDINGS, LLC, LUIS A. RUBI GONZALEZ and M/Y OLGA's to dismiss the action brought in St. Thomas, U.S. Virgin Islands on *forum non conveniens* grounds. I make this Affidavit based on my personal knowledge, professional experience and knowledge of the laws of the BVI.

11. All the facts and matters deposed herein are true to the best of my information and belief. Exhibited to this affidavit and marked "AMT-1" is a bundle of true copy authorities which I believe are relevant and to which I have referred to herein.

12. The Court system in the BVI is a part of the Court system of the Eastern Caribbean Supreme Court and is based on the system of law developed in Great Britain. Our Courts have a hierarchal system and the Magistrate's Court is the first level. There is also a High Court of Justice which is presided over by a single judge and a Commercial Division of the High Court which is presided over by a High Court Judge and which deals with claims which are commercial in nature and which involve a claim of at least US$500,000. There is a Court of Appeal of the Eastern Caribbean which sits in rotation in the various territories and which is presided over by three Justices of Appeal. The final appellate Court is Her Majesty's Judicial Committee of The Privy Council which sits in London and which is presided over by a panel of five (5) Law Lords.

13. I have seen a copy of the Plaintiff's complaint in this matter ("the Complaint"). The Complaint asserts that the incident giving rise to the claim took place in the BVI, the vessel was located in the BVI and the incident involved persons living and working here, including employees at Scrub Island Resort, Spa & Marina.

14. The laws of the BVI in respect of claims in tort, follows the common law principles of tort. Such matters are routinely dealt with by our Courts and there is a wide body of jurisprudence on this aspect of the law.

15. The BVI is home to many companies incorporated under the British Virgin Islands Business Companies Act, 2004. These companies transact business all over the world, and frequently these Business Companies become involved in litigation. Given the cross border nature of many of the disputes issued in the BVI, *forum non conveniens* and jurisdictional arguments are regularly raised in the BVI Courts. In summary, and on review of the Complaint, the BVI Courts are likely to accept jurisdiction to hear this matter as set out below.

JA000061

## JURISDICTION

16. A claimant can start proceedings in the BVI against a defendant if that defendant is resident, domiciled or present within the BVI and upon whom service may be effected. Alternatively, the BVI Courts will assume jurisdiction over a party and give leave for process to be served outside of the jurisdiction subject to the claim falling within one of the established statutory gateways.[1] A claimant can also, in certain circumstances, bring claims in the same action against different parties who are within and outside the jurisdiction[2].

17. 7R HOLDINGS LLC, LUIS A. RUBIGONZALEZ and M/Y OLGA's have, I am instructed, agreed to submit to the jurisdiction of the BVI Courts and to accept service in the BVI for the matter of MICHELLE TROTTER. In any event, had the Defendants not agreed to voluntarily submit to the Courts of the BVI, I am of the view that the BVI Court would have been prepared to accept jurisdiction and grant leave for the Defendants to be served outside of the jurisdiction because the claim is founded in tort. EC CPR 7.3(4) provides for "service out" when a "*claim in tort is made and the act causing the damage was committed within the jurisdiction or the damage was sustained within the jurisdiction.*"

18. In the BVI the principles applicable to a "*forum non conveniens*" application are well established and are set out in the speech of Lord Geoff of Chievely in the leading case of *Spiliada Maritime Corporation 1987 AC 46.* I am not aware of the relevant applicable rules that apply in the Court of the Unites States when considering what the most appropriate forum for a matter would be, however briefly set out below are considerations that the BVI Court would consider for the purposes of ascertaining the most appropriate jurisdiction.

---

[1] EC CPR Part 7
[2] *IPOC International Growth Fund v LV Finance Group Limited et al, BVI Civ App Nos 20 of 2003 and 1of 2004 19 September 2005*

19. The Spiliada principles have been followed and applied by the Eastern Caribbean Supreme Court in numerous cases and in *IPOC International Growth Fund v LV Finance Group Limited et al, BVI Civ App Nos 20 of 2003 and 1of 2004 19 September 2005* Gordon JA at paragraph 27 adopted and summarised the Spiliada principles and indicated as follows:

> "…*When considering whether to grant a stay or not, the Court will look to what is the "natural forum" as was described by Lord Keith of Kinkel in* **The Abidin Daver**[3]*, "that with which the action has the most real and substantial connection." In this connection the Court will be mindful of the availability of witnesses, the likely languages that they speak, the law governing the transactions or to which the fructification of the transactions might be subject, in the case of actions in tort, where it is alleged that the tort took place and the places where the parties reside and carry on business. The list of factors is by no means meant to be exhaustive but rather indicative of the kinds of consideration a Court should have in exercising its discretion….*"

20. I understand that many of the witnesses are employed at Scrub Island Resort, Spa & Marina or Peebles Hospital in the BVI and residents of the BVI, and are therefore are subject to the compulsory processes of the BVI Courts, including being subject to appear as party witnesses and or by summons to give evidence. However, in the event that the USVI proceedings remain, in order to facilitate the attendance of the witnesses based in the BVI, there will be inevitable costs for their travel to and from St Thomas.

21. The law of the BVI is based on the English common law and has been extended to the BVI by the Common Law (Declaration of Application) Act (Cap 13). Under section 13 of the Eastern Caribbean Supreme Court Act, the principles of English equity also apply. As a result, the common law of the British Virgin Islands is largely identical with that of England (except as modified by statute). In addition, the laws of the BVI can be found in statutes enacted by the Legislative Council of The Virgin Islands, as well as in judicial decisions both of the Eastern Caribbean Supreme Court and The Privy Council. BVI Courts rely on the doctrine of the *stare decisis*. In addition, in the absence of any BVI

---

[3] [1984] AC 398

authority on point decisions of the English Courts are of strong persuasive authority. In the absence of some local consideration to justify a deviation, the BVI Courts are unlikely to differ from the decisions of the English Courts (whilst not strictly binding). Decisions of the Courts of the Commonwealth are also of persuasive precedent in BVI Courts. Decisions of the Privy Council in matters arising from the BVI are binding on the BVI Courts. There is therefore a high level of certainty as it relates to judicial authorities. It is my understanding that there are some material differences between the substantive and procedural law of the United States and that of the BVI.

## BVI PROCEDURE

22. The trial would proceed in accordance with The Eastern Caribbean Supreme Court Procedure Rules 2000. These rules are modelled largely on the English Civil Procedure Rules as well as procedural reforms in Canada. The parties will be required to file their statement of case (claim form, statement of claim, defence and reply and if necessary counterclaim and ancillary claim), prepare witness statements and case summaries. The rules begin with a single guiding principle for their interpretation namely the "overriding objective". The "overriding objective" is to enable the Court to deal with cases justly. This novel requirement is to ensure the parties are on an equal footing, save expense, deal with the case proportionately, ensure that each case is dealt with expeditiously, and allot to the case an appropriate share of the Court's resources.

23. At the heart of the new rules is the concept of active case management, by which the procedural Judge or Case Management Master takes a "hands-on" proactive approach from the outset of the litigation. Dependent of course on the sensitivity of the case, active case management includes encouraging the parties to cooperate with each other throughout the proceedings; "front-loading" cases; disposing of some issues summarily; encouraging the parties to use ADR and promoting early settlement; and fixing timetables and giving tight deadlines with strict penalties for non-compliance. As a result, the Court now manages the progress of litigation to avoid delay and ensure consistency with the overriding objective.

24. The Plaintiff (called the Claimant) must prove his pleaded case on the balance of probabilities. Disclosure of relevant documents takes place by each party providing appropriate lists and subsequent discovery. A party is under a duty to provide disclosure that both assists and undermines his case. The trial will take place at a time fixed by the Court and notified to all the parties. The taking of evidence is public, and attendance of the parties would be required. Attendance of witnesses can be compelled by subpoena (summons). The written witness statements usually stand as the evidence in chief of each maker of such statement and parties will have the right to cross-examine each other and each other's witnesses based on their witness statements. Witnesses who have been summoned, must appear and testify and may be penalized for their failure to do so. Written transcripts of the proceedings would be available to all parties at a reasonable cost.

25. Parties would be entitled to present such evidence as exists and is relevant, including photographs, documents, reports of experts and any other material, and would be required to disclose such material prior to trial as a usual part of the discovery process.

26. The judicial system in the BVI functions well and enjoys very favourable international repute. The judges and persons involved at all levels of the system are well accustomed to the demands of the commercial world and important cases of an international nature and involving very substantial sums of money, main jurisdictions and multiple counsel are regularly litigated with dispatch in our Courts. Accordingly, there is a high likelihood that the Plaintiff's case would be handled expeditiously in this system. A written judgment would be given by the judge and any party who is not satisfied with the decision can avail itself of the appeal process.

27. A successful plaintiff/ judgment creditor in the BVI will also be able to avail himself of the various methods of enforcing a BVI judgment against a judgment debtor if the judgment is not satisfied by a monetary payment. Such methods which include, and are not limited to, execution against the judgment debtor's assets located within the jurisdiction.

JA000065

28. Residents of the British Virgin Islands who are witnesses in the matter will not be bound by a subpoena issued by the District Court of the Virgin Islands or any other Court and the intervention of the BVI Court system will be required to facilitate this. This would necessarily add to the time, and costs of accommodating the travel of all witnesses to St. Thomas. Even in such an instance, it is extremely unlikely that the BVI Court could compel persons to travel outside the jurisdiction to testify in a civil trial.

**CONCLUSION**

29. The Courts of the BVI are an available forum and, given the submission of the Defendants to the jurisdiction, the locus in quo and residency of witnesses would, as a matter for BVI law be deemed the most appropriate forum in which the matter should be heard.

30. The Courts of the BVI are independent and efficient and have jurisdiction in this matter. The law of tort and damages, and the general law will provide adequate remedies for the Plaintiff, and he is assured a fair trial. There is a Statute of Limitations in the BVI, which requires that the Claimant brings his claim before the expiration of the six (6) year limitation prescribed in the Limitation Act, Cap 43 but limitation is not likely to be an issue in this case given the asserted date of the incident.

Sworn by the said Andrew )
Thorp at Road Town )
Tortola, British Virgin Islands )  _____
this  5 day of March 2015, )     Andrew Thorp
Before me: )



_____
A NOTARY PUBLIC OF THE
BRITISH VIRGIN ISLANDS



IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| MICHELLE TROTTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No.: 3:14-cv-00099 |
| | ) | |
| vs. | ) | |
| | ) | ACTION FOR DAMAGES |
| 7R HOLDINGS, LLC, LUIS A. RUBI | ) | |
| GONZALEZ, M/Y OLGA., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## **Certificate of Exhibits**

I, hereby certify that these are the documents referred to in the Affidavit of Andrew M Thorp sworn to herein as **"AMT-1."**

Dated this 5 day of March 2015



NOTARY PUBLIC OF THE
BRITISHVIRGIN ISLANDS

JA000068

# Eastern Caribbean Supreme Court

### PART 1
### THE OVERRIDING OBJECTIVE

| Rule 1.1 | The Overriding Objective | EC CPR 1.1 |
| Rule 1.2 | Application of overriding objective by the court | EC CPR 1.2 |
| Rule 1.3 | Duty of Parties | EC CPR 1.3 |

### PART 2
### APPLICATION AND INTERPRETATION OF THESE RULES

| Rule 2.1 | Citation and Commencement | EC CPR 2.1 |
| Rule 2.2 | Application of these Rules | EC CPR 2.2 |
| Rule 2.3 | Application of Interpretation Acts | EC CPR 2.3 |
| Rule 2.4 | Definitions | EC CPR 2.4 |
| Rule 2.5 | Who may exercise the powers of the court | EC CPR 2.5 |
| Rule 2.6 | Court staff | EC CPR 2.6 |
| Rule 2.7 | Court's discretion as to where, when and how it deals with cases | EC CPR 2.7 |

### PART 3
### TIME, DOCUMENTS

| Rule 3.1 | Time – court to state calendar date | EC CPR 3.1 |
| Rule 3.2 | Time – computation | EC CPR 3.2 |
| Rule 3.3 | Vacations | EC CPR 3.3 |
| Rule 3.4 | Hearings in vacations | EC CPR 3.4 |
| Rule 3.5 | Time – vacations | EC CPR 3.5 |
| Rule 3.6 | Documents | EC CPR 3.6 |
| Rule 3.7 | Filing of documents | EC CPR 3.7 |
| Rule 3.8 | Filing and service by FAX | EC CPR 3.8 |
| Rule 3.9 | Sealing of documents issued by the court | EC CPR 3.9 |

This is an unofficial consolidation produced by Harney Westwood & Riegels
May 2014

Case: 16-1967-000 Document: 003112896905 Page: 47 Date Filed: 09/01/2016

EC CPR 7

# PART 7
# SERVICE OF COURT PROCESS OUT OF JURISDICTION

| Rule 7.1 | Scope of this Part | EC CPR 7.1 |
| Rule 7.2 | General rule as to service of claim form out of jurisdiction | EC CPR 7.2 |
| Rule 7.3 | Service of claim form out of jurisdiction in specified proceedings | EC CPR 7.3 |
| Rule 7.4 | Proceedings which include other types of claim | EC CPR 7.4 |
| Rule 7.5 | Permission to serve claim form out of jurisdiction | EC CPR 7.5 |
| Rule 7.6 | Acknowledgment of service and defence where claim form served out of the jurisdiction | EC CPR 7.6 |
| Rule 7.7 | Application to set aside service under rule 7.3 | EC CPR 7.7 |
| Rule 7.8 | Mode of service of claim form – general provisions | EC CPR 7.8 |
| Rule 7.8A | Mode of service – alternative procedure | EC CPR 7.8A |
| Rule 7.8B | Power of court to dispense with service of the claim form | EC CPR 7.8B |
| Rule 7.9 | Service of claim form through foreign governments, or judicial and consular authorities | EC CPR 7.9 |
| Rule 7.10 | Procedure where claim form is to be served through foreign governments, etc. | EC CPR 7.10 |
| Rule 7.11 | Service of claim form on a State where court permits service out of jurisdiction | EC CPR 7.11 |
| Rule 7.12 | Translation of claim form | EC CPR 7.12 |
| Rule 7.13 | Undertaking to be responsible for expenses of minister with responsibility for foreign affairs | EC CPR 7.13 |
| Rule 7.14 | Service of court process other than claim form | EC CPR 7.14 |
| *Practice Direction 7 – Service of Claim Form out of Jurisdiction* | | EC PD 7 |

JA000070

**EC CPR 7.1**

**7.1    Scope of this Part**

(1)       This Part contains provisions about the –

      (a)    circumstances in which court process may be served out of the jurisdiction; and

      (b)    procedure for serving court process out of the jurisdiction.

(2)       In this Part references to service or filing copies of the claim form include –

      (a)    the statement of claim (unless contained in the claim form); or

      (b)    an affidavit in support of the claim, if these Rules so require; and

      (c)    if permission has been given under rule 8.2 to serve the claim form without the statement of claim a copy of the order giving permission.

**EC CPR 7.2**

**7.2    General rule as to service of claim form out of jurisdiction**

A claim form may be served out of the jurisdiction only if –

      (a)    rule 7.3 allows; and

      (b)    the court gives permission.

**EC CPR 7.3**

**7.3    Service of claim form out of jurisdiction in specified proceedings**

(1)       The court may permit a claim form to be served out of the jurisdiction if the proceedings are listed in this rule.

*Features which may arise in any type of claim*

(2)       A claim form may be served out of the jurisdiction if a claim is made –

      (a)    against someone on whom the claim form has been or will be served, and –

            (i)    there is between the claimant and that person a real issue which it is reasonable for the court to try; and

            (ii)    the claimant now wishes to serve the claim form on another person who is outside the jurisdiction and who is a necessary or proper party to that claim;

      (b)    for an injunction ordering the defendant to do or refrain from doing some act within the jurisdiction; or

      (c)    for a remedy against a person domiciled or ordinarily resident within the jurisdiction.

*Claims about contracts*

(3)       A claim form may be served out of the jurisdiction if –

JA000071

4

(a) a claim is made in respect of a breach of contract committed within the jurisdiction;

(b) a claim made in respect of a contract where the contract -

    (i) contains a term to the effect that the court shall have jurisdiction to determine any claim in respect of the contract; or

    (ii) is by its terms or by implication governed by the law of any Member State or Territory;

    (iii) was made by or through an agent trading or residing within the jurisdiction; or

    (iv) was made within the jurisdiction; or

(c) the claim is for a declaration that no contract exists, where, if the contract did exist, it would fulfill one or more of the conditions in sub-paragraph (b) of this rule.

*Claims in tort*

(4) A claim form may be served out of the jurisdiction if a claim in tort is made and the act causing the damage was committed within the jurisdiction or the damage was sustained within the jurisdiction.

*Enforcement*

(5) A claim form may be served out of the jurisdiction if a claim is made to enforce any judgment or arbitral award which was made by a foreign court or tribunal and is amenable to be enforced at common law.

*Claims about property within the jurisdiction*

(6) A claim form may be served out of the jurisdiction if the whole subject matter of the claim relates to property within the jurisdiction.

*Claims about companies*

(7) A claim form may be served out of the jurisdiction if the subject matter of the claim relates to –

    (a) the constitution, administration, management or conduct of the affairs; or

    (b) the ownership or control of a company incorporated within the jurisdiction.

*Claims about trusts*

(8) A claim form may be served out of the jurisdiction if –

    (a) a claim is made for a remedy against the defendant as constructive trustee and the defendant's alleged liability arises out of acts committed within the jurisdiction;

    (b) a claim is made for –

JA000072



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# United Kingdom House of Lords Decisions

You are here: BAILII >> Databases >> United Kingdom House of Lords Decisions >> Spiliada Maritime Corp v Cansulex Ltd [1986] UKHL 10 (19 November 1986)
URL: *http://www.bailii.org/uk/cases/UKHL/1986/10.html*
Cite as: [1986] 3 WLR 972, [1987] ECC 168, [1986] UKHL 10, [1987] 1 FTLR 103, [1987] 1 Lloyd's Rep 1, [1987] AC 460, [1986] 3 All ER 843

[New search] [Buy ICLR report: [1986] 3 WLR 972] [Buy ICLR report: [1987] AC 460] [Help]

Judgment: 19.11.86

**HOUSE OF LORDS**

**SPILIADA MARITIME CORPORATION (APPELLANTS)**

v.

**CANSULEX LIMITED (RESPONDENTS)**

Lord Keith of Klnkel
Lord Templeman
Lord Griffiths
Lord Mackay of Clashfern
Lord Goff of Chieveley

**LORD KEITH OF KINKEL**

My Lords,

     I have had the benefit of reading in draft the speech to be delivered by my noble and learned friend Lord Goff of Chieveley. I agree with it and for the reasons he gives would allow the appeal and restore the order of Staughton J.

Case: 13-1967-000 Document: 003112896905 Page: 51 Date Filed: 09/01/2016

**LORD TEMPLEMAN**

My Lords,

In these proceedings parties to a dispute have chosen to litigate in order to determine where they shall litigate. The principles which the courts of this country should apply are comprehensibly reviewed and closely analysed in the speech of my noble and learned friend Lord Goff of Chieveley. Where the plaintiff is entitled to commence his action in this country, the court, applying the doctrine of forum non conveniens will only stay the action if the defendant satisfies the court that some other forum is more appropriate. Where the plaintiff can only commence his action with leave, the court, applying the doctrine of forum conveniens will only grant leave if the plaintiff satisfies the court that England is the most appropriate forum to try the action. But whatever reasons may be advanced in favour of a foreign forum, the plaintiff will be allowed to pursue an action which the English court has jurisdiction to entertain if it would be unjust to the plaintiff to confine him to remedies elsewhere.

In thr present case, a vessel managed partly in Greece and partly in England, ilying the flag of Liberia and owned by a Liberian corporation is said to have been damaged by a cargo loaded by a British Columbia shipper and carried from Vancouver to India. Both sets of insurers are English. Similar litigation took place in Canada concerning the vessel Roseline. Similar litigation took place in England over another vessel, the Cambridgeshire, after Staughton J. had refused to stay the action. If Staughton J. had good reason to try the Cambridgeshire, it is difficult to see that he had bad reason for trying the Spiliada.

The factors which the court is entitled to take into account in considering whether one forum is more appropriate are legion. The authorities do not, perhaps cannot, give any clear guidance as to how these factors are to be weighed in any particular case. Any dispute over the appropriate forum is complicated by the fact that each party is seeking an advantage and may be influenced by considerations which are not apparent to the judge or considerations which are not relevant for his purpose. In the present case, for example, it is reasonably clear that Cansulex prefer the outcome of the Roseline proceedings in Canada to the outcome of the Cambridgeshire proceedings in England and prefer the limitation period in British Columbia to the limitation period in England. The shipowners and their insurers hold other views. There may be other matters which naturally and Inevitably help to produce in a good many cases conflicting evidence and optimistic and gloomy assessments of expense, delay and inconvenience. Domicile and residence and place of incident are not always decisive.

In the result, it seems to me that the solution of disputes about the relative merits of trial in England and trial abroad is pre-eminently a matter for the trial judge. Commercial court judges are very experienced in these matters. In nearly every case evidence is on affidavit by witnesses of acknowledged probity. I hope that in future the judge will be allowed to study the evidence and refresh his memory of the speech of my noble and learned friend Lord Goff of Chieveley in this case in the quiet of his room without expense to the parties; that he will not be referred to other decisions on other facts; and that submissions will be measured in hours and not days. An appeal snoutd be rare and the appellate court should be slow to interfere. I agree with my noble and learned friend Lord Goff of Chieveley that there were no grounds for interference in the present case and that the appeal should be allowed.

**LORD GRIFFITHS**

My Lords,

      I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Templeman and Lord Goff of Chieveley. For the reasons they give I would allow the appeal.

## LORD MACKAY OP CLASHFERN

My Lords,

      I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Temple man and Lord Goff of Chieveley. I agree with them and for the reasons which they give I would allow the appeal.

## LORD GOFF OF CHIEVELEY

My Lords,

      There is before your Lordships an appeal, brought by leave of your Lordships' House, against a decision of the Court of Appeal (Oliver and Neill, L.J J.) whereby they reversed a decision of Staughton J. in which he refused an application by the respondents, Cansulex Ltd., to set aside leave granted ex parte to the appellants, Spiliada Maritime Corporation, to serve proceedings on the respondents outside the jurisdiction. The effect of the decision of the Court of Appeal was, therefore, to set aside the leave so granted and the proceedings served on the respondents pursuant to that leave.

### (1) The facts of the case

      As this appeal is concerned with an interlocutory application, I must, like the courts below, take the facts from the affidavit evidence filed on behalf of the parties. The appellants (whom I shall refer to as "the shipowners") claim to be (and can, for the purposes of this appeal, be accepted as being) the owners of a bulk carrier, of about 20,000 tonnes deadweight, called "Spiliada." The shipowners are a Liberian Corporation, and their vessel flies the Liberian flag; but their managers are in Greece, though some part of the management takes place in England. The respondents (whom I shall refer to as "Cansulex") carry on business in British Columbia as exporters of sulphur. The shipowners chartered their vessel to an Indian company called Minerals & Metals Trading Corporation of India Ltd. (whom I shall refer to as "M.M.T.C.") under a voyage charter dated 6 November 1980, for the carriage of a cargo of sulphur from Vancouver to Indian ports. The charterparty contained a London arbitration clause. Pursuant to that charterparty, the vessel proceeded to Vancouver and there loaded a cargo of sulphur between 18 and 25 November 1980. The sulphur was loaded on board

the vessel by order of Cansulex, who were f.o.b. setters of the sulphur to M.M.T.C. Bills of lading were then issued to, and accepted by, Cansulex. The bills were shipped bills, Cansulex being named as shippers in the bills. Clause 21 on the reverse of the bills of lading provided that, subject to certain clauses which are for present purposes immaterial, the bills of lading "no matter where issued, shall be construed and governed by English law, and as if the vessel sailed under the British Flag." The bills were signed by agents for and by authority of the Master. The cargo was discharged at ports in India between 29 December 1980 and 6 February 1981.

It has been alleged by the shipowners that the cargo of sulphur so loaded on the vessel was wet when loaded and as a result caused severe corrosion and pitting to the holds and tank tops of the vessel. The shipowners have claimed damages from Cansulex in respect of the damage so caused. The shipowners rely upon the age of the ship at the time of the voyage (she was then three years old) and the condition of the holds before and after the voyage. The shipowners have advanced their claim against Cansulex as shippers under the contract of carriage contained in or evidenced by the bills of lading to which I have already referred, basing their claim on Article 4, Rule 6, of the Hague Rules incorporated into the bills, and on a warranty implied by English law that dangerous cargo will not be shipped without warning. Arbitration proceedings have also been commenced by the shipowners against M.M.T.C. in London under the arbitration clause in the voyage charter. It is open to M.M.T.C. to bring arbitration proceedings in London against Cansulex under the sale contract between them, by virtue of the London arbitration clause in that contract. Leave was obtained by the shipowners to issue and serve a writ upon Cansulex outside the jurisdiction on a ground contained in the then R.S.C., Ord. 11, r. 1(1) (f)(iii), viz. that the action was brought to recover damages in respect of breach of a contract which was by its terms governed by English law.

Cansulex then applied for an order to set aside such leave and all subsequent proceedings. The application came before Staughton J. on 26 October 1984. The hearing of the application took place while there was proceeding before Staughton J. a very similar action, in which Cansulex were also defendants. That action concerned a ship called the Cambridgeshire^ owned by an English company, Bibby Bulk Carriers Ltd. in it, the owners claimed damages for damage alleged to have been caused to their vessel by a cargo of sulphur loaded on her at Vancouver in November and December 1980, for carriage to South Africa and Mozambique. The defendants in the action were the charterers of the ship, Cobelfret NV, and three shippers - Cansulex, Petrosul International Ltd., and Canadian Superior Oil Ltd. In that action, Cansulex (supported by Petrosul International Ltd., another Canadian company) who had been served with proceedings outside the jurisdiction on the same ground as in the present case, applied in September 1982 for the leave to serve proceedings upon them outside the jurisdiction, and all subsequent proceedings, to be set aside. Staughton J. heard that application and dismissed it, holding that there was a good arguable case that the Canadian companies were parties to a contract governed by English law, and that the case was a proper one for service out of the jurisdiction. There was no appeal from that decision. The trial of the Cambridgeshire action started on 15 October 1984, again before Staughton J. He recorded in his judgment in the present case that there were no less than 15 counsel engaged in the Cambridgeshire action; that each was equipped with 75 files; and that the then estimate for the length of the trial was six months.

There has been another set of proceedings concerning damage to a vessel alleged to have been caused by a wet sulphur cargo shipped at Vancouver. This concerned a ship called the Roseline. The matter came before a Canadian Federal Court in March 1984, the defendant being Petrosul International Ltd. The owners of the Roseline claimed a declaration that a contract existed between them and Petrosul under which disputes were to be referred to arbitration in Paris. The contract was said to have been contained in or evidenced by a bill of lading, in which Petrosul were named as shippers. Mrs. Justice Reed upheld a contention by Petrosul that they were not a party to any contract with the owners, or at least not a party to any contract containing an arbitration clause; her conclusion was reached on the basis that the bill of lading, in the hands of Petrosul, "partook of the nature of a receipt or a document of title," and that use for this purpose did not make the document a contractual one so far as Petrosul were concerned. There is doubt whether a similar conclusion would be reached in English law; Staughton J. was told that there was an unreported decision of Mustill J. (as he then was) to the contrary effect. However, Staughton J. held, and it is now accepted by Cansulex, that in the present case there is a good arguable case that Cansulex were parties to the bill of lading contract, and so parties to a contract governed by English law.

It is right that I should record that the judge was told that there were other disputes concerning similar damage to ships alleged to have been caused by sulphur loaded at Vancouver; but he knew no more about them.

**(2) The decision of Staughton J.**

The judge approached the application of Cansulex in the present case as follows.

Having concluded that there was a good arguable case that the shipowners and Cansulex were parties to a contract governed by English law, he then proceeded to consider whether the case had been shown to be, as a matter of discretion, a proper case for service out of the jurisdiction. He referred first to the decision of this House in Amin Rasheed Shipping Corporation v. Kuwait Insurance Co. [1984] A.C. 50, and in particular to certain passages (which I will quote later) from the speeches in that case of Lord Diplock, at p. 65, and Lord Wilberforce, at p. 72, and to a suggested conflict between those two passages; but, following a decision of the Court of Appeal in Ilyssia Compania Naviera S.A. v. Bamaodah [1985] 1 Lloyd's Rep. 107, he concluded that the suggested conflict was more apparent than real, and that the appropriate test for him to apply was that, if the English Court is shown to be distinctly more suitable for the ends of justice, then the case is a proper one for service out of the jurisdiction. He then said:

"In considering the exercise of discretion I must, of course, assume that the Spiliada action will come to trial eventually, either in England or in Canada. In fact, that seems to me improbable. After the Cambridgeshire proceedings have reached a final conclusion, with vast expenditure of money, time and effort, I think it very likely that the parties to the Spiliada dispute will have little appetite for litigation, and will reach a compromise. Cansulex feature as defendants in both actions, and are presently represented by the same solicitors and counsel in both. The plaintiff shipowners are, of course, different in the two actions, but they too are represented by the same solicitors and counsel, and it may be that they are supported by the same insurers. So I suspect that what I am in fact deciding is not where the Spiliada action will ultimately be tried, but whether a settlement will be reached against the background of litigation pending in England or of litigation pending in Canada. Nevertheless, it is the prospect of a trial which provides the sanction to induce a settlement, and in my judgment I must decide this application on the assumption that a trial there will be."

This was, so far as the Cambridgeshire action was concerned, a prescient observation. For, on 13 January 1985, the parties to that action settled their differences. Furthermore his thought that "it may be that they [the shipowners] are supported by the same insurers" was one which would certainly have occurred to other experienced commercial practitioners, and the judge's tentative inference that both the Cambridgeshire and the Spiliada were entered in the same P. and I. Club was confirmed before your Lordships; indeed the solicitors acting for the owners in both cases have commenced proceedings against a number of Canadian sulphur exporters, including Cansulex, on behalf of various shipowners all entered in the same P. & I. Club.

The judge then turned to consider the various factors which were said to influence the choice between an English and Canadian Court. I need not list them all. The most important were (1) availability of witnesses, (2) multiplicity of proceedings, and (3) a matter which was regarded as crucial by the judge, which I will call the Cambridgeshire factor and which relates to preparation for very substantial proceedings.

On availability of witnesses, the judge had this to say:

"Apart from those matters, I now have, after listening to the opening speech in the Cambridgeshire trial for 15 days, a somewhat clearer picture of what the relative importance of the issues is likely to be. The principal or most important events in the case occurred in Vancouver, but many events of significance occurred in many other places. The most important witnesses of fact will be from Cansulex and various other concerns in Vancouver, and the ship's officers. But there are likely to be a great many witnesses from other places. In the Cambridgeshire applications I concluded that, in terms of witness/hours, events in Vancouver were likely to

JA000077/15

loom largest at the trial. I am no longer convinced that that was right, even leaving out of account the expert evidence. Certainly, there will be a very substantial body of evidence dealing with events which did not take place in Vancouver. As to the expert witnesses, I am told that all but one of them in the Cambridgeshire are English. But, as I then said, experts can travel, or be replaced by other experts.

It is true that the Cambridgeshire plaintiffs are an English company and the ship is British, whereas the Spiliada plaintiffs are Liberian; so is their ship; and their managers are in Greece, although some part of the management takes place in England. That means that the Spiliada action has much less connection with England, but it does not give it any greater connection with Vancouver. It is also true that two witnesses in the Cambridgeshire action decline to come to England to give evidence, so that their evidence will have to be taken on commission in North America. Nevertheless, I reach the clear conclusion that Vancouver is not overall a more suitable place for trial than England in terms of the convenience of witnesses. Indeed, if one assumes that the parties will wish to have the same experts as in the Cambridgeshire, I would say that England is shown to be more suitable".

I should interpolate that the judge was not right in thinking that all but one of the experts in the Cambridgeshire action were English; in fact, two of the defendants' experts came from England and four from elsewhere (one from Canada, one from the United States, and two from Europe - from Scandinavia and Greece). This was drawn to the judge's attention at the end of his judgment. The judge then stated that he did not however regard this difference as significant - no doubt he had it in mind that all the owners' experts were from England.

Next, turning to the question of multiplicity of proceedings, he referred to the facts that Cansulex wished to join their insurers and possibly others as third parties, which they could only do in Canada, and that the shipowners wished to join M.M.T.C. as co-defendants with Cansulex, which would obviously be a sensible course if it could be achieved. As to the former, he gave the same weight to it as he did in the Cambridgeshire application; as to the latter, he gave less, because, whereas the relevant charterers were joined as co-defendants in the Cambridgeshire action, in the present case (following, it appears, lobbying by both sides) he felt that he should regard the shipowners' objective of joining M.M.T.C. as problematical.

Turning to the Cambridgeshire factor, which he regarded as crucial, the judge had this to say:

"But at the end of the day what seems to me important is this. Mr. Evans submits that Cansulex, having been put to the trouble and expense of bringing their witnesses and senior executives here once, should not have to bear the same burden again. Mr. Rokison replies that litigation is not like a football or cricket season, with one fixture at home and the other away. The trouble with such an attractive analogy or metaphor is that it tends to take one's eye off the ball, so to speak. Indeed, if all other things were equal, I should be inclined to hold that even-handed justice would be served best if one action were tried here and the other in Canada. But all other things are far from equal. The plaintiff's solicitors have made all the dispositions and incurred all the expense for the trial of one action in England; they have engaged English counsel and educated them in the various topics upon which expert evidence will be called; they have engaged English expert witnesses; and they have assembled vast numbers of documents. They have also, no doubt, educated themselves upon the issues in the action. All that has been done on behalf of Cansulex as well, save that one of their expert witnesses is Canadian. If they now wish to start the process again in Canada, that is their choice. But it seems to me that the additional inconvenience and expense which would be thrust upon the plaintiffs if this action were tried in Canada far outweighs the burden which would fall upon Cansulex if they had to bring their witnesses and senior executives here a second time.

There might have been an appeal from my decision on the Cambridgeshire applications, but there was not. I appreciate that there are a number of significant points of distinction between the two cases, including the principal ones that I have mentioned. It may then in a sense be hard on Cansulex if the decision reached on the Cambridgeshire applications should have the effect of determining their application in this case. But in my judgment it does, in the circumstances and for the reasons that I have mentioned. Overall it would be wasteful in

the extreme of talent, effort and money if the parties to this case were to have to start again in Canada. The case is a proper one for service out of the jurisdiction".

On that basis, the judge decided not to accede to Cansulex's application. After he had prepared his judgment, evidence was placed before him on behalf of the shipowners with regard to the relevant limitation period applicable in British Columbia. It transpired that that period was two years, and had expired by November 1982, long before the hearing of Cansulex's application before the judge. The shipowners sought to rely on this point, apparently on the basis that to send the case back to British Columbia would deprive them of a legitimate juridical advantage in this country. However the judge, having already concluded that the action should be tried here, irrespective of the time bar point, did not think it necessary to consider that matter.

### (3) The decision of the Court of Appeal

In the Court of Appeal, Neill L.J. (who delivered the first judgment) referred to the speech of Lord Diplock in Hadmor Productions Ltd. v. Hamilton [1983] 1 A.C. 191, 220 and both he and Oliver L.J. referred to the speech of my noble and learned friend Lord Brandon of Oakbrook in The Abidin Daver [1984] A.C. 398, 420, which state the limited grounds upon which an appellate court may interfere with the exercise of a trial judge's discretion. They also, like the judge, regarded themselves bound by the decision of the Court of Appeal in the Ilyssia case [1985] 1 Lloyds' Rep. 107 to regard the difference between the speeches of Lord Diplock and Lord Wilberforce in the Amin Rasheed case [1984] A.C. 50 as more apparent than real. Neill L.J. reviewed the judge's assessment of the various factors as follows. With regard to the availability of witnesses, he felt that, even on the judge's own analysis of the facts, the convenience of the parties and the witnesses probably tilted the scales towards British Columbia as the forum, but certainly did not show that an English court was "distinctly more suitable for the ends of justice." On multiplicity of proceedings, he saw force in the criticism of Mr. Goldsmith (counsel for Cansulex) that this was at most a neutral factor, and certainly did not bring the scales down heavily on the side of England. On the relevance of the Cambridgeshire factor, while rejecting Mr. Goldsmith's primary submission that the Cambridgeshire litigation was wholly irrelevant, he considered that the judge attached far too much importance to it. He said:

> "The fact that the London solicitors who are presently acting are firms of great eminence and the further fact that members of these firms have acquired detailed knowledge about the shipment of sulphur cargoes from Vancouver are pointers to trial in England but should not be regarded as of decisive importance if other factors tilt the balance the other way".

He held that it was impossible to conclude that the relevant factors, when taken together, showed that the English court was distinctly more suitable for the ends of justice. On this view of the case, it became necessary for him to consider the impact of the time bar in British Columbia. On that he adopted the view of Oliver L.J. that the existence of a time bar was a neutral factor. He therefore decided to allow the appeal.

Oliver L.J., like Neill L.J., accepted that they were bound to follow the decision of the Court of Appeal in the Ilyssia case, on the basis of which he thought it right to follow the view of Lord Wilberforce in the Amin Rasheed case; and he did not therefore accept the submission of Mr. Goldsmith for Cansulex that the judge had propounded the wrong test. He then considered the exercise of the judge's discretion. He reviewed the judge's assessment of the availability of witnesses in considerable detail; and pointed out that the judge had proceeded on an erroneous assumption that all the experts in the Cambridgeshire action were English. He went on to express the opinion that the supposed advantages of England as a forum were, in this respect, far less clear cut than the judge had appeared to have imagined. In his opinion, the highest that it could be put on the shipowners' side was that the factor of convenience of witnesses was neutral. He then considered the point of multiplicity of proceedings, and rejected criticism of the judge's approach because the point seemed to him to have played a neutral role in the judge's decision. Turning to the Cambridgeshire factor, he was very critical of the judge's approach. He summarised Mr. Goldsmith's principal criticism as follows:

"But what, Mr. Goldsmith asked forensically, does all that amount to beyond this, that the plaintiffs say, in effect, 'we wish, for the purposes of our own and because it is convenient to do so, to retain the services of particular legal advisers and experts who happen to be resident and practising in England. Therefore, our desire to retain English legal advisers makes England a more appropriate forum for the hearing of the dispute.'"

Oliver L.J., accepted that criticism as well-founded. He concluded that, in giving to the Cambridgeshire action the decisive and conclusive weight that he did, the judge erred in principle.

Finally, Oliver L.J. considered the impact of the time bar in British Columbia. He came to the conclusion that the time bar was not of itself a factor which ought to carry the day. The difficulty in the way of the shipowners' argument that, by sending the case to be tried in British Columbia, they would be deprived of a legitimate juridical advantage in that the action was not time-barred in England, was that what was one side's advantage must be another's disadvantage. This pointed, of course, to a time bar being regarded as a neutral factor. Even if, following the decision of Sheen J. in The Blue Wave [1982] 1 Lloyd's Rep. 151, it was to be treated as a factor on which the shipowners as plaintiffs could rely unless they had acted unreasonably in allowing the time bar to elapse in the relevant foreign jurisdiction, that could be of no benefit to the shipowners in the present case, because there was no evidence tendered on their behalf providing any satisfactory explanation why no steps were taken to ascertain what the law of British Columbia was. Furthermore, the factor of the time bar in British Columbia could not in any event be conclusive; because the evidence showed that it was open to the shipowners to sue Cansulex in the Federal Court in any Province in Canada. Accordingly, in agreement with Neill L.J., he decided that the appeal of Cansulex should be allowed.

### (4) Submissions of counsel

Before your Lordships, the shipowners submitted that the Court of Appeal, having accepted that the judge applied the correct test, went beyond their limited power of review of the exercise of the judge's discretion. The real reason for their intervention was that they disagreed with the weight attached by the judge to the Cambridgeshire factor and were then, it was submitted, over-astute to discover an error which would enable them to substitute their own discretion for his. For Cansulex, on the other hand, it was submitted that the Court of Appeal were fully entitled to interfere with the judge's exercise of his discretion, substantially for the reasons given by them; but it was further submitted that, in any event, both the judge and the Court of Appeal should have applied the more stringent test set out in the passage from Lord Diplock's speech in the Amin Rasheed case [1984] A.C. 50, 68, which, if correctly applied, should certainly have led to the same order as that made by the Court of Appeal.

In considering the submissions of counsel, for whose assistance I am most grateful, it is necessary to review the applicable principles. I say this for two particular reasons. First, since the courts below have been troubled by apparent differences between observations of Lord Diplock and Lord Wilberforce in the Amin Rasheed case, it is, I think, desirable that this House should now resolve those differences. Second, since the question of the relevance of a time bar has now arisen in a number of cases, including the present, it is desirable that this House should give further consideration to the relevance of what has been called a "legitimate personal or juridical advantage," with special reference to time bars. But, in any event, the law on this subject is still in a state of development; and it is perhaps opportune to review the position at this stage, and in particular to give further consideration to the relationship between cases where jurisdiction has been founded as of right by service of proceedings on the defendant within the jurisdiction, but the defendant seeks a stay of the proceedings on the ground of forum non conveniens, and cases where the court is invited to exercise its discretion, under R.S.C., Ord. 11, to give leave for service on the defendant out of the jurisdiction.

### (5) The fundamental principle

Spiliada Maritime Corp v Cansulex Ltd [1986] UKHL 10 (19 November 1986)    Case: 16-496700 Document 003042892805 Page: 58 Date Filed 09/05/2016   13 of 18

13

In cases where jurisdiction has been founded as of right, i.e. where in this country the defendant has been served with proceedings within the jurisdiction, the defendant may now apply to the court to exercise its discretion to stay the proceedings on the ground which is usually called forum non conveniens. That principle has for long been recognised in Scots law; but it has only been recognised comparatively recently in this country. In The Abidin Daver [1984] A.C. 398, 411, Lord Diplock stated that, on this point, English law and Scots law may now be regarded as indistinguishable. It is proper therefore to regard the classic statement of Lord Kinnear in Sim v. Robinow 1892 19 R. 665 as expressing the principle now applicable in both jurisdictions. He said, at p. 668:

"... the plea can never be sustained unless the court is satisfied that there is some other tribunal, having competent jurisdiction, in which the case may be tried more suitably for the interests of all the parties and for the ends of justice."

For earlier statements of the principle, in similar terms, see Longworth v. Hope 1865 3 M. 1049, 1053, per Lord President McNeill, and Clements v. Macaulay 1866 4 M. 583, 592, per Lord Justice-Clerk Inglis; and for a later statement, also in similar terms, see Societe du Gaz de Paris v. Societe Anonyme de Navigation "Les Armateurs Francais," 1926 S.C. (H.L.) 13 at p. 22, per Lord Sumner.

I feel bound to say that I doubt whether the Latin tag forum non conveniens is apt to describe this principle. For the question is not one of convenience, but of the suitability or appropriateness of the relevant jurisdiction. However the Latin tag (sometimes expressed as forum non conveniens and sometimes as forum conveniens) is so widely used to describe the principle, not only in England and Scotland, but in other Commonwealth jurisdictions and in the United States, that it is probably sensible to retain it. But it is most important not to allow it to mislead us into thinking that the question at issue is one of "mere practical convenience." Such a suggestion was emphatically rejected by Lord Kinnear in Sim v. Robinow 1892 19 R. 65 at p. 668, and by Lord Dunedin, Lord Shaw of Dumferline and Lord Sumner in Societe du Gaz case 1926 S.C. (H.L.) 13 at pp. 18, 19, and 22 respectively. Lord Dunedin said (at p. 18), with reference to the expressions forum non competens and forum non conveniens:

"In my view, 'competent' is just as bad a translation for 'competens' as 'convenient' is for 'conveniens.' The proper translation for these Latin words, so far as this plea is concerned, is 'appropriate.'"

Lord Sumner (at p. 22) referred to a phrase used by Lord Cowan in Clements v. Macaulay 1866 4 M. 583, 594, viz. "more convenient and preferable for securing the ends of justice," and said:

"... one cannot think of convenience apart from the convenience of the pursuer or the defender or the court, and the convenience of all these three, as the cases show, is of little, if any, importance. If you read it as 'more convenient, that is to say, preferable, for securing the ends of justice,' I think the true meaning of the doctrine is arrived at. The object, under the words 'forum non conveniens' is to find that forum which is the more suitable for the ends of justice, and is preferable because pursuit of the litigation in that forum is more likely to secure those ends.'

In the light of these authoritative statements of the Scottish doctrine, I cannot help thinking that it is wiser to avoid use of the word "convenience" and to refer rather, as Lord Dunedin did, to the appropriate forum.

### (6) How the principle is applied in cases of stay of proceedings

When the principle was first recognised in England, as it was (after a breakthrough in The Atlantic Star [1974] A.C. 436) in MacShannon v. Rockware Glass Ltd. [1978] A.C. 795, it cannot be said that the members of the Judicial Committee of this House spoke with one voice. This is not surprising; because the law on this topic was then in an early stage of a still continuing development. The leading speech was delivered by Lord Diplock. He put the matter as follows, at p. 812:

> "In order to justify a stay two conditions must be satisfied, one positive and the other negative; (a) the defendant must satisfy the court that there is another forum to whose jurisdiction he is amenable in which justice can be done between the parties at substantially less inconvenience or expense, and (b) the stay must not deprive the plaintiff of a legitimate personal or juridical advantage which would be available to him if he invoked the jurisdiction of the English court."

This passage has been quoted on a number of occasions in later cases in your Lordships' House. Even so, I do not think that Lord Diplock himself would have regarded this passage as constituting an immutable statement of the law, but rather as a tentative statement at an early stage of a period of development. I say this for three reasons. First, Lord Diplock himself subsequently recognised that the mere existence of "a legitimate personal or juridical advantage" of the plaintiff in the English jurisdiction would not be decisive: see The Abidin Daver [1984] 1 A.C. 398, 410, where he recognised that a balance must be struck. Second, Lord Diplock also subsequently recognised that no distinction is now to be drawn between Scottish and English law on this topic, and that it can now be said that English law has adopted the Scottish principle of forum non conveniens: see The Abidin Daver [1984] 1 A.C. 398, 411. It is necessary therefore now to have regard to the Scottish authorities; and in this connection I refer in particular, not only to statements of the fundamental principle, but also to the decision of your Lordships' House in the Societe du Gaz case 1926 S.C. (H.L.) 13. Third, it is necessary to strike a note of caution regarding the prominence given to "a legitimate personal or juridical advantage" of the plaintiff, having regard to the decision of your Lordships' House in Trendtex Trading Corporation v. Credit Suisse [1982] A.C. 679, in which your Lordships unanimously approved the decision of the trial judge to exercise his discretion to stay an action brought in this country where there existed another appropriate forum, i.e., Switzerland, for the trial of the action, even though by so doing he deprived the plaintiffs of an important advantage, viz. the more generous English procedure of discovery, in an action involving allegations of fraud against the defendants.

In my opinion, having regard to the authorities (including in particular the Scottish authorities), the law can at present be summarised as follows.

(1) The basic principle is that a stay will only be granted on the ground of forum non conveniens where the court is satisfied that there is some other available forum, having competent jurisdiction, which is the appropriate forum for the trial of the action, i.e. in which the case may be tried more suitably for the interests of all the parties and the ends of justice.

(2) As Lord Kinnear's formulation of the principle indicates, in general the burden of proof rests on the defendant to persuade the court to exercise its discretion to grant a stay (see, e.g., the Société du Gaz case, 1926 S.C.(H.L.) 13, 21, per Lord Sumner; and Anton, Private International Law (1967) p. 150). It is however of importance to remember that each party will seek to establish the existence of certain matters which will assist him in persuading the court to exercise its discretion in his favour, and that in respect of any such matter the evidential burden will rest on the party who asserts its existence. Furthermore, if the court is satisfied that there is another available forum which is prima facie the appropriate forum for the trial of the action, the burden will then shift to the plaintiff to show that there are special circumstances by reason of which justice requires that the trial should nevertheless take place in this country (see (f), below).

(3) The question being whether there is some other forum which is the appropriate forum for the trial of the action, it is pertinent to ask whether the fact that the plaintiff has, ex hypothesi, founded jurisdiction as of right in accordance with the law of this country, of itself gives the plaintiff an advantage in the sense that the English court will not lightly disturb jurisdiction so established. Such indeed appears to be the law in the United States, where "the court hesitates to disturb the plaintiff's choice of forum and will not do so unless the balance of factors is strongly in favor of the defendant,": see Scoles and Hay, Conflict of Laws (1982), p. 366, and cases there cited; and also in Canada, where it has been stated (see Castel, Conflict of Laws (1974), p. 282) that "unless the balance is strongly in favor of the defendant, the plaintiff's choice

Spiliada Maritime Corp v Cansulex Ltd (Case 16.4967900.09.01.007.030424896005) etc (Page 61.09.01.007.030424896005) etc (Page 61.09.01.007.030424896005) etc Page 41 of 18

15

of forum should rarely be disturbed." This is strong language. However, the United States and Canada are both federal states; and, where the choice is between competing jurisdictions within a federal state, it is readily understandable that a strong preference should be given to the forum chosen by the plaintiff upon which jurisdiction has been conferred by the constitution of the country which includes both alternative jurisdictions.

A more neutral position was adopted by Lord Sumner in the Société du Gaz case, 1926 S.C.(H.L.) 13, 21, where he said:

> "All that has been arrived at so far is that the burden of proof is upon the defender to maintain that plea. I cannot see that there is any presumption in favour of the pursuer."

However, I think it right to comment that that observation was made in the context of a case where jurisdiction had been founded by the pursuer by invoking the Scottish principle that, in actions in personam, exceptionally jurisdiction may be founded by arrest of the defender's goods within the Scottish jurisdiction. Furthermore, there are cases where no particular forum can be described as the natural forum for the trial of the action. Such cases are particularly likely to occur in commercial disputes, where there can be pointers to a number of different jurisdictions (see, e.g., European Asian Bank A.G. v. Punjab and Sind Bank [1982] 2 Lloyd's Rep. 356), or in Admiralty, in the case of collisions on the high seas. I can see no reason why the English court should not refuse to grant a stay in such a case, where jurisdiction has been founded as of right. It is significant that, in all the leading English cases where a stay has been granted, there has been another clearly more appropriate forum - in The Atlantic Star [1974] A.C. 436 (Belgium); in MacShannon's case [1978] A.C. 795 (Scotland); in Trendtex [1982] A.C. 679 (Switzerland); and in the The Abidin Daver [1984] A.C. 398 (Turkey). In my opinion, the burden resting on the defendant is not just to show that England is not the natural or appropriate forum for the trial, but to establish that there is another available forum which is clearly or distinctly more appropriate than the English forum. In this way, proper regard is paid to the fact that jurisdiction has been founded in England as of right (see MacShannon's case [1978] A.C. 795, per Lord Salmon); and there is the further advantage that, on a subject where comity is of importance, it appears that there will be a broad consensus among major common law jurisdictions. I may add that if, in any case, the connection of the defendant with the English forum is a fragile one (for example, if he is served with proceedings during a short visit to this country), it should be all the easier for him to prove that there is another clearly more appropriate forum for the trial overseas.

(4) Since the question is whether there exists some other forum which is clearly more appropriate for the trial of the action, the court will look first to see what factors there are which point in the direction of another forum. These are the factors which Lord Diplock described, in MacShannon's case [1978] A.C. 795, 812, as indicating that justice can be done in the other forum at "substantially less inconvenience or expense." Having regard to the anxiety expressed in your Lordships' House in the Société du Gaz case, 1926 S.C. (H.L.) 13 concerning the use of the word "convenience" in this context, I respectfully consider that it may be more desirable, now that the English and Scottish principles are regarded as being the same, to adopt the expression used by my noble and learned friend, Lord Keith of Kinkel, in The Abidin Daver [1984] A.C. 398, 415, when he referred to the "natural forum" as being "that with which the action has the most real and substantial connection." So it is for connecting factors in this sense that the court must first look; and these will include not only factors affecting convenience or expense (such as availability of witnesses), but also other factors such as the law governing the relevant transaction (as to which see Crédit Chimique v. James Scott Engineering Group Ltd., 1982 S.L.T. 131), and the places where the parties respectively reside or carry on business.

(5) If the court concludes at that stage that there is no other available forum which is clearly more appropriate for the trial of the action, it will ordinarily refuse a stay; see, e.g., the decision of the Court of Appeal in European Asian Bank A.G. v. Punjab and Sind Bank [1981] 2 Lloyd's Rep. 651. It is difficult to imagine circumstances when, in such a case, a stay may be granted.

(6) If however the court concludes at that stage that there is some other available forum which prima facie is clearly more appropriate for the trial of the action, it will ordinarily grant a stay unless there are circumstances by reason of which justice requires that a stay should nevertheless not be granted. In this enquiry, the court will consider all the circumstances of the case, including circumstances which go beyond those taken into account when considering connecting factors with other jurisdictions. One such factor can be the fact, if established objectively by cogent evidence, that the plaintiff will not

JA000083/15

obtain justice in the foreign jurisdiction; see the The Abidin Daver [1984] 1 A.C. 398, 411, per Lord Diplock, a passage which now makes plain that, on this enquiry, the burden of proof shifts to the plaintiff. How far other advantages to the plaintiff in proceeding in this country may be relevant in this connection, I shall have to consider at a later stage.


### (7) How the principle is applied in cases where the court exercises its discretionary power under R.S.C., Ord. 11


As I have already indicated, an apparent difference of view is to be found in the speeches of Lord Diplock and Lord Wilberforce in the Amin Rasheed case [1984] A.C. 50. In that case, Lord Diplock said at pp. 65-66:


"... the jurisdiction exercised by an English court over a foreign corporation which has no place of business in this country, as a result of granting leave under R.S.C., Ord. 11, r.l(l)(f) for service out of the jurisdiction of a writ on that corporation, is an exorbitant jurisdiction, i.e., it is one which, under general English conflict rules, an English court would not recognise as possessed by any foreign court in the absence of some treaty providing for such recognition. Comity thus dictates that the judicial discretion to grant leave under this paragraph of R.S.C., Ord. 11, r.l(l) should be exercised with circumspection in cases where there exists an alternative forum, viz. the courts of the foreign country where the proposed defendant does carry on business, and whose jurisdiction would be recognised under the English conflict rules."


Again, at p. 68, he said:


"... the onus under R.S.C., Ord. 11, r.4(2) of making it 'sufficient to appear to the court that the case is a proper one for service out of the jurisdiction under this order' lies upon the would-be plaintiff. Refusal to grant leave in a case falling within rule l(l)(f) does not deprive him of the opportunity of obtaining justice, because ex hypothesi there exists an alternative forum, the courts of the country where the proposed defendant has its place of business where the contract was made, which would be recognised by the English courts as having jurisdiction over the matter in dispute and whose judgment would be enforceable in England.

"The exorbitance of the jurisdiction sought to be invoked where reliance is based exclusively upon rule l(l)(f)(iii) is an important factor to be placed in the balance against granting leave. It is a factor that is capable of being outweighed if the would-be plaintiff can satisfy the English court that justice either could not be obtained by him in the alternative forum; or could only be obtained at excessive cost, delay or inconvenience."


In contrast, Lord Wilberforce said at p. 72:


"R.S.C., Ord. 11, r.1 merely states that, given one of the stated conditions, such service is permissible, and it is still necessary for the plaintiff (in this case the appellant) to make it 'sufficiently to appear to the court that the case is a proper one for service out of the jurisdiction under this Order' (r.4(2)). The rule does not state the considerations by which the court is to decide whether the case is a proper one, and I do not think we can get much assistance from cases where it is sought to stay an action started in this country, or to enjoin the bringing of proceedings abroad. The situations are different: compare the observations of Stephenson L.J. in Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amria) [1981] 2 Lloyd's Rep. 119, 129. The intention must be to impose upon the plaintiff the burden of showing good reasons why service of a writ, calling for appearance before an English court, should, in the circumstances, be permitted upon a foreign defendant. In considering this question the court must take into account the nature of the dispute, the legal and practical issues involved, such questions as local knowledge, availability of witnesses and their evidence and expense."

Spiliada Case 16-4967, Document 100-3, 12/29/2016, 1926905, Page 62 of 203    Case 1:16-cv-03345-LTS Document 1-6 Filed 09/01/2016 Page 18 of 18

17

In the Ilyssia case [1985] 1 Lloyd's Rep. 107, the Court of Appeal had to consider the apparent difference between the two approaches expressed by Lord Diplock and Lord Wilberforce. Ackner L.J. resolved the difference as follows, at p. 113:

> "Mr. Gross submits that Lord Diplock's statement was intended to be an exhaustive one. When reliance is based exclusively upon r.l(l)(f)(iii), it is only capable of being outweighed if the would-be plaintiff can satisfy the English court that either justice cannot be obtained by him in the alternative forum or could only be obtained at excessive cost, delay or inconvenience. Like Staughton J., I do not accept that submission. As I read the speech in the context of that case as a whole Lord Diplock was emphasising that where exclusive reliance is placed upon r.l(l)(f)(iii) then the burden of showing good reasons justifying service out of the jurisdiction is a particularly heavy one, and he illustrated this by the examples which he gave of the situations which were capable of tipping the balance in favour of the granting of leave. Thus construed, as the judge points out, there is no conflict between Lord Diplock's statement and that of Lord Wilberforce ... Lord Wilberforce there states that in order to decide whether the case is a proper one the court must take into account the nature of the dispute, the legal and practical issues involved, such questions as local knowledge, availability of witnesses and their evidence and expense."

May L.J. spoke in similar terms, at p. 118 of the report. The practical effect was, however, as is reflected in the judgment of Oliver L.J. in the present case, that the statement of principle of Lord Wilberforce was accepted as being the applicable principle.

With that conclusion, I respectfully agree; but I wish to add some observations of my own. The first is this. Lord Wilberforce said that he did not think that we can get much assistance from cases where it is sought to stay an action started in this country, or to enjoin the bringing of proceedings abroad; in this connection he referred to certain observations of Stephenson L.J. in Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amrla) [1981] 2 Lloyd's Rep. 119, 129. It is right to point out that, in the relevant passage in his judgment in that case, Stephenson L.J. was only expressing caution with regard to assimilating cases of a stay to enforce a foreign jurisdiction clause with cases of a stay on the principle of forum non conveniens under MacShannon's case. He was not addressing himself to the question of the applicable principles under R.S.C., Ord. 11, and, while sharing Lord Wilberforce's concern about help to be derived, in Order 11 cases, from cases where an injunction is sought to restrain proceedings abroad, I respectfully doubt whether similar concern should be expressed about help to be derived from cases of forum non conveniens. I cannot help remarking upon the fact that when Lord Wilberforce came, at the end of the passage from his speech which I have quoted, to state the applicable principle, his statement of principle bears a marked resemblance to the principles applicable in forum non conveniens cases. It seems to me inevitable that the question in both groups of cases must be, at bottom, that expressed by Lord Kinnear in Sim v. Robinow 1892 19 R. 665 668, viz. to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice. That being said, it is desirable to identify the distinctions between the two groups of cases. These, as I see It, are threefold. The first is that, as Lord Wilberforce indicated, in the Order 11 cases the burden of proof rests on the plaintiff, whereas in the forum non conveniens cases that burden rests on the defendant. A second, and more fundamental, point of distinction (from which the first point of distinction in fact flows) is that in the Order 11 cases the plaintiff is seeking to persuade the court to exercise its discretionary power to permit service on the defendant outside the jurisdiction. Statutory authority has specified the particular circumstances in which that power may be exercised, but leaves it to the court to decide whether to exercise its discretionary power in a particular case, while providing that leave shall not be granted "unless it shall be made sufficiently to appear to the court that the case is a proper one for service out of the jurisdiction" (see R.S.C., Ord. 11, r.4 (2)).

Third, it is at this point that special regard must be had for the fact stressed by Lord Diplock in the Amin Rasheed case [1984] A.C. 50, 65, that the jurisdiction exercised under Order 11 may be "exorbitant". This has long been the law. In Societe Generale de Paris v. Dreyfus Brothers (1885) 29 Ch.D. 239, 292-243, Pearson J. said:

> "It becomes a very serious question .... whether this court ought to put a foreigner, who owes no allegiance here, to the inconvenience and annoyance of being brought to contest his rights in this country, and I for one say, most

JA000085

distinctly, that I think this court ought to be exceedingly careful before it allows a writ to be served out of the jurisdiction."

That statement was subsequently approved on many occasions, notably by Farwell L.J. in The Hagen [1908] P.189, 201, and by Lord Simonds in your Lordships' House in Tyne Improvement Commissioners v. Armement Anversois S.A. (The Brabo) [1949] A.C. 326, 350. The effect is, not merely that the burden of proof rests on the plaintiff to persuade the court that England is the appropriate forum for the trial of the action, but that he has to show that this is clearly so. In other words, the burden is, quite simply, the obverse of that applicable where a stay is sought of proceedings started in this country as of right.

Even so, a word of caution is necessary. I myself feel that the word "exorbitant" is, as used in the present context, an old-fashioned word which perhaps carries unfortunate overtones: it means no more than that the exercise of the jurisdiction is extraordinary in the sense explained by Lord Diplock in the Amin Rasheed case [1984] A.C. 50, 65. Furthermore, in Order II cases, the defendant's place of residence may be no more than a tax haven to which no great importance should be attached. It is also significant to observe that the circumstances specified in Order 11, r. 1(1), as those in which the court may exercise its discretion to grant leave to serve proceedings on the defendant outside the jurisdiction, are of great variety, ranging from cases where, one would have thought, the discretion would normally be exercised in favour of granting leave (e.g., where the relief sought is an injunction ordering the defendant to do or refrain from doing something within the jurisdiction) to cases where the grant of leave is far more problematical. In addition, the importance to be attached to any particular ground invoked by the plaintiff may vary from case to case. For example, the fact that English law is the putative proper law of the contract may be of very great importance (as in BP Exploration Co. (Libya) Ltd. v. Hunt [1976] 1 W.L.R. 788, where, in my opinion, Kerr J. rightly granted leave to serve proceedings on Mr. Hunt out of the jurisdiction); or it may be of little importance as seen in the context of the whole case. In these circumstances, it is, in my judgment, necessary to include both the residence or place of business of the defendant and the relevant ground invoked by the plaintiff as factors to be considered by the court when deciding whether to exercise its discretion to grant leave; but, in so doing, the court should give to such factors the weight which, in all the circumstances of the case, it considers to be appropriate.

### (8) Treatment of "a legitimate personal or juridical advantage"

Clearly, the mere fact that the plaintiff has such an advantage in proceedings in England cannot be decisive. As Lord Sumner said of the parties in the Societe du Gaz case 1926 S.C. (H.L.) 13, 22:

"I do not see how one can guide oneself profitably by endeavouring to conciliate and promote the interests of both these antagonists, except in that ironical sense, in which one says that it is in the interests of both that the case should be tried in the best way and in the best tribunal, and that the best man should win."

Indeed, as Oliver L.J. pointed out in his judgment in the present case, an advantage to the plaintiff will ordinarily give rise to a comparable disadvantage to the defendant; and simply to give the plaintiff his advantage at the expense of the defendant is not consistent with the objective approach inherent in Lord Kinnear's statement of principle in Sim v. Robinow [1892] 19 R. 665, 668.

The key to the solution of this problem lies, in my judgment, in the underlying fundamental principle. We have to consider where the case may be tried "suitably for the interests of all the parties and for the ends of justice." Let me consider the application of that principle in relation to advantages which the plaintiff may derive from invoking the English jurisdiction. Typical examples are: damages awarded on a higher scale; a more complete procedure of discovery; a power to award interest; a more generous limitation period. Now, as a general rule, I do not think that the court should be deterred from granting a stay of proceedings, or from exercising Its discretion against granting leave under R.S.C. Ord. 11, simply because the plaintiff will be deprived of such an advantage, provided that the court is satisfied that substantial

justice will be done in the available appropriate forum. Take, for example, discovery. We know that there is a spectrum of systems of discovery applicable in various jurisdictions, ranging from limited discovery available in civil law countries on the continent of Europe to the very generous pre-trial oral discovery procedure applicable in the United States of America. Our procedure lies somewhere in the middle of this spectrum. No doubt each of these systems has its virtues and vices; but, generally speaking, I cannot see that, objectively, injustice can be said to have been done if a party is, in effect, compelled to accept one of these well-recognised systems applicable in the appropriate forum overseas. In this, I recognise that we appear to be differing from the approach presently prevailing in the United States: see, e.g., the recent opinion of Judge Keenan in the <u>Bhopal</u> case, in the District Court for the Southern District of New York, May 12 1986, where a stay of proceedings in New York, commenced on behalf of Indian plaintiffs against Union Carbide arising out of the tragic disaster in Bhopal, was stayed subject to (inter alia) the condition that Union Carbide was subject to discovery under the model of the United States Federal Rules of Civil Procedure after appropriate demand by the plaintiff. But in the <u>Trendtex</u> case [1982] A.C. 679, this House thought it right that a stay of proceedings in this country should be granted where the appropriate forum was Switzerland, even though the plaintiffs were thereby deprived of the advantage of the more extensive English procedure of discovery of documents in a case of fraud. Then take the scale on which damages are awarded. Suppose that two parties have been involved In a road accident in a foreign country, where both were resident, and where damages are awarded on a scale substantially lower than those awarded in this country. I do not think that an English court would, in ordinary circumstances, hesitate to stay proceedings brought by one of them against the other In this country merely because he would be deprived of a higher award of damages here.

But the underlying principle requires that regard must be had to the interests of all the parties and the ends of justice; and these considerations may lead to a different conclusion in other cases. For example, it would not, I think, normally be wrong to allow a plaintiff to keep the benefit of security obtained by commencing proceedings here, while at the same time granting a stay of proceedings in this country to enable the action to proceed in the appropriate forum. Such a conclusion is, I understand, consistent with the manner in which the process of saisie conservatoire is applied in civil law countries; and cf. section *26* of the Civil Jurisdiction and Judgments Act 1982, now happily in force. Again, take the example of cases concerned with time bars. Here a special problem arises from the fact that, in English law, limitation is classified as a procedural rather than as a substantive matter. Let me consider how the principle of forum non conveniens should be applied in a case in which the plaintiff has started proceedings in England where his claim was not time-barred, but there is some other jurisdiction which, in the opinion of the court, is clearly more appropriate for the trial of the action, but where the plaintiff has not commenced proceedings and where his claim is now time-barred. Now, to take some extreme examples, suppose that the plaintiff allowed the limitation period to elapse in the appropriate jurisdiction, and came here simply because he wanted to take advantage of a more generous time bar applicable in this country; or suppose that it was obvious that the plaintiff should have commenced proceedings in the appropriate jurisdiction, and yet he did not trouble to issue a protective writ there; in cases such as these, I cannot see that the court should hesitate to stay the proceedings in this country, even though the effect would be that the plaintiff's claim would inevitably be defeated by a plea of the time bar in the appropriate jurisdiction. Indeed a strong theoretical argument can be advanced for the proposition that, if there is another clearly more appropriate forum for the trial of the action, a stay should generally be granted even though the plaintiff's action would be time-barred there. But, in my opinion, this is a case where practical justice should be done. And practical justice demands that, if the court considers that the plaintiff acted reasonably in commencing proceedings in this country, and that, although it appears that (putting on one side the time bar point) the appropriate forum for the trial of the action is elsewhere than England, the plaintiff did not act unreasonably in failing to commence proceedings (for example, by issuing a protective writ) in that jurisdiction within the limitation period applicable there, it would not, I think, be just to deprive the plaintiff of the benefit of having started proceedings within the limitation period applicable in this country. This approach is consistent with that of Sheen J. in <u>The Blue Wave</u> [1982] 1 Lloyd's Rep. 151. It is not to be forgotten that, by making its jurisdiction available to the plaintiff - even the discretionary jurisdiction under R.S.C. Ord. 11 - the courts of this country have provided the plaintiff with an opportunity to start proceedings here; accordingly, if justice demands, the court should not deprive the plaintiff of the benefit of having complied with the time bar in this country. Furthermore, as the applicable principles become more clearly established and better known, it will, I suspect, become increasingly difficult for plaintiffs to prove lack of negligence in this respect. The fact that the court has been asked to exercise its discretion under R.S.C. Ord. 11, rather than that the plaintiff has served proceedings upon the defendant in this country as of right, is, I consider, only relevant to consideration of the plaintiff's conduct in failing to save the time bar in the other relevant alternative jurisdiction. The appropriate order, where the application of the time bar in the foreign jurisdiction is dependent upon its invocation by the defendant, may well be to make it a condition of the grant of a stay or the exercise of discretion against giving leave to serve out of the jurisdiction, that the defendant should waive the time bar in the foreign jurisdiction; this is apparently the practice in the United States of America.

JA000087

#### (9) Application of the principles to the facts of the present case

The judge proceeded on the basis that the relevant test was that "if the English court is shown to be distinctly more suitable for the ends of justice, then the case is a proper one for service out of the jurisdiction." The applicable principles are, I believe, as I have stated them to be; and the judge's approach was in accordance with those principles. I am therefore unable to accept the submission made on behalf of Cansulex that there was any material error of principle on the part of the judge.

I turn then to the question whether the Court of Appeal was entitled to interfere with the judge's exercise of his discretion. First, I take the criticism of the judge's assessment of the factor of availability of witnesses. It was said that he erred in thinking that all Cansulex's expert witnesses in the Cambridgeshire action were from England, whereas in fact two were from England, and four were from elsewhere. However, as I have recorded, this was drawn to his attention at the end of his judgment: he then took into account the true position, and said that this difference was not of significance. No doubt, in making that observation, he had it in mind that all the owners' expert witnesses in the Cambridgeshire action were from England. Next, Neill L.J. commented that "even on his own analysis of the facts the convenience of the parties and the witnesses probably tilted the scales towards British Columbia as the forum, but certainly did not show that an English court would be 'distinctly more suitable for the ends of justice.'" Similar observations were made by Oliver L.J. For my part, I consider, with all respect, that these comments were not justified. At this stage, the judge did not have to apply the overall test, but merely to assess the merits of the particular factor under consideration; and I cannot help but think that the judge, with all his experience derived from hearing a substantial part of the Cambridgeshire action, was better placed to make an assessment of this factor than the Court of Appeal.

Turning to the factor of multiplicity of proceedings, the judge referred to the possibility of M.M.T.C. being joined as co-defendants in the English proceedings as problematical. Before the Court of Appeal, Mr. Goldsmith submitted on behalf of Cansulex that the other proceedings were at most a neutral factor and certainly did not bring the scales down on the side of England. Neill L.J. saw force in this criticism. But, once again, the judge did not have to decide, and did not decide, that this particular factor was decisive of the case. Moreover, if (as I think) the judge gave weight to this factor, he was, in my judgment, entitled to do so. There is much to be said, in the interests of justice, in favour of the shipowners' claims against both Cansulex and M.M.T.C. being tried in the same proceedings; and, having regard to the advice given to M.M.T.C. by their solicitors, there was a prospect that, if it was decided that the case should be heard in England, M.M.T.C. would, acting in their own interests, accept their own solicitors' advice. Indeed, if this were to happen, it might also be agreed that a claim over by M.M.T.C. against Cansulex should be included in the same proceedings, rather than be arbitrated in London under an arbitration clause in the sale contract.

But the crucial point, in the judge's view, was the Cambridgeshire factor. This was regarded, certainly by Neill L.J., as relevant; and in this I find myself to be in agreement. The criticism of the judge's view of this factor goes, therefore, to its weight, as Neill L.J. indicated when he said that it seemed to him that the judge attached far too much importance to this factor. With all respect, however, when I read the judgments of both the Lords Justices, I consider that they underrated it. I believe that anyone who has been involved, as counsel, in very heavy litigation of this kind, with a number of experts on both sides and difficult scientific questions involved, knows only too well what the learning curve is like; how much information and knowledge has to be, and is, absorbed, not only by the lawyers but really by the whole team, including both lawyers and experts, as they learn about the interrelation of law, fact and scientific knowledge, having regard to the contentions advanced by both sides in the case, and identify in their minds the crucial matters on which attention has to be focussed, why these are the crucial matters, and how they are to be assessed. The judge in the present case has considerable experience of litigation of this kind, and is well aware of what is involved. He was, in my judgment, entitled to take the view (as he did) that this matter was not merely of advantage to the shipowners, but also constituted an advantage which was not balanced by a countervailing equal disadvantage to Cansulex; and (more pertinently) further to take the view that having experienced teams of lawyers and experts available on both sides of the litigation, who had prepared for and fought a substantial part of the Cambridgeshire action for Cansulex (among others) on one side and the relevant owners on the other, would contribute to efficiency, expedition and economy - and he could have added, in my opinion, both to assisting the court to reach a just resolution, and to promoting a possibility of settlement, in the present case. This is not simply a matter, as Oliver L.J. suggested, of financial advantage to the

shipowners; it is a matter which can, and should, properly be taken into account, in a case of this kind, in the objective interests of justice.

For these reasons alone, I am of the opinion that this is a classic example of a case where the appellate court has simply formed a different view of the weight to be given to the various factors, and that this was not, therefore, an appropriate case for interfering with the exercise of the judge's discretion. But, in addition, there are two other factors which the judge could, but did not, take into account, in support of the conclusion which he in fact reached. First, he was, in my judgment, entitled to take into account, in assessing the Cambridgeshire factor, the fact that, although the owners in the two cases were different, the solicitors for the owners were in both cases instructed by the same insurers; and he was also entitled to take into account that the insurers of the shipowners in the present case are managed in England. Usually this is a matter of no concern in English litigation; because, in subrogation claims, the action is in this country (unlike other countries) brought in the name of the assured, and the rights being enforced are the rights of the assured. But in the case of an application such as that in the present case, it is shutting one's eyes to reality to ignore the fact that it is the insurers who are financing the litigation and are do minus litis; and this is, in my view, a relevant factor to be taken into account (see the Societe du Gaz case 1926 S.C. (H.L.) 13 at p. 20, per Lord Sumner). Second, it was a relevant factor that this litigation was being fought under a contract of which the putative governing law was English law, and that this was by no means an insignificant factor in the present case, since there was not only a dispute as to the effect of the bill of lading contract (as to which, as I have already recorded, there appears to be some difference of opinion between English and Canadian judges), but also, it appears, as to the nature of the obligations under the contract in respect of what is usually called dangerous cargo. However, had the judge taken these matters into account, they would only have reinforced the conclusion which he in fact reached.

## (10) The effect of the time bar in British Columbia

On the view of the case which I have formed, it is not strictly necessary to consider the effect of the time bar in British Columbia; but, since the point has been fully argued before us, I propose briefly to express my views upon it.

First, I cannot think that the fact (if it be the case) that the shipowners' claim was not time-barred if brought in the Federal Courts of Canada in Provinces other than British Columbia - one suggestion was the Federal Court sitting in the neighbouring Province of Alberta - was - of any relevance. On this, I accept the submission of the shipowners that it cannot be in the interests of the parties or in the interests of justice that the action should effectively be remitted to a forum which cannot be described as appropriate for the trial of the action.

Second, I do not think that the discretionary power which is, I understand, vested in the courts of British Columbia to waive the time bar, is relevant in this case. The point is simply that the shipowners' claim is not time-barred in England but may be treated as time-barred in British Columbia. In these circumstances, the question inevitably arises whether the English court, if it were minded to set aside the leave to serve proceedings on Cansulex out of the jurisdiction, should do so on the condition that Cansulex should waive any right to rely on the time bar applicable in British Columbia.

So it is necessary to consider whether justice required the imposition of such a term. The evidence before the Court Appeal showed that neither the shipowners nor their legal advisers were aware of the two-year limitation period applicable in British Columbia. Cansulex did not draw the matter to their attention in their affidavit evidence; the shipowners' solicitors simply stumbled upon it when investigating the availability of suitable lawyers in Vancouver. Next, although Cansulex had applied to the English court to set aside the proceedings in the Cambridgeshire action, they had not appealed from the judge's adverse decision on the point and the Cambridgeshire action had proceeded to trial. Furthermore, had the shipowners' solicitors considered the matter, experience would have indicated that, having regard to the law as generally understood to prevail before the decision of this House in the Amin Rasheed case [1984] A.C. 50, in which the speeches were delivered in July 1983, and to the prominence hitherto given to legitimate personal and juridical advantages in the English jurisdiction (see, in particular, the decisions of the Court of Appeal in Brittannia Steamship

Insurance Association Ltd. v. Ausonia Assicurazioni S.p.A. [1984] 2 Lloyd's Rep. 98 and the Ilyssia case [1985] 1 Lloyd's Rep. 107), it was improbable that any different conclusion would be reached on an application to set aside the leave granted in the present case. In this connection, it is to be observed that the shipowners' cause of action against Cansulex in the present case must have accrued in November 1980 (when the loading of the cargo on board the Spiliada in Vancouver was completed) and so was prima facie time-barred in British Columbia by November 1982, nine months before the decision of this House in the Amin Rasheed case. In my judgment, had the point arisen, I would have been minded to hold that, in all the circumstances of the case, the shipowners had acted reasonably in commencing proceedings in this country, and that they had not acted unreasonably in failing to commence proceedings in British Columbia before the expiry of the limitation period there. In these circumstances, had I agreed with the Court of Appeal that the judge erred in the exercise of his discretion, I would nevertheless only have set aside the proceedings, to enable proceedings to be brought in British Columbia, on the condition that Cansulex should waive its right to rely on the time bar in British Columbia.

However, for the reasons I have given I would allow the appeal with costs here and below, and restore the order of Staughton J.

### (11) Postscript

I feel that I cannot conclude without paying tribute to the writings of jurists which have assisted me in the preparation of this opinion. Although it may be invidious to do so, I wish to single out for special mention articles by Mr. Adrian Briggs in (1983) 3 Legal Studies 74 and in [1984] L.M.C.L.Q. 227, and the article by Miss Rhona Schuz in (1986) 35 I.C.L.Q. 374. They will observe that I have not agreed with them on all points; but even when I have disagreed with them, I have found their work to be of assistance. For jurists are pilgrims with us on the endless road to unattainable perfection; and we have it on the excellent authority of Geoffrey Chaucer that conversations among pilgrims can be most rewarding.

**BAILII:** Copyright Policy |Disclaimers |Privacy Policy |Feedback |Donate to BAILII
URL: *http://www.bailii.org/uk/cases/UKHL/1986/10.html*

THE LAWS OF THE

VIRGIN ISLANDS

Chapter 13

COMMON LAW (DECLARATION OF APPLICATION) ACT

Based on the Revised Laws of 1991 of the Virgin Islands.

**Important**

This is an <u>unofficial</u> version of the Common Law (Declaration of Application) Act. Whilst every effort has been made to ensure correctness, no responsibility is assumed for any errors which may appear.

Harney Westwood & Riegels
Craigmuir Chambers
P.O. Box 71
Road Town
Tortola
British Virgin Islands

24

**VIRGIN ISLANDS**

**COMMON LAW (DECLARATION OF APPLICATION) ACT**

**ARRANGEMENT OF SECTIONS**

*Section*

1.   Short title.

2.   How far the Common Law of England is in force here, etc.

627400_1

**JA000092**

BRITISH VIRGIN ISLANDS

IN THE COURT OF APPEAL

CIVIL APPEAL NOS. 20 OF 2003 & 1 OF 2004

BETWEEN:

IPOC INTERNATIONAL GROWTH FUND LIMITED

Claimant/Applicant

and

| | |
|---|---|
| [1] | LV FINANCE GROUP LIMITED |
| [2] | TRANSCONTINENTAL MOBILE INVESTMENT LIMITED |
| [3] | OOO CT-MOBILE |
| [4] | SANTEL LIMITED |
| [5] | AVENUE LIMITED |
| [6] | JANOW PROPERTIES LIMITED |
| [7] | BARROWS ALLIANCE LIMITED |
| [8] | CORMACK SELECT LTD |
| [9] | STEGMAN UNIVERSAL LTD |
| [10] | SMART FINANCE LIMITED |
| [11] | CARBERT INTERNATION LIMITED |
| [12] | CARBONELL TRADING LTD |
| [13] | RAMPTON ENTERPRISES LIMITED |
| [14] | ALAMOSA HOLDINGS LIMITED |
| [15] | NORMANTON LIMITED |
| [16] | OOO ALFA-ECO |

Defendants/Respondents

Before:
The Hon. Mr. Brian Alleyne S.C.                    Chief Justice [Ag]
The Hon. Mr. Michael Gordon Q.C.                  Justice of Appeal
The Hon. Mr. Denys Barrow S.C.                Justice of Appeal [Ag]

Appearances:
Martin Mann QC, with him Adrian Francis and Colin McKie, Solicitor Advocate, instructed by Maples & Calder of The British Virgin Islands and Winston & Straun of London for the Appellant

Mark Cran QC with Andrew Thomas, Jeffrey Elkinson and Dawn Smith instructed by Conyers Dill & Pearman of the British Virgin Islands and Neil Gotshal & Manges of London for the 1st Respondent

1

JA000093

Clyde Williams with Kissock Laing instructed by Dancia Penn & Co of the British Virgin Islands and McKenna of London for the 2nd Respondent
Stephen Smith QC with Robert Levy and Samuel Jack Husbands instructed by Walkers of the British Virgin Islands and Lovells of London for the 4th – 6th and 16th Respondents

John Carrington for the 3rd and 7th – 15th Respondents instructed by McW Todman of the British Virgin Islands and Freshfield of London

-------------------------------------------------
2005: July 11,12,13,14,15,18;
September 19.
-------------------------------------------------

### JUDGMENT

[1]   **GORDON J.A.:**   OOO CT Mobile, the third Respondent, (hereafter CTM) is a company incorporated in Russia whose principal asset is a 25 .1 % shareholding in a limited liability company incorporated in Russia called OAO Megafon (hereafter Megafon) a large mobile phone operator in Russia. CTM was a wholly owned subsidiary of the second named Respondent, a Bahamian incorporated company called Transcontinental Mobile Investment Limited (hereafter TMI). TMI was itself a wholly owned subsidiary of the first named Respondent, a British Virgin Island (BVI) company, LV Finance Group Limited (hereafter LVF).

[2]   The Appellant, a company incorporated in Bermuda, entered into two option agreements with LVF to purchase LVF's shareholding in TMI. The first such option agreement was executed on 10th April 2001 and was in respect of 77.7 percent of the issued share capital of TMI and the second option agreement was entered into on 14th December 2001 in respect of the remaining share capital of TMI, namely 22.3%. Both option agreements contained clauses for binding arbitration in the event of dispute, the first in Zurich and the latter in Geneva. In both cases the law of the contract was stated to be English law and the proceedings were to be carried on in English.

[3]   It is the Appellant's case that it duly exercised the option rights conferred by the option agreements and that it is legally and beneficially entitled to the whole of the issued share capital of TMI, by virtue of which it is entitled to absolute control of CTM and through CTM

2

JA000094

of the latter's holding in Megafon. It is the Appellant's further case that LVF, through a series of transactions, which allegations will be expanded later, sought to block the Appellant's acquisition of the TMI shares. The dispute between the Appellant and LVF has been submitted to arbitration in Geneva and in Zurich. The Geneva arbitration has resulted in an award in favour of the Appellant in respect of the December option agreement and the Zurich award which is on-going has resulted so far in a partial award that the April option has not been properly exercised.

### The Proceedings to date

[4]     On September 2, 2003 the Appellant filed an application in the High Court of the BVI seeking the appointment of Receivers of all of the issued shares in, or property in or ownership rights relating to the 2nd and 3rd named Respondents (CTM and TMI) and all property and assets of the 2nd and 3rd named Respondents. In addition, the application sought, inter alia, that the receivership should attach to all shares issued in Megafon that were currently or formerly held by or on behalf of the 3rd named Respondent, and any and all assets in the hands of any of the Respondents which represent the traceable proceeds of any of the aforesaid shares, ownership rights, property or assets. The application was heard 'ex parte' and the Court granted the order as prayed on September 4, 2003. Between September 18, and 19, 2003 by three separate applications all of the Respondents filed applications to revoke the order of September 4.

[5]     An inter partes hearing of the applications to set aside took place between September 26 and October 1, 2003. That hearing resulted in two orders of the Court, one delivered at the close of the hearing of the applications on October 1, 2003 and the other delivered as a reserved judgment on January 21, 2004. The initial order of the Court granted ex parte will hereafter be referred to as the September Order, the second order delivered immediately after the inter partes hearing will hereafter be referred to as the October Order and the decision delivered in January 2004 will be referred to hereafter as the January Decision. The October Order, inter alia, discharged the September Order as against the 3rd and 16th Respondents, CTM and OOO Alfa-Eco, and ordered the Appellant to deposit the sum of

3

$30,000,000.00 as security for its undertakings contained in the September Order and for any potential liability for costs awarded against it (which sum was deposited in Court within the applicable time limit). It would appear that no order was written up deriving from the January Decision. However, the concluding words of the January Decision were:

"In my judgment the 4th September order should be discharged in its entirety against all the remaining fourteen named Applicants and I so order".

The Appellant is dissatisfied with the October Order and the January Decision and has appealed to this Court. There have been a number of other applications but save for the application by the Respondents for further security for costs, to which passing reference will be made later, they do not impact on this appeal.

[6]   The Appellant alleges that the Respondents are all involved in a scheme to wrongfully deprive it of the benefits of the option agreements. The allegations are that in December 2002, in other words some 12 months after the execution of the second option agreement, TMI sold 49.9% of the CTM shares to three companies, LV Investments Partner 1-3, (incorporated in Panama) which three LV companies on 21st July 2003 simultaneously sold to three buyers, namely, Alamosa Holdings Limited (Respondent No. 14), Carbert International Limited (Respondent No.11) and Rampton Enterprises Limited (Respondent No. 13). Also on July 21, 2003 TMI sold its remaining 51.1% shareholding in CTM to three other companies, namely Normanton Limited (Respondent No. 15), Carbonell Trading Limited (Respondent No. 12) and Smart Finance Limited (Respondent No. 10). On that same date LVF sold all of its shares in TMI to three other companies, not parties to these proceedings for $27,000.00. Some 7 days later CTM issued new shares which were allotted to Barrows Alliance Limited (Respondent No.7), Cormack Select Limited (Respondent No.8) and Stegman Universal Limited (Respondent No. 9). Respondents Nos 7 – 15 inclusive (which shall hereafter be referred to as the Intermediary Companies) each sold their shares in CTM in varying proportions to three companies, namely, Santel Limited (Respondent No. 4), Avenue Limited (Respondent No. 5) and Janow Properties Limited (Respondent No 6) which latter three companies are said to be subsidiaries of the 16th Respondent or at any rate part of the Alfa Eco Group. Respondents 4 – 6 inclusive and 16 will hereafter be referred to collectively as the Alfa Companies.

[7]     It is the Appellant's case that the commercial purpose of the two option agreements was to enable it to ultimately hold and/or control the CTM 25.1% stake in Megafon. It was common ground between the parties that Megafon is a very large company and the 25.1% stake was therefore itself a very valuable asset. Various figures were bandied about as to the worth of the 25.1 % stake. Suffice it to say that there seemed little argument that the worth could be measured in the mid range of nine figures.

[8]     The Appellant appealed against both the October Order and the January Decision. The two appeals were consolidated and argued together. All of the respondent save Respondent No. 2 filed  counter-notices of appeal which will be dealt with subsequently. As expressed in the Appellant's skeleton arguments, the main issues of the appeal, from the Appellant's point of view, was:

-   whether there are grounds for interfering with the exercise of the trial Judge's discretion as expressed in the October Order and the January Decision;

-   if so, whether this Court is satisfied that the BVI is forum non conveniens;

-   if not, whether this Court considers that the Appellant should have interim relief pending trial and, if so, the nature and extent of such relief and the terms on which it should be given.

For the most part each of the Counsel for the Respondents adopted such parts of other Counsel's arguments that were applicable. In the circumstances, intending absolutely no disrespect to any such Counsel, arguments on behalf of the Respondents will be referred to generically, save where arguments specific to a particular Respondent are referred to. I should also like, at this stage, to pay tribute to all Counsel who appeared before us for their thoroughness of preparation and presentation. This hearing stretched over a period of six days, which might well have been shortened, but it was the view of the Court that as a large number of issues were being canvassed, it was an appropriate use of court resources to permit full development of argument by Counsel.

JA000097

Are there grounds for the interference by this Court with the Judge's October Order and/or January Decision

[9]     The essence of the argument of learned Queens Counsel for the Appellant on this issue was that the trial Judge failed to exercise properly or at all her discretion on certain fundamental issues before her, and hence this Court should substitute its own discretion. In **Hadmor Productions Limited et al v Hamiliton and Anor**[1] the House of Lords reminded appeal courts of their function and jurisdiction with regard to the substituting of the appeal court's discretion for that of a trial judge. It is well to repeat that admonition:

> "Upon an appeal from a judge's grant or refusal of an interlocutory injunction the function of an appellate court... is not to exercise an independent discretion of its own. It must defer to the judge's exercise of his discretion and must not interfere with it merely on the ground that the members of the appellate court would have exercised the discretion differently. ... It may set aside the judge's exercise of his discretion on the ground that it was based upon a misunderstanding of the law or the evidence before him or upon an inference that particular facts existed or did not exist, which, although it was one that might legitimately have been drawn upon the evidence that was before the judge, can be demonstrated to be wrong by further evidence that has become available by the time of the appeal; or on the ground that there has been a change of circumstances after the judge made his order that would have justified his acceding to an application to vary it. Since reasons given by judges for granting or refusing interlocutory injunctions may sometimes be sketchy, there may be occasional cases where even though no erroneous assumption of law or fact can be identified the judge's decision to grant or refuse the injunction is so aberrant that it must be set aside upon the ground that no reasonable judge regardful of his duty to act judicially could have made it. It is only if and after the appellate court has reached the conclusion that the judge's exercise of his discretion must be set aside for one or other of these reasons, that it becomes entitled to exercise an original discretion of its own."

[10]    It is the Appellant's case that the trial Judge failed properly or at all to assimilate the factual matrix of the Appellant's case and failed to analyse the legal consequences of the parties' assertions. The Appellant further argues that the trial Judge failed in her duty to give reasons for the October Decision, and that that in itself is sufficient grounds for the launching of this appeal – **Flannery v Halifax Estate Agencies Limited**[2]. In that latter case there was a difference between the experts of the plaintiff and those of the

---

[1] [1983]1 A.C. 191
[2] [2000] 1 WLR 377

JA000098

defendants regarding the cause of cracks in a first floor flat. The trial judge accurately set out the crucial issue and what he had to decide. He then, in his judgment, stated that having had the advantage of hearing the expert testimony on behalf of both parties, he preferred that of the defendant. Before the Court of Appeal in England, both parties accepted that there was adequate evidence for the trial judge to have come to a conclusion in favour of either party, but, as the Court of Appeal commented, the judgment was "entirely opaque. It gives the judge's conclusions but not his reasons for reaching that conclusion." The Court of Appeal went on to make a number of general comments on a judge's duty to give reasons which are summarized below:

(i)     The first reason for a judge to give reasons for a decision is that the duty is part of due process, and therefore of justice. The rationale of that statement has two principal aspects. Firstly, the parties should be left in no doubt as to why they have lost or won, especially the losing party. Without reasons given, the losing party is in no position to know whether the court has misdirected itself, and thus whether he may have an available appeal. The second is that the giving or reasons concentrates the mind of the judge.

(ii)    The first principal aspect recited above, that the parties be left in no doubt as to why they have lost or won, "implies that want of reasons may be a good self standing ground of appeal." If it is impossible to tell whether the trial judge has gone wrong on the facts or the law, the losing party would be deprived of his chance of appeal unless the appellate court entertains an appeal based on the lack of reasons itself.

(iii)   The extent of the duty to give reasons will depend on the complexity of the matter to be resolved. It may be enough where there is a straightforward dispute as to simple fact after summarising the evidence for the judge to simply state that one version of the facts is preferred to another. However, where the dispute is more complex, and both sides have canvassed differing analyses of the circumstances, the judge must explain why one side is preferred to the other.

JA000099

32

[11]     The learning expressed in **Flannery** is gratefully adopted in this jurisdiction.

[12]     It is the argument of the Appellant that it is sufficient to ground an allowance of the appeal against the October Order on the single ground that no reasons were given in its justification. As remarked above, the appeals against the October Order and the January Decision were consolidated by consent. This, in my view, allows this Court to review the January Decision as it impacted, explained or was confirmatory of the October Order.

[13]     Learned Queen's Counsel for the Appellant contended that a reading of the January Decision demonstrates that the learned Judge wholly misconceived the evidence and submissions of the Appellant. He pointed to paragraph 5 of the January Decision wherein the trial Judge stated that "Alfa Eco bought all the shares in CTM". This is factually incorrect, as conceded by all parties. However, the trial Judge, later in her decision, on at least two separate occasions, correctly recorded the arguments of counsel for the Respondents which clearly indicated that the owners of the CTM shares were the 4th – 6th Respondents. It is not contested that the 4th – 6th Respondents belong to the Alfa-Eco group of companies. I am of the view that whilst the learned Judge might have misspoken herself, there can be little doubt that she was seised of the relationships between Respondents 4 – 6 and 2 and 3.

[14]     Learned Queen's Counsel for the Appellant complained that when the trial Judge stated at paragraph 12 of the January Decision "It is the Respondent's (Appellant herein) contention that the ownership of the Megafon shareholding provided the commercial rationale for the Option Agreements. A perusal of the two Option Agreements will show that there is no mention of Megafon", she clearly demonstrated a lack of understanding of what the Appellant's case was before her.  Given the evidence before the trial Judge and the submissions made to her, I agree that the above quoted statement by the trial Judge fell short of demonstrating a complete grasp of the inter relationships of the parties and the evolution of the original CTM shareholding into a shareholding in Megafon. Having so said, however, in the context of the remainder of the January Decision, I am of the view that such a misunderstanding did not impact the final conclusion of the learned Judge.

JA000100

[15]    Many other instances of what were described as deficiencies of the trial Judge's expressed reasoning and conclusions were submitted on behalf of the Appellant. I am of the view that whilst the learned Judge without question erred on the side of extreme brevity (and I do not hold prolixity to be a virtue) it cannot be said that a reading of her judgment would leave a party or an appellate court bereft of understanding of the cognitive process employed by the Judge in arriving at her conclusions. I do not find apposite in this case the criticism by Jonathan Parker LJ in **UCB Group Ltd v Hedworth**[3] wherein he stated:

> "Whilst I have considerable sympathy for the judge, whose expertise does not lie in this area and who is faced with potentially difficult and complex issues involving the application of equitable principles with which he is not especially familiar, nevertheless I cannot avoid the conclusion that his judgment is so superficial and perfunctory that his conclusion cannot stand."

Judges in this jurisdiction work under the combined pressure of a heavy civil list and commercial urgency and are required to establish a fine balance between the efficient dispatch of business and the avoidance of the appearance of summary justice. The learned trial judge in this case did not over-balance. I am therefore of the view that there is no valid basis for substituting our discretion for that of the learned Judge.

[16]    That, however, is not the end of the matter. A considerable body of new evidence that was not before the trial Judge has been admitted in the hearing of this appeal for the specific purpose of the argument on the issue of *Forum non conveniens.*  It therefore behoves this Court to examine de novo the whole issue of forum.

**Forum non conveniens/ Submission to the Jurisdiction**

[17]    At  paragraph 53 of the January Decision the trial Judge said the following:

> "I agree with the submission of the Applicants (Respondents) that the BVI is not the appropriate forum for the trial of this case since the issue in the case is the enforcement of a contract between a Bermudan company whose business interests are in Russia and a BVI company that is controlled in Russia. Therefore applying the principles in the **Spiliada** case, followed in **Mohammed v Bank of Kuwait and the Middle East KSC** [1996] 1 WLR 1483 I find that Russia is the more appropriate forum."

---

[3] [2003] EWCA Civ 1717

JA000101

34

The Appellant has appealed against this conclusion. In the context of paragraph 16 above that conclusion will be reexamined. It becomes necessary to examine in some further detail the Appellant's allegations of the scheme by the Respondents to deprive it of the benefit of the two option agreements to put in context the various arguments on this issue..

[18]    However, before I examine the Appellant's allegations I should remark that in this action some of the Respondents (Defendants) have been served within the jurisdiction and some without. Issue has been taken by those Respondents who were served without the jurisdiction that permission to serve out was improperly given in the September Order, which permission, it will be recalled was given after an ex parte hearing. The conjoint effect of the October Order and the January Decision was that permission to serve out was withdrawn. The Appellant's grounds of appeal complains of this also. In **E. I. Du Pont de Nemours & Co et al v I. C. Agnew et al**[4] a similar confluence of the issues of service out and forum had to be dealt with by the Court of Appeal of England. Bingham LJ said the following:

> "I now turn to consider the comparison[5] which the authorities indicate must be carried out. In doing so I make three points at the outset. First, in a case such as this where some defendants have been served within and some without the jurisdiction, the Court must in my judgment view the case in the round. It would not be correct to review the position of the English defendants independently and treat that decision as concluding the position of the foreign defendants. Or vice versa. Relative appropriateness and the requirements of justice should be assessed taking the case as a whole and not giving preponderant weight to the position of either group of defendants..."

Although the heading above this section of the judgment is "Forum non conveniens" the facts and considerations that follow are relevant to the issue of service out, though that latter subject is not identified specifically.

[19]    According to the Appellant, this was a high value transaction, with the Appellant undertaking, pursuant to the two option agreements, to invest many millions of dollars into a company called Sonic Duo, which it duly did. To protect the Appellant's investment, the

---

[4] [1987] 2 Lloyd's Rep 585
[5] Of jurisdictions

JA000102

option agreements required the existing group structure (TMI – CTM – Sonic Duo/later the Megafon stake) to be maintained and conferred on the Appellant a certain measure of control of TMI's affairs.

[20] At a meeting just before Christmas 2002, Leonid Rozhetskin, the C.E.O. of LVF, informed Geoffrey Galmond representing the Appellant that he and LVF wanted to renegotiate the option agreements and to receive $60-70 million more than the Appellant was contractually obliged to pay. Galmond refused.

[21] The Appellant alleges that unknown to it, by the date of this meeting Rozhetskin had taken steps, in breach of the option agreements, to transfer 49.9% of TMI's shares in CTM to three Panamanian companies, the 3 LV Partner companies referred to at paragraph 6 above. The audited accounts of LVF do not explain the purpose of the transaction but state that these companies were controlled by LVF's management. The Appellant believes these were amongst the first steps taken to deprive it of the benefit of the option agreements and that the "partners" referred to in the Panamanian companies' names are the active partners in LVF

[22] The Appellant's case is that in the ensuing months Rozhetskin sought out a purchaser for LVF, improperly offering to sell the Megafon stake as part of the package and that in the Spring of 2003 he met with the Alfa Group. An agreement was reached and work began immediately on valuation and due diligence.

[23] Learned Queens Counsel for the Appellant argued that these direct dealings between LVF and Alfa are central to the Appellant's case because, if they are established, it follows that the complex series of transactions that followed ending up with Alfa acquiring, through CTM, the Megafon stake, can be shown to be a contrivance to conceal the direct deal done between LVF and Alfa.

[24] The trial Judge had before her an affidavit of Vadim Kucharin, Vice President for Economics and Finance of the 16th Respondent in which it is denied that the 16th

11

Respondent had any direct dealings with LVF for the purchase of the CTM shareholding. Rather, he states, the negotiations were with the then shareholders of CTM. The trial Judge also had before her an affidavit of Kenneth Rawding, a partner of Freshfields Bruckhouse Derringer acting on behalf of the 3rd and 7 – 15th Respondents in which he stated, inter alia, that the directors of all of those latter companies were Russian citizens resident in Russia and many of whom spoke only Russian.

[25]    By Order of this Court dated May 11, 2005, permission was granted to both the Appellant and the Alfa Respondents to rely on a large number of affidavits with copious exhibits for the purpose only of supporting the relevant party's arguments on the issue of *forum non conveniens*. In large measure, these affidavits dealt with what I shall refer to as the money laundering charge leveled by the Alfa Respondents against the Appellant, a charge which arose in the context of the use of the $40,000,000.00 now being held in the court as security for the undertakings of the Appellant and for costs. As I remarked in my judgment on the application for further security for costs, the evidence both for and against the charge of money laundering comprised some 17 or 18 large ring binders. The allegation, which I record with neutrality, is that the Appellant is a corporate vehicle for the laundering of funds derived from the illegal dealings by a minister of the Russian government and that the scheme has been on-going for some ten years. A great deal of the evidence, both documentary and oral, derives from Russia and other places. None derives from the BVI.

[26]    Counsel for the Respondents urged that if the Court were minded to remove the stay and allow the action to proceed, the money laundering allegations would form an integral part of the defence of the Respondents. Counsel relied on this aspect as a major connecting factor with Russia.

[27]    This jurisdiction has frequently had to deal with the principles that a trial judge should apply in exercising a discretion whether to stay proceedings on the grounds of *forum non conveniens*. As always the starting point is **Spiliada Maritime Corporation v Cansulex Limited**[6], a decision of the House of Lords, the learning within which has on more than

---

[6] [1987] 1 A.C. 460

JA000104

one occasion been accepted by this Court. In the lead judgment, Lord Goff of Chieveley summarised the law in the following way, and I take the liberty of paraphrasing the learned Law Lord:

(i)     The starting point, or basic principle, is that a stay on the grounds of *forum non conveniens* will only be granted where the court is satisfied that there is some other available forum, having competent jurisdiction, which is the appropriate forum for the trial of the action. In this context, appropriate means more suitable for the interests of all of the parties and the ends of justice.

(ii)     The burden of proof is on the defendant who seeks the stay to persuade the court to exercise its discretion in favour of a stay. Once the defendant has discharged that burden, the burden shifts to the claimant to show any special circumstances by reason of which justice requires that the trial should nevertheless take place in this jurisdiction. Lord Goff opined that there was no presumption, or extra weight in the balance, in favour of a claimant where the claimant has founded jurisdiction as of right in this jurisdiction, save that "where there can be pointers to a number of different jurisdictions" there is no reason why a court of this jurisdiction should not refuse a stay. In other words, the burden on the defendant is two-fold: firstly, to show that there is an alternate available jurisdiction, and, secondly, to show that that alternate jurisdiction is clearly or distinctly more appropriate than this jurisdiction.

(iii)     When considering whether to grant a stay or not, the court will look to what is the "natural forum" as was described by Lord Keith of Kinkel in **The Abidin Daver**[7], "that with which the action has the most real and substantial connection". In this connection the court will be mindful of the availability of witnesses, the likely languages that they speak, the law governing the transactions or to which the fructification of the transactions

---

[7] [1984] A.C. 398

JA000105

38

might be subject, in the case of actions in tort where it is alleged that the tort took place and the places where the parties reside and carry on business. The list of factors is by no means meant to be exhaustive but rather indicative of the kinds of considerations a court should have in exercising its discretion.

(iv)    If the court determines that there is some other available and prima facie more appropriate forum then ordinarily a stay will be granted unless there are circumstances by reason of which justice requires that a stay should nevertheless not be granted. Such a circumstance might be that the claimant will not obtain justice in the appropriate forum. Lord Diplock in the **Abidin Daver** made it very clear that the burden of proof to establish such a circumstance was on the claimant and that cogent and objective evidence is a requirement.

[28]    The Respondents urge that Russia is clearly the most appropriate forum for the following reasons:

- this whole action revolves around the 25.1% stake in Megafon, a Russian corporation providing mobile telephone services in Russia and subject to Russian regulatory provisions;

- the owner of the 25.1% stake in Megafon, CTM, is also a Russian corporation and so is the 16th Respondent;

- according to the affidavit of Nicolas Ulmer on behalf of the Appellant (Ulmer 1 at paragraph 67) both the Russian Ministry of Antimonopoly Policy and the Ministry of Communications and Information have been put on notice by the Appellant of what the Appellant refers to as LVF's and/or the Alfa Group's illegal acts. Those same Ministries were also informed of the Order of the Court of the Commonwealth of the Bahamas in respect of a not dissimilar action commenced by the Appellant in that Court;

- the Appellant operates from Russia and has a particular focus on investment in Russia;

14

- the beneficial owner of the Appellant is either Jeffrey Galmond or Leonid Rieman, the latter being Russian and the former doing business in Russia;
- All the owners of the shares in the Alfa companies are Russian citizens or Russian corporations;
- The April option agreement was negotiated in Russia;
- The principal persons mentioned in the evidence, particularly in respect of the money laundering allegation, are Russian or based in Russia;
- The Appellant's claim as against the 2nd to 16th Respondents can only be grounded in tort, a tort which, if committed, would have had to be committed in Russia making Russian law the proper law;
- It is unlikely that any order of the BVI Court would be enforceable in Russia and hence even if such an order were obtained, the matter would have to be re-litigated to obtain enforcement in Russia.

[29]    Learned Queen's Counsel for the Appellant, on the other hand points to what he describes as non-Russian connecting factors. He points to the fact that only two of the Respondents are incorporated in Russia, the others being incorporated in the BVI, Panama, the Seychelles, Belize and the Turks and Caicos Islands. He further points to the fact that the principal law firms and counsel that have had conduct of the substance of the disputes between the parties are all based in England. Both of the option agreements are in English and contain clauses making English Law the proper law of the contracts and provide for arbitration in Switzerland. The sales agreements between the 9 selling companies and the Alfa companies are also in English and contain English choice of law. Learned Queen's Counsel relied on a passage in Goff L.J.'s speech in **Spiliada** to the following effect:

> "Furthermore, there are cases where no particular forum can be described as the natural forum for the trial of the action. Such cases are particularly likely to occur in commercial disputes, where there can be pointers to a number of different jurisdictions…I can see no reason why the English court should not refuse to grant a stay in such a case, where jurisdiction has been founded as of right. It is significant that, in all the leading English cases where a stay has been granted, there has been another clearly appropriate forum…In my opinion the burden resting on the defendant is not just to show that England is not the natural or appropriate forum for the trial, but to establish that there is another available forum which is clearly or distinctly more appropriate that the English forum."

15

JA000107

Learned Counsel argued that on the basis that there were pointers to more than one jurisdiction in this case the BVI should be retained as forum conveniens recognizing that jurisdiction had been founded as of right, at least against some of the Respondents. Perhaps the most telling point made on behalf of the Appellant was that if the Appellant LVF was successful in the arbitrations, the award in its favour would have to be enforced in the BVI, LVF's place of incorporation. Indeed, we were informed that enforcement proceedings based on the Geneva award had already been commenced in the BVI, though these had been stayed pending the final outcome of the Zurich arbitration. In my view, the logical counter to that argument is simply that none of the other 15 Respondents could ever be parties to any such enforcement proceedings purely based on the fact that they were neither parties to the option agreements nor to the arbitration proceedings.

[30]    Learned Queen's Counsel for the Appellant further argued that at no point did the Respondents acquit the burden of proof on them in their application for a stay, namely to satisfy the Court that Russia, or any where else, for that matter, was an available forum. The Respondents counter by admitting that there was no direct evidence on the issue but advance firstly that there is no requirement for specific expert evidence on the subject of availability of a specific jurisdiction and secondly that the very affidavits of the Appellant show that proceedings have already been commenced in Russia by the Appellant, albeit not proceedings replicatory of the proceedings in the BVI but nevertheless deriving from the same set of transactions. They point to the 6th affidavit of Nicolas Ulmer wherein he exhibits a copy of proceedings in the City of Moscow Arbitrazh Court wherein Respondents 3, 4 and 5 have sued the Appellant, among others, seeking a declaration that the Megafon shareholders agreement is invalid on the ground that it offends imperative provisions of Russian company law. They also point to the third affidavit of Jeffrey Galmond on behalf of the Appellant wherein he gives evidence of proceedings brought by CTM challenging Megafon's decision to enter, at the Receivers' request, and maintain a blocking entry against CTM's stake in Megafon's share register. These proceedings were also brought in the City of Moscow Arbitrazh Court. In the same affidavit Galmond also refers to proceedings initiated by the Appellant in the St. Petersburg Arbitrazh Court against parties to the Megafon shareholders agreement. Based on the

JA000108

41

above, I am satisfied that this Court can infer that Russia is an available jurisdiction and that this aspect of the Spiliada first test has been met by the Respondents.

[31]   It was the Respondents' contention that the only connection that this case had with the BVI was that some of the Respondent companies had been incorporated there. It was argued on behalf of the Respondents that in this jurisdiction this Court was recently faced with a not dissimilar situation in the case of **Astian Group Limited et al v TNK Industrial Holdings Limited et al**[8] in which the 2 Appellants were respectively a BVI company and a Seychelles company and the three Respondents were all BVI companies. This Court upheld a decision of the trial Judge to grant a stay on the grounds of forum non conveniens. The trial Judge had found that incorporation in a tax efficient jurisdiction is merely one of the factors to be taken into account by the court in the exercise of its discretion on this issue. The fact that nine of the Respondents were incorporated in the BVI is merely one of the factors to be considered, and is not necessarily a dominant factor when placed in the context of the non-BVI connecting factors listed in paragraph 28 above. A further consideration is that the Appellant has applied to join a further 12 defendants to the main action, of which only one is a BVI incorporated company. Three of the proposed additional defendants are Russian individuals, one is a person of French nationality and the remainder are corporations incorporated in various off-shore jurisdictions.

[32]   I am satisfied on a review of the authorities and the circumstances in this case that BVI is not the forum conveniens. I am of the view that Russia is not only an available forum but is the forum "with which the action has the most real and substantial connection". There have been no circumstances adverted to by the Appellant by reason of which justice requires that a stay should nevertheless not be granted. In the circumstances I confirm the learned trial Judge's finding that Russia is the more appropriate forum. Because of the view that I have taken in regard to the forum issue it becomes unnecessary for me to regard specifically the points raised by the non-BVI Respondents on the appropriateness of the September Order in regard to service out of the jurisdiction under Part 7 of the Civil Procedure Rules 2000.

---

[8] 2005 BVI Civil Appeals Nos 11 and 17 of 2004 (unreported)

JA000109

42

### Submission to Jurisdiction

[33]     There is one further jurisdictional matter to be dealt with. As remarked earlier on in this
judgment, the Respondents had all applied to this Court for security for costs for the
consolidated appeals. It will be recalled that the October Order ordered the Appellant to
provide security for its undertakings and for costs in the sum of $30,000,000.00 (which
sum was later increased to $40,000,000.00 by a single Judge of this Court as a condition
for granting a stay of the January Decision).  The basis of the applications for security for
costs was that the Respondents alleged that the $40,000,000.00 presently being held by
the Court were tainted funds, being the proceeds of money laundering and they
apprehended that that sum might not be available to them in the event of their success in
this appeal. The allegation of money laundering first arose (in so far as these proceedings
are concerned) in a witness statement by one V. Sharma given in the Geneva arbitration
proceedings. In support of their applications voluminous affidavits with exhibits attached
were filed setting forth the allegations of money laundering and the Appellant replied in
similar measure.

[34]     It is the contention of the Appellant that the conduct of the parties, in particular their pursuit
of the money laundering allegations, has been such that they have forfeited the right to
argue that this Court should not exercise jurisdiction in this case. Learned Queen's
Counsel for the Appellant framed his argument in this way: a party submits to the
jurisdiction if he takes a voluntary step in proceedings that clearly and unequivocally
acknowledges the existence of them. With the greatest of respect to learned Queen's
Counsel, I am of the view that he has misstated the principle. In the old case of **Rein v
Stein**[9] the principle was stated thus by Cave J. in the Divisional Court:

> "It seems to me that, in order to establish a waiver, you must show that the party
> alleged to have waived his objection has taken some step which is only necessary
> or useful if the objection has been actually waived, or if the objection has never
> been entertained at all."

---

[9] (1892) 66 L.T. 469

JA000110

The above statement was quoted with approval in the House of Lords decision of **Williams & Glyn's Bank v Astro Dinamico**[10].   The Appellant prayed in aid of their argument that an application for security for costs could be a waiver of objection to the jurisdiction of the court the case of **Hewden Stuart Heavy Cranes Ltd v Leo Gottwald Kommanditgesellschaft et al**, (1992) a decision of the English Court of Appeal of which we were provided a transcript. I am unaware of this case having been reported. The principal opinion was delivered by Lloyd L.J. in the course of which he said the following:

> "The plaintiffs say that the defendants submitted to the jurisdiction on three separate occasions – first when they applied for and obtained an extension of time for service of their defence, secondly when they applied for an order for security for costs and thirdly in the course of the hearing of the application under Order 12, rule 8…
> As for security for costs, the application covered the period up to and including the hearing of the application under Order 12, rule 8. The application was on the ground that the plaintiffs are a dormant company, without apparent assets. The defendants made clear from the outset, and in particular in an affidavit in support of the application for security for costs, that it was without prejudice to the defendants' forthcoming application under Order 12, rule 8. The point was repeated not once but twice in a letter of 11th April shortly before the hearing.
> It is difficult to know what more the defendants could have done to preserve their challenge to the jurisdiction. It is said that the application was inconsistent with an application under Order 12, rule 8, since the schedule of anticipated costs included costs related to the substantive issues in the action. But a closer look at the schedule reveals that this is not so. The substantive issues were those relevant to the application for security for costs itself and not beyond. I can find nothing in the application for security for costs itself, nor in the manner in which it was put forward, which could amount to a submission or a waiver. I reject the submission, if indeed it was advanced, that an application for security for costs up to and including the hearing of an application under Order 12, rule 8 and for the purposes of that application is of itself inconsistent with a challenge to the jurisdiction."

[35]     The applications for security for costs are specific. The application of the 4th – 6th and 16th Respondents for example, sought an order of the Court that the Claimant (Appellant) do "Provide security for the Applicants' costs of IPOC's appeals nos. 20/2003 and 1/2004" by paying a sum into court or explaining in writing to the reasonable satisfaction of the Applicants the source of funds which were then in court. In the affidavit of Samuel Husbands dated 28th April 2004 in support of the application for security, at paragraph 35 it is stated:

---

[10] [1984] 1 WLR 438

"By way of conclusion, in view of the very grave allegations made at the ICC Arbitration, and the impact upon the Fourth to Sixth and Sixteenth Defendants' ability to have recourse to the funds in Court, I respectfully request that IPOC be required to make available security in the sum of US$240,000.00 within 14 days as a condition of being permitted to continue with its appeals."

It is clear that the Respondents are going no further in their applications than to secure for themselves, in the event that they are successful in this appeal, their costs. I am of the clear view that the Respondents did not, by their application for security for costs, waive their objection to the jurisdiction.

[36]     There were many other issues canvassed at the hearing before us by both sides. In view of my findings above I do not find it necessary to deal with them, save one, as they all fall away once the Appellant fails on the jurisdictional/forum issue.  The additional issue that I will deal with concerns the protocols for an ex parte application for interim remedies such as injunctive relief or appointment of receivers.

**Material misrepresentation and non-disclosure by Appellant**

[37]     It has long been settled law that an applicant for ex parte relief must act in the utmost good faith and disclose to the court all matters relevant to the exercise of the court's discretion. In **Brinks Mat Ltd v Elcombe et al**[11] Ralph Gibson LJ of the Court of Appeal in England giving the lead judgment opined that a court in considering whether there had been relevant non-disclosure and/or misrepresentation and what consequence to attach to it should have in mind the following circumstances:

-     the duty of the applicant is to make "full and fair disclosure of all the material facts";

-     the material facts are those which it is material for the court to know in dealing with the application as made; materiality is to be decided by the court and not the applicant;

-     there is a duty on the applicant to make proper enquiries before making the application. Thus a state of correctable ignorance is no excuse;

-     the extent of the enquiries to be made by the applicant must depend on the nature of the order that he is seeking and the circumstances in which the order is being sought.

[11] [1988] 1 WLR 1350

JA000112

In other words, the more intrusive the effect of the order to the respondents' business the more searching must be the enquiries. A further factor is the degree of legitimate urgency;

- if material non-disclosure is shown a court should be "astute to ensure that a plaintiff who obtains [an ex parte order] without full disclosure is deprived of any advantage he may have derived by that breach of duty" , per Donaldson LJ in **Bank Mellat v Nikapour**[12] );

- a court must, nevertheless determine whether the facts(s) not disclosed are of sufficient materiality to justify immediate discharge of the order without examination of the merits. The innocence or deliberateness of the non-disclosure is relevant, though not necessarily decisive;

- it "is not for every omission that the injunction will be automatically discharged. A locus poenitentiae may sometimes be afforded", per Denning MR in **Bank Mellat**[13]. In other words, the court has a continuing discretion.

To the list adumbrated by Ralph Gibson LJ I would add that there is also a duty on the plaintiff to advance, albeit in summary form, arguments that might reasonably be anticipated would be advanced against the grant of the ex parte order so that the judge might advert his mind to such argument in exercising his discretion

[38]    The Respondents argued that the Appellant fell well short of fulfilling the duty of disclosure and non-misrepresentation. The Respondents posited that the Appellant misled the court in stating, through the first affidavit of Nicolas Ulmer at paragraph 40, that the Appellant had made or tendered all payments and notifications necessary for the exercise of its option rights under the two option agreements. There was no mention, the Respondents complain, of the requirement on the Appellant to pay a further $18 million, nor of the private agreement between Leonid Rozhetskin acting for LVF and Jeffrey Galmond acting for the Appellant. The ex parte application that resulted in the September Order was supported by an affidavit by Mr. Nicolas Ulmer, a lawyer acting on behalf of the Appellant. That affidavit was dated September 1, 2003. Prior to the swearing of that affidavit, Mr.

---

[12] [1985] F.S.R. 87
[13] supra

JA000113

46

Ulmer had sworn another affidavit for use in proceedings in the Supreme Court of the Commonwealth of the Bahamas on August 21, 2003. The two affidavits were substantially similar, though there were significant variations. In the affidavit used for the ex parte application in this jurisdiction Mr. Ulmer says the following at paragraph 40:

> "Specifically, the April 14, 2001 Call Option Agreement (this is clearly a misprint as the date should have read April 10, 2001) provides for IPOC to pay an Option Price made up of a "Funding Price" of at least $15,150,000 together with a minor "Required Expenditure amount". As to the December 14, 2001 Call Option Agreement IPOC has paid LV Finance the $10 million portion of the "Option Price" set forth at 2.2.1 and, as further, explained below, has twice sent the $16 million final payment foreseen under 2.2.2 of the Agreement. To the best of my knowledge LV Finance's only statement that it had not received full payment under the Option Agreements is a March 31, 2003 letter to the Escrow Agent... Stating that the 'full Option Price' had not been paid under the agreements... At the time of that letter, March – May 2003, only the $16 million final payment of the Option Price under the December 14, 2001 Call Option Agreement remained to be paid; that amount has been repeatedly tendered through the Escrow Agent as explained below."

Paragraph 17 of Mr. Ulmer's affidavit submitted to the Bahamian Court is in exactly similar terms (including the misprint of the date) save that after the phrase "together with a minor 'Required Expenditure Amount'" there is the following language, which is absent from the BVI affidavit:

> "The 'Total Purchase Price' set forth in 2.4 of that first Agreement was a stratagem initially insisted upon by Mr. Rozhetskin and has not, and was not intended to be, paid because it was waived and varied by the parties, notably by operation of the December 14, 2001 Call Option Agreement which provided for a total 'Purchase Price' of one dollar. Any payment of the 'Total Purchase Price' under the April 10, Call Option Agreement was, furthermore, subject to an undertaking by Mr. Rozhetskin to cause it to be returned."

It was argued on behalf of the Respondents that in his submission before the trial Judge on the ex parte application, learned Queen's Counsel for the Appellant placed a convoluted construction on the language of the two option agreements, and in particular the second option agreement with the result that the trial Judge was misled into believing that the option price of $18 million was not payable. This, the Respondents argued, was a grave misrepresentation. Without going into detail, I would agree that the presentation by learned Counsel for the Appellant in the ex parte hearing was less than felicitous.

22

JA000114

[39] When one looks at the Claim form before the trial Judge who heard the ex parte application for the interlocutory orders, it is clear that fundamental to the Appellant's case was the proper exercise of the two options in accordance with the option agreements. I am of the view that the failure to disclose the circumstances of non-payment of the $18 million purchase price for the 77.3% of the shareholding of TMI pursuant to the April Option Agreement was non-disclosure of a material fact. In the circumstances of the earlier part of this judgment, I am not required to decide whether it was of sufficient materiality as to justify this Court acting upon it.

[40] In the premises, I would dismiss the Appellant's appeal.

[41] In the January Decision, the learned trial Judge said the following: "The Respondent is to pay the costs of this application which I fix at $10,000.00 in favour of each group of Applicants represented at the hearing." Each of the Respondents save the 2nd, 3rd and 16th Respondents filed counter-notices challenging the trial Judge's determination of quantum of costs. We have intimated to Counsel for the 2nd, 3rd and 16th Respondents that we would hear argument on whether in the absence of an appeal by those Respondents against the costs order in the January Decision this Court has jurisdiction to vary that order in so far as it affects them. Upon hearing argument by Counsel for the Appellant and the named Respondents a comprehensive costs order will be made.

<div align="right">

Michael Gordon, Q.C.
Justice of Appeal

</div>

I concur.

<div align="right">

Brian Alleyne, S.C
Chief Justice [Ag.]

</div>

I concur.

<div align="right">

Denys Barrow, S.C.
Justice of Appeal

</div>

48

CHAPTER 13.

COMMON LAW (DECLARATION OF APPLICATION) ACT.

31/1705.

(*20th June,* 1705.)

WHEREAS Law Suits and Controversies frequently arise between the Inhabitants of these Islands, principally occasioned by the different Nature and Circumstances of our Estates from those in England, whereby it sometimes hath happened, through the Partiality of some, and Ignorance of others, the contradictory Judgments have been given in cases founded on the same Rules and Principles of Law and Reason; for the redressing of which Mischiefs, and establishing a constant and certain Uniformity in the Proceedings of the Courts of the several Islands under the Government, and for declaring the Rights of particular Tenants in these Islands.

**Short title.**

1.     This Act may be cited as the Common Law (Declaration of Application) Act.

**How far the Common Law of England is in force here, etc.**

2.     We your Majesty's most dutiful and loyal Subjects, the Commander in Chief of your Majesty's Leeward Charibbee Islands, the General Council, and General Assembly of the said Islands, now meet at Nevis, do humbly pray your Majesty that it may be declared, and it is hereby declared by the Authority aforesaid, That the Common Law of England, as far as it stands unaltered by any written Laws of these Islands, or some of them, confirmed by Your Majesty, or some of your Royal Predecessors in Council, or by some Act or Acts of Parliament of the Kingdom of England, extending to these Islands, is in force in each of these your Majesty's Leeward Charibbee Islands, and is the certain Rule whereby the Rights and Properties of your Majesty's good Subjects inhabiting these Islands, are and ought to be determined; and that all Customs or pretended Customs, or Usages, contradictory thereunto, are illegal, null, and void.

627400_1

JA000116

STATUTORY INSTRUMENTS.

1967 No. 223

ASSOCIATED STATES

THE SUPREME COURT ORDER 1967.

Made - - - 22nd February, 1967
Coming into Operation   27th February, 1967

[This Order is printed as amended by the Anguilla, Montserrat and Virgin Islands (Supreme Court) Order 1983 (U.K. — S.I. 1983 No. 1108), S.R.O. 41/1975, 42/1975, 12/1976 and 29/1978 and 29/1978 and S.I. 2/1985, 10/1985 and 27/1990.]

At the Court at Buckingham Palace, the 22nd day of February, 1967.

Present,
The Queen's Most Excellent Majesty in Council

Her Majesty, by virtue and in exercise of Her powers under section 6 of the West Indies Act 1967(a), is pleased, by and with the advice of Her Privy Council, to order, and it is hereby ordered, as follows:—

PART 1—INTRODUCTORY

1. (1) This Order may be cited as the Supreme Court Order 1967.

(2) This Order shall come into operation on 27th February 1967:

Provided that the provisions of subsection (3) of this section and sections 18 to 23 of this Order shall come into operation on such later date (hereinafter referred to as "the prescribed date") as the Chief Justice may by order prescribe.

(3) The Windward Islands and Leeward Islands (Courts) Order in Council 1959(b), as amended (c), (hereinafter referred to as "the Order of 1959") and the British Caribbean Court of Appeal Order in Council 1962(d), as amended (e), (hereinafter referred to as "the Order of 1962") are revoked in so far as they may have effect as part of the law of each State:

Citation, commencement and revocation.

S.I. 1983 No. 1108

(a) 1967 c.4.
(b) S.I. 1959/2197 (1959 I, p.565).
(c) The relevant amending Orders are S.I. 1960/1658, 1962/1084, 1967/162 (1960 I, p. 473; 1962 II, p. 1220).
(d) S.I. 1962/1086 (1962 II, 1247)
(e) The relevant amending Orders are S.I. 1962/1245, 1962/1870, 1966/575, 1966/1455 (1962 II pp. 1567, 2186; 1966 II, p. 1229; III, p.3858).

Provided that the provisions of sections 21(2) and 22(5) of the Order of 1959 and article 9 of the Order of 1962 shall continue in force as part of the law of each State as if those Orders had not been revoked.

2. (1) In this Order "State" means any of the following, that is to say—

Antigua, and Barbuda
Dominica,
Saint Christopher and Nevis,
Saint Lucia, and
Saint Vincent and the Grenadines.

(2) In this Order any reference to a State shall be construed as including a reference to its dependencies (if any).

(3) In this Order, unless the context otherwise requires, any reference to the holder of an office by the term designating his office shall be construed as including a reference to any person who, under and to the extent of any authority in that behalf, is for the time being performing the functions of that office.

(4) (a) Where any person has vacated any office established by or under this Order he may, if qualified, again be appointed to hold that office from time to time.

(b) A person may be appointed to an office established by or under this Order notwithstanding that some other person may be holding that office when that other person is on leave of absence, pending the relinquishment of the office; and where two or more persons are holding the same office by reason of an appointment made in pursuance of this paragraph, then, for the purposes of any function conferred upon the holder of that office, the person last appointed shall be deemed to be the sole holder of the office.

(5) Any act done for the purposes of this Order by the Judicial and Legal Services Commission or the interim Commission established by section 24 of this Order signified in writing under the hand of the Chairman of the Commission.

(6) The Interpretation Act 1889(a) shall apply, with the

Interpretation.
S.I. 1983 No. 1108

(a) 1889 c.63.

49

JA000117

(2) The jurisdiction of the High Court in Admiralty shall be exercised in accordance with the Colonial Courts of Admiralty Act 1890, (Imperial) and part I of the Administration of Justice Act 1956.

**9.** The jurisdiction of the High Court in bankruptcy shall be exercised in accordance with the provisions of the Bankruptcy Act and any rules made thereunder.

> Practice in bankruptcy,
>
> Cap. 8.

**10.** The jurisdiction of the High Court in all criminal proceedings shall be exercised in accordance with the Criminal Procedure Act and any other law in force, in the Territory.

> Practice in criminal proceedings.
> Cap. 18.

**11.** The jurisdiction vested in the High Court in civil proceedings, and in probate, divorce, and matrimonial causes, shall be exercised in accordance with the provisions of this Ordinance and any other law in operation in the Territory and rules of court, and where no special provision is therein contained such jurisdiction shall be exercised as nearly as may be in conformity with the law and practice administered for the time being in the High Court of Justice in England.

> Practice in civil proceedings and in probate, divorce and matrimonial causes.

**12.** Any judge of the High Court may in accordance with rules of Court, or so far as such rules shall not provide, in accordance with the practice and procedure which shall for the time being be in force in the High Court of Justice in England, exercise, in Court or in Chambers, all or any of the jurisdiction vested in the High Court.

> Jurisdiction of single judge.

**13.** Subject to the express provisions of any other law in every civil cause or matter commenced in the High Court, law and equity shall be administered by the High Court and the Court of Appeal, as the case may be, according to the provisions of the seven sections of this Ordinance next following.

> Law and equity to be concurrently administered.

**14.** If a plaintiff or petitioner claims to be entitled to any equitable estate or right or to relief on any equitable ground against any deed, instrument or contract or against any right, title or claim whatsoever asserted by any defendant or respondent in the cause or matter, or to any relief founded upon a legal right which before the 1st day of November, 1875 could in England only have been given by a court of equity, the court or judge shall give to the plaintiff or petitioner the same relief as would be given by the High Court of Justice in England in a suit or proceeding for the same or a like purpose.

> Equities of the plaintiff.

JA000118

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

MICHELLE TROTTER,

     Plaintiff,

  v.

7R HOLDINGS, LLC, LUIS A. RUBI
GONZALEZ, M/Y OLGA,

     Defendants.

CIVIL CASE NO. 3:14-cv-0099-CVG-RM

**JURY TRIAL DEMANDED**

**Action Filed : November 19, 2014
Trial Date    : None set**

**OPPOSITION TO MOTION TO DISMISS FOR FORUM *NON CONVENIENS***

     Plaintiff MICHELLE TROTTER, through her attorney, respectfully submits the following

Opposition to Defendants' Motion to Dismiss for Forum *Non Conveniens*:

## I. INTRODUCTION

     This action arises out of injuries sustained by Plaintiff, a seaman, while she was a chef aboard

the M/Y Olga and collecting provisions for the vessel. Plaintiff's causes of action are brought under

maritime jurisdiction pursuant to the Jones Act and include a claim for maintenance and cure.

Defendants filed a Motion to Dismiss ("MTD") requesting the Court dismiss Plaintiff's claims based

on forum *non conveniens*, arguing the appropriate forum is the BVI. Defendants base this request

on the site of injury, where the vessel is registered, and potential, yet unidentified, witnesses. Under

the doctrine of forum *non conveniens*, it is Defendants burden to prove the BVI is an appropriate

alternative forum and that the private and public factors heavily weigh in favor of disrupting

Plaintiff's choice of forum. Defendants have fallen well short of meeting this burden.

     As established below, the BVI is not an appropriate forum because it would preclude Plaintiff

from litigating her Jones Act claims under U.S. maritime law, leaving her without adequate recourse.

The greater access to witnesses and evidence afford by U.S. law, as well as the subject vessel's

frequent location in the USVI renders the private interest factors heavily favorable to Plaintiff.

Further, the public interest factors weigh in Plaintiff's favor because of the strong connections this

dispute has with the U.S. and the difficulty presented in applying limited BVI law to Plaintiff's

Trotter v. 7R Holdings, et al.    OPPOSITION TO MOTION TO DISMISS    3:14-cv-0099 CVG-RM

JA000119

1    maritime claims. A balancing of these factors convincingly supports the application of U.S. law in

2    this Court and therefore Defendants' motion should be dismissed.

3    ## II. STATEMENT OF FACTS

4         This case arises from personal injuries sustained by Plaintiff while she was a chef onboard

5    the M/Y Olga. On November 27, 2012, Captain Bernard Calot ("Calot") contacted Plaintiff via e-

6    mail for a chef job aboard the M/Y Olga. (Declaration of Michelle Trotter at ¶ 2.) Calot located

7    Plaintiff through Churchill Yachts, a company located in Fort Lauderdale, Florida. *Id.* Plaintiff had

8    provided her name to Churchill Yachts to find chef jobs on private yachts. *Id.* Calot also telephoned

9    Plaintiff at her Florida residence to discuss the position, pay rate, length of the charter, and the

10   number of guests and crew members on the vessel. *Id.* Calot informed Plaintiff the charter would be

11   December 26, 2012 through January 5, 2013, with 10 guests and 5 crew persons. *Id*. Calot further

12   advised Plaintiff the vessel was currently in Puerto Rico and would be brought to St. Thomas for

13   provisioning on December 19 before moving to Scrub Island, BVI on December 22. *Id.*

14        On November 30, Calot contacted Plaintiff while she was in Florida to provide her with the

15   guest menu preference sheets. *Id.* at ¶ 3. He requested she put together menus to forward to guests

16   for approval to provision the vessel before the charter. *Id.* Plaintiff performed this task in Florida.

17   Plaintiff and Calot also discussed when she should join the vessel and they decided upon 2-3 days

18   before the charter to ensure the galley was properly set up and provisioned. *Id.* Ultimately, Calot

19   requested Plaintiff oversee the final food provisioning in St. Thomas beginning December 19. *Id.*

20        Calot's communication with Plaintiff in Florida continued throughout December. On

21   December 2, 2012, Calot contacted Plaintiff to confirm she received the guest preference sheets. *Id.*

22   at ¶ 4. On December 3, 2012, Plaintiff contacted Calot to request the ages of the guests' children and

23   to confirm impending completion of the menus. *Id.* at ¶ 5. That day, Calot provided Plaintiff with

24   the contact details of his preferred produce supplier, The Fruit Bowl in St. Thomas. *Id.*

25        Plaintiff's work continued in Florida when, on December 5, Calot forwarded the guest

26   schedule to Plaintiff indicating 10 guests were to arrive by private jet on December 26, at a location

27   to be determined, 8 guests would depart on December 29, and 8 new guests would arrive on

28   December 29 and depart January 5, 2013. *Id.* at ¶ 6. On December 7, Calot contacted Plaintiff,

- 2 -

Trotter v. 7R Holdings, et al.     OPPOSITION TO MOTION TO DISMISS     3:14-cv-0099 CVG-RM

JA000120

1    requesting she place the meat and fish order with National Marine in Puerto Rico to provision the

2    vessel while in Puerto Rico. *Id.* at ¶ 7. Calot also confirmed the vessel would likely be moved to St.

3    Thomas on December 20, and confirmed Plaintiff needed join the vessel while it was in St. Thomas.

4    *Id.* That day, Plaintiff placed the meat and fish order with National Marine from Florida. *Id.*

5       On December 8, 2012, Calot sent Plaintiff an inventory of the food currently on board the

6    vessel. *Id.* at ¶ 8. On December 10, 2012, Plaintiff sent her menu plans to Calot, taking into account

7    the changeover guests on December 29. *Id.* at ¶ 9. The next day, Calot contacted Plaintiff with the

8    list of galley equipment on board. *Id.* at ¶ 10. He also confirmed the vessel would be moved from

9    Puerto Rico to St. Thomas on December 19 and would remain there through December 22. *Id.* Calot

10   asked whether Plaintiff wanted to join the vessel on December 19 or 20, 2012 and she responded that

11   she preferred to arrive on December 19. *Id.*

12       On December 11, 2012, Maggie Vale at Churchill Yachts contacted Plaintiff in Florida to

13   follow up on her employment aboard the M/Y Olga. *Id.* at ¶ 10. At this time, Plaintiff shared her

14   menu plans with Maggie. *Id.* Maggie had also arranged for the guests who were chartering the M/Y

15   Olga during the time Plaintiff was to be a chef onboard. *Id.*

16       On December 14, 2012, Plaintiff sent Calot a shopping list for Costco in Puerto Rico and he

17   responded the National Marine order would be delivered to the vessel on December 19. *Id.* at ¶ 11.

18   On December 15, 2012, Plaintiff received an e-mail from Calot containing her ticket and travel

19   itinerary from Regency Travel. *Id.* at ¶ 12. This indicated Plaintiff would arrive in St. Thomas on

20   December 19 and depart from St. Thomas on January 8, 2013. *Id.* That day, Plaintiff e-mailed a

21   second produce order for December 29, 2012, to be provided by the produce supplier, The Fruit

22   Bowl, in St. Thomas. *Id.* at ¶ 13. On December 17, 2012, Plaintiff e-mailed a dry good checklist to

23   Calot. *Id.* at ¶ 14.

24       On December 19, 2012, Calot e-mailed Plaintiff requesting the Fruit Bowl produce delivery

25   occur on December 22, in order to move the vessel to Scrub Island on December 22. *Id.* at ¶ 15. That

26   day, Plaintiff arrived in St. Thomas at 4:30 p.m. and went to the vessel. *Id.* at ¶ 16.

27       The vessel remained in St. Thomas, while Plaintiff organized the galley and re-checked the

28   provisioning. *Id.* at ¶ 17. The first produce delivery from The Fruit Bowl arrived during this time.

1   *Id.* Plaintiff determined the delivery was in poor condition and would not last until December 26.

2   *Id.* Therefore, Plaintiff shopped in St. Thomas to re-provision the vessel with fresh produce. *Id.*

3   Plaintiff's paid employment began while she was in St. Thomas and included a per diem payment

4   for December 22 and 23, 2014 while the vessel was in St. Thomas. *Id.* at ¶ 18.

5          The vessel was eventually moved from St. Thomas to Scrub Island on December 24. *Id.* at

6   ¶ 18. On December 26, 2012, at or near 9:00 a.m., the vessel was tied up at the dock in Scrub Island

7   to allow Plaintiff to obtain certain herbs and spices for the vessel from the executive chef at Scrub

8   Island. *Id.* at ¶ 19. The stairs that Plaintiff was required to traverse in order to discharge her duties

9   as a chef aboard the M/Y Olga had uneven rise and runs and did not have a handrail. Complaint at

10  ¶ 10. As a result, while descending the stairs, Plaintiff misstepped and fell, sustaining serious

11  injuries. Complaint at ¶ 10. To the best of Plaintiff's knowledge, there were no witnesses to the

12  actual fall and no one, including M/Y Olga crewmembers, were present. *Id.* at ¶ 23.

13         On December 28, 2012, the vessel returned to US Virgin Islands and anchored off St. John

14  so the guests could use jet skis, which are not permitted in BVI waters. *Id.* at ¶ 20. That evening the

15  vessel docked at Yacht Haven Grand on St. Thomas. *Id.* at ¶ 21. On December 29, 2012, a

16  replacement chef boarded the vessel in St. Thomas. *Id.* at ¶ 22. There was also a changeover of

17  guests whereby guests scheduled to leave the vessel disembarked in St. Thomas and new guests

18  boarded the vessel. *Id.* Plaintiff disembarked at this time to board a flight to Florida that afternoon.

19  *Id.* Once back in Florida, Plaintiff received medical treatment at several Florida medical facilities.

20                            **III. <u>ARGUMENT</u>**

21         In considering whether dismissal pursuant to forum *non conveniens* is proper, the court must

22  first determine whether an appropriate alternative forum exists. *Piper Aircraft Co. v. Reyno*, 454 U.S.

23  235, 254 n.22 (1981); *see also Windt v. Qwest Comm. Intern, Inc.*, 529 F.3d 183, 189-90 (3d Cir.

24  2008). If an alternative forum exists, the court must conduct a balancing test to decide whether

25  dismissal would be proper. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947). The defendant

26  has the burden of persuasion on all elements of the forum *non conveniens* analysis. *See Lacey v.*

27  *Cessna Aircraft Co.*, 932 F.2d 170, 180 (3d Cir. 1991). Defendant only meets this burden if he

28  establishes an adequate alternative forum for all defendants and private and public factors *heavily*

- 4 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000122

1    favor dismissal. *Id.* "If, when added together, the relevant [ ] interest factors are in equipoise, or even

2    if they lean only slightly toward dismissal, the motion to dismiss must be denied. *Id*.

3         The Supreme Court stated a plaintiff's choice of forum should rarely be disturbed and there

4    is a "strong presumption of convenience in favor of a domestic plaintiff's chosen forum." *Piper*, 454

5    U.S. at 255; *see also Windt*, 529 F.3d at 192. Plaintiff's choice is accorded *great deference* and must

6    only be disturbed when the balance of private and public interest considerations strongly weighs in

7    favor of the defendant. *See Piper*, 454 U.S. at 255-56; *see also Gulf Oil Corp.*, 330 U.S. at 508. For

8    defendants to prevail, the weighing of these factors must establish that plaintiff's forum choice

9    causes an oppressiveness and vexation to defendant disproportionate to plaintiff's convenience.

10   *Windt*, 529 F.3d at 189. When plaintiff is a U.S. citizen and the alternative forum is foreign, the

11   defendant's burden to demonstrate plaintiff's choice is inconvenient is even greater. *See Sevison v.*

12   *Cruise Ship Tours, Inc.*, 37 V.I. 231, 238 (1997). The Supreme Court held that a plaintiff's "choice

13   of forum is entitled to greater deference when the plaintiff has chosen his home forum. [citations

14   omitted]. When the home forum has been chosen, it is reasonable to assume that this choice is

15   convenient." *Piper*, 454 U.S. at 256 *citing Koster v. (American) Lumbermens Mut. Cas. Co.*, 330

16   U.S. 518, 522 (1947)).

17       **A.    The BVI is Not An Appropriate Forum For The Present Claims Arising From
              A Seaman's Injuries Within the Jones Act**

18

19        Before considering whether a case may be dismissed on the basis of forum *non conveniens*,

20   the court "must first decide whether an adequate alternative forum exists to hear the case." *See Lony*

21   *v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 633 (3d Cir. 1989). Ordinarily, the requirement

22   of an adequate alternative forum may be satisfied where the "defendant is amendable to process in

23   the other jurisdiction." *Piper*, 454 U.S. at 255 n.22.  However, when the remedy offered "by the

24   other forum is clearly unsatisfactory" because it fails to "permit litigation of the subject matter of the

25   dispute," then that alternative forum is not adequate. *Id.*

26        Defendants stipulate that, if the matter is tried in the BVI, they "agree[ ] to submit [ ] to the

27   jurisdiction of the BVI and to accept service in the BVI in [this] matter." MTD at 2. Defendants'

28   amenability to process in the BVI alone does not suffice to establish that the BVI provides an

- 5 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000123

adequate alternative forum for Plaintiff's claims under the Jones Act, general maritime negligence, and maintenance and cure. The BVI deprives Plaintiff of the ability to litigate the Jones Act claim and provides inadequate procedures to litigate the general maritime and maintenance and cure claims, thereby limiting the available adequate remedies to Plaintiff.

The Jones Act provides remedies for injured seamen against their employer in accordance with the "[l]aws of the United States regulating recovery for personal injury to" the seamen. 46 U.S.C.A.§ 30104. Congress' primary concern in enacting the Jones Act was to protect American seamen by creating a negligence cause of action for ship personnel against their employer. *See Lauritzen v. Larsen*, 345 U.S. 571, 579 (1953). An employee is a seaman, and covered by the Jones Act, when she performs a substantial part of her work on the vessel and her performed duties contribute to the accomplishment of the vessel's mission, or to the operation or welfare of the vessel. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 366 (1995).

Plaintiff, a chef, performed a substantial part of her duties on board the M/Y Olga and contributed to the accomplishment of the welfare of the pleasure vessel because her duties included provisioning food and meals to guests on board. *See, e.g.*, *Lunsford v. Fireman's Fund Ins. Co.*, 635 F.Supp. 72 (E.D. La. 1986) (finding a cleaner's duties of cleaning and provisioning a pleasure yacht contributed to the function of the yacht within the Jones Act). When Plaintiff was injured, she was acting within the course and scope of employment because she was attempting to embark and disembark the M/Y Olga to provision the vessel. Therefore, as a U.S. seaman, Plaintiff falls precisely within the class that Congress contemplated for protection when enacting the Jones Act.

The Jones Act statutorily provides a lower burden of proof for an injured seaman, such that, a ship-owner is liable for its employees' injuries if an employee can prove by a preponderance of the evidence that the employer's negligence was "even a slight causative factor in producing the injury." *Rogers v. Missouri Pac. Ry. Co.*, 352 U.S. 500 (1957). The "quantum of evidence necessary to support a finding of Jones Act negligence is [therefore] less than that required for common law negligence." *Ribitzki v. Canmar Reading & Bates, Ltd. P'ship.*, 111 F.3d 658, 662 (1997); *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997).

Were this case to be litigated in the BVI, Plaintiff would be denied the ability to litigate her

- 6 -

Trotter v. 7R Holdings, et al.     OPPOSITION TO MOTION TO DISMISS     3:14-cv-0099 CVG-RM

JA000124

1    Jones Act claims, which was established to protect Plaintiff in exactly this type of situation. Plaintiff

2    has established she is entitled, as a seaman, to bring a Jones Act claim under the laws of the U.S.

3    However, the BVI is not required to apply the statutorily provided remedies and procedures under

4    the Jones Act. Further, although the BVI may allow for a general negligence claim, it requires a

5    higher burden of proof than Jones Act claims and, more importantly, Plaintiff did not allege general

6    negligence. Additionally, Plaintiff will be prevented the right to a jury in the BVI. The BVI is clearly

7    not an adequate forum based on Plaintiff's Jones Act claims under U.S. maritime law.

8         Plaintiff would also be prevented from asserting her maintenance and cure claim. "Under the

9    Jones Act, an employer has a non-delegable duty to provide an injured seaman with maintenance and

10   cure without reference to liability until the injured seaman reaches maximum medical improvement."

11   *Musielak v. Rowan Intern., Inc.*, 814 F.Supp. 556, 557 (S.D. Tex. 1993) (*citing Gaspard v. Taylor*

12   *Diving & Salvage Co.,* 649 F.2d 372, 374 n.3 (5th Cir. 1981)). "The negligent denial of maintenance

13   and cure may be the subject of a Jones Act claim." *Atl. Sounding Co., Inc. v. Townsend*, 129 U.S.

14   2561, 2574 (2009). Therefore, if BVI is the forum and Plaintiff is unable to bring her Jones Act

15   claims, she will likely be denied the right to her corresponding maintenance and cure cause of action.

16        Lastly, Defendants submit Attorney Thorp's affidavit which details BVI procedures. These

17   include encouraging resolution, setting deadlines, disclosure of relevant documents and enforcement

18   of judgments against debtors. These procedures are all available in U.S. courts. There is nothing

19   notable or advantageous about the BVI procedures that Attorney Thorp detailed in his affidavit.

20   Further, regardless of whether the BVI allows for general negligence claims, Plaintiff is entitled to

21   bring a Jones Act claim subject to the lower standard, which the BVI simply does not allow for. If

22   BVI were the forum, Plaintiff would be left without adequate recourse and be greatly prejudiced.

23   **B.    The Private Interest Factors Weigh Heavily In Favor of Plaintiff**

24        If a court finds an appropriate alternative forum exists, it must then determine the amount of

25   deference to give to plaintiff's choice of forum. Then, the court must analyze the convenience of the

26   competing forums by balancing  private interest factors. The private factors to be considered are: (1)

27   relative ease of access to source of proof; (2) availability of compulsory process for attendance of

28   unwilling witnesses; (3) cost of obtaining attendance of willing witnesses; (4) possibility of viewing

- 7 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000125

the premises; and (5) all other practical problems. Sometimes the enforceability of a judgment may be considered. *See Gulf Oil,* 330 U.S. at 508 (1947). The movant cannot merely show plaintiff's choice of forum is lacking certain factors. *Lacey,* 832 F.2d at 180. Rather, the defendant must meet its burden by establishing the balance of factors tips decidedly in favor of the foreign forum. *Id.*

### 1.   Relative Ease of Access to Source of Proof

Defendants allege that a majority, if not all, evidence is in the BVI based upon the vessel's location and site of the incident. Defendants also contend that no witnesses or evidence are in the USVI.  This incorrect. The vessel's frequent location in the USVI, the mobility of the vessel, the lack of eye witnesses, the limitations of BVI discovery and the nationwide subpoena power of the U.S. all weigh in favor of the USVI as the appropriate forum in this case.

Defendants frequently argue that because the vessel is registered and located in the BVI, the BVI is the more appropriate forum. However, the vessel is frequently in the USVI and other U.S. waters. CharterWorld.com states that the M/Y Olga's charter locations include: St. Thomas, St. John, Miami, Fort Lauderdale, Florida Keys, Florida. *See* Request for Judicial Notice, Exhibit "A." Also, an advertisement for charters on the M/Y Olga on Barrington Hall Corporation's website states that the vessel is available for charters in St. Thomas and the Virgin Islands. Plaintiff also established that the vessel is provisioned in St. Thomas, boards and deboards guests in St. Thomas, and anchors in St. John. Therefore, the vessel, and a majority of evidence, would be easily accessible in the USVI.

Not only is the vessel frequently in the U.S., but it could easily relocate to the USVI if docked in the BVI. The Second Circuit has recognized that "the assessment of whether the balance of public and private interests strongly overcomes the plaintiff's choice of forum must be made in light of the realities of modern transportation and communications." *Manu Int'l., S.A. v. Avon Products, Inc.,* 641 F.2d 62, 65 (2d Cir.1981). As the *Manu* court noted, "it will often be easier to transfer a witness or document than to transfer a lawsuit." *Id.* The subject vessel is made to easily relocate and if it was needed for evidence, it could easily be brought to the U.S. for inspection.

Defendant also argues the tortfeasors and witnesses are in the BVI and that no witnesses are in the USVI. First, with respect to the tortfeasors, according to Defendants' declarations, 7R Holdings has its principal place of business in Puerto Rico and Defendant Luis Ruby Gonzalez is

- 8 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000126

1   a resident of Puerto Rico. Further, Calot is a resident of Canada. Therefore, the tortfeasors are not

2   in the BVI and as parties, they would be subject to the USVI's jurisdiction which is the appropriate

3   forum. With respect to witnesses, Plaintiff established in her declaration that, to the best of her

4   knowledge, no individual witnessed the incident. No crewmembers were with Plaintiff when she fell,

5   and there are no identified Scrub Islands Resort employees or BVI residents who witnessed the fall.

6   Therefore, any claim that there is a lack of witnesses in the USVI can be equally applied to the lack

7   of BVI witnesses and Defendant's argument does not assert any actual evidence to meet its burden

8   of proof.

9           In actuality, the U.S. would be a more appropriate forum with respect to witnesses because

10  of its broader discovery rules and nationwide subpoena power. In its Motion, Defendants concede

11  that the BVI provides for severely limited discovery, especially in light of the potential witnesses'

12  various residencies. If the BVI were the selected forum, Plaintiff could not compel the attendance

13  of witnesses or the production of documents located outside the BVI. Further, Plaintiff would be

14  precluded from conducting depositions unless a witness was unavailable for trial. These procedural

15  limitations are significant in this specific case because, as established in the affidavits submitted by

16  Defendants, (1) Calot is a resident of Canada, (2) Defendant 7R Holdings has its principal place of

17  business in San Juan Puerto Rico, (3) Luis Rubi Gonzalez, the Director of 7R Holdings, is a resident

18  of Puerto Rico (4) and one of the crew members is a resident of Florida in the U.S.

19          Pursuant to Fed. R. Civ. P. 45, the U.S. courts have nationwide subpoena power. *See* FRCP

20  45, committee note to 2013 amendment. Therefore, with the USVI as the forum, the parties have the

21  ability to obtain testimony and documents via subpoena from any individual in Puerto Rico where

22  7R Holdings has its principal place of business and from Mate David McCoy, a resident of Florida.

23  The BVI on the other hand does not readily allow for access to this information located outside of

24  its territory. In addition, Plaintiff would be able to obtain the testimony of and documents from Calot

25  through letters of request from the U.S. courts to the Canadian court. Not only do the procedures of

26  this Court provide much easier access to proof in this matter, but they allow access to witnesses and

27  information that would not even be obtainable in the BVI.

28          Not only will the BVI make it extremely difficult to obtain evidence outside of the BVI, but

- 9 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

1   it prevents Plaintiff from obtaining deposition testimony of witnesses regardless of their residence.

2   Although Plaintiff is not aware of any witnesses to the incident, Defendants argue there are

3   potentially numerous individuals with knowledge of this matter. Assuming this is true, in order to

4   obtain their testimony before trial, the parties would need to take depositions. Under BVI law, these

5   depositions are not allowed unless that individual is unavailable for trial. This presents a severe

6   limitation to all parties on obtaining evidence and testimony necessary to the case. In the USVI, the

7   parties would be allowed to take these depositions pursuant to the Federal Rules of Civil Procedure.

8       Given the greater access to witnesses and evidence in the U.S. and the ability to move the

9   vessel in question to the USVI, the ease of access to proof weighs in favor of the USVI in light of

10  the discovery procedures and subpoena power available to the parties.

11              **2.    Availability of Compulsory Process for Attendance of Unwilling
                        Witnesses**

12

13      As stated above, Plaintiff is unaware of any witnesses to the incident. Defendants sweepingly

14  assert there are BVI witnesses not within this Court's jurisdiction but completely fails to identify any

15  non-party witnesses in the BVI. Given the BVI's lack of compulsory process over unwilling

16  witnesses, this factor again weighs heavily in favor of Plaintiff.

17      Defendants' MTD and affidavits are riddled with inconsistencies. Contrary to Defendants'

18  assertion that "Plaintiff's choice of venue would deprive the Defendant of any live testimony of the

19  individuals with knowledge involving the alleged incident," Plaintiff's choice of forum would

20  actually allow for both parties to obtain testimony. In their Motion, Defendants argue that the

21  witnesses are not subject to the jurisdiction of this Court but "these" witnesses are subject to BVI

22  courts and authorities. It is unclear what witnesses Defendants are referring to. Defendants

23  continuously assert Scrub Island Resort employees would be witnesses but then fail to identify any

24  of these individuals and where they reside. Further, Plaintiff has established that no one witnessed

25  the incident so the need for the testimony of these employees is unfounded. Even assuming most

26  witnesses are BVI employees who may not be subject to this Court's subpoena power, this Court has

27  recognized that there are "other methods of obtaining evidence from international sources absent the

28  subpoena power, such as letters rogatory," and dismissal on this forum *non conveniens* factor alone

- 10 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000128

1    is improper. *Sevison*, 37 V.I. at 240.

2         Regarding the witnesses Defendants do identify, although employees of a BVI business, not

3    one crewmember witness resides in the BVI. The identified crewmembers include residents of

4    Mexico and Thailand not subject to BVI jurisdiction and most notably, Mate David Mc-Coy, a

5    resident of the U.S., subject to this Court's jurisdiction. Other potential non-party witnesses, if any,

6    would be employees or individuals involved with 7R Holdings in Puerto Rico, who would be subject

7    to this Court's subpoena power. With respect to Calot, he is subject to this Court's jurisdiction

8    pursuant to a letter of request and if he is captaining the M/Y Olga, he will often be in USVI waters.

9    If BVI were found to be the proper jurisdiction, the testimony of these witnesses would be entirely

10    unavailable because, as conceded by Defendants, the BVI does not provide means of compelling

11    attendance of witnesses or production of documents located outside the BVI. The U.S. does provide

12    for that compulsory process and the BVI would therefore be an extremely inconvenient forum here

13    where most non-party witnesses are not BVI residents.

14         Overall, it is Defendants' choice of forum that would severely deprive both parties of

15    testimony and evidence. Due to the BVI's non-existent compulsory process, Defendants try to divert

16    this Court's attention by claiming the witnesses are all BVI residents subject to the BVI's

17    jurisdiction. A look at the facts, including those offered by Defendants, demonstrates that a majority

18    of witnesses, if any, would be subject to this Court's jurisdiction. In light of Defendants' burden,

19    there is no basis under this factor to argue the BVI is a more convenient forum.

20         **3.    Cost of Obtaining Attendance of Willing Witnesses**

21         Defendants contend the cost to obtain testimony of its witnesses in the USVI will be overly

22    burdensome because of transportation, housing, etc. Again, Defendants' argument is based upon the

23    premise that evidence and witnesses are located in the BVI. However, other than the site of the

24    incident, Defendants have failed to identify any specific BVI witnesses or evidence. As stated above,

25    Plaintiff is unaware of any individual, much less a BVI resident, who witnessed the fall. In addition,

26    none of the crewmembers are residents of the BVI and even if Calot, a resident of Canada, is

27    working on the vessel in the BVI, it is frequently docked in the USVI where this trial would occur.

28         Any burdens that will exist for Defendants in transporting those witnesses who actually do

Trotter v. 7R Holdings, et al.        OPPOSITION TO MOTION TO DISMISS        3:14-cv-0099 CVG-RM

JA000129

1  reside in the BVI to the USVI are likewise imposed upon the Plaintiff if the case is transferred.

2  Similar to Defendants, Plaintiff would incur the same costs for herself, the crewmembers of the M/Y

3  Olga, 7R Holdings employees, expert witnesses and treating physicians in Florida, none of whom

4  are residents of the BVI. Also, any cost of obtaining additional counsel in the USVI, as argued by

5  Defendants, would likewise be imposed on Plaintiff in the BVI.

6       Overall, traveling to the USVI for a trial is arguably as inconvenient as traveling to the BVI.

7  *See Sevison*, 37 V.I. at 239. It is Defendant's burden to establish the BVI is the more convenient

8  forum and any argument Defendants provide as to their inconvenience would be suffered by Plaintiff

9  if this case were heard in the BVI. This factor is in equipoise at best and therefore weighs in favor

10  of denying dismissal. *See Windt*, 529 F.3d at 192; *see also Lacey*, 932 F.2d at 170.

11            **4.    Possibility of Viewing Premises**

12       Although Plaintiff sustained injuries in the BVI, this factor is not dispositive. Further, the

13  boat, which potentially would need to be inspected, is a moveable vessel that not only could easily

14  be brought to the U.S., but is often chartered and docked in the U.S., including in the USVI. *See*

15  Request for Judicial Notice Exhibit "A" and "B."

16            **5.    Practical Considerations**

17       A key practical consideration, addressed above and further below, is that the claims in this

18  case arises out of U.S. federal maritime law, specifically the Jones Act claim and a corresponding

19  claim for maintenance and cure. As a seaman, Plaintiff is entitled to bring a Jones Act claim against

20  her employer pursuant to the laws of the U.S. This matter does not involve general negligence, which

21  as argued by Defendants, could easily, efficiently and non-prejudicially be transferred to the BVI.

22  Litigating this case in the USVI under the laws of the U.S. would be more practical and expeditious

23  and therefore weighs in favor of maintaining the forum in the USVI.

24            **6.    Enforcement of Judgment**

25       Defendants argue that enforcement of a judgment is a favorable factor for Defendants

26  because the BVI provides a means for enforcing judgments against judgment debtors. This is

27  inapposite because the USVI has the same ability and it would in fact be easier to enforce a judgment

28  through the necessary proceedings in the U.S. where Plaintiff resides. Again, given their burden,

Trotter v. 7R Holdings, et al.        OPPOSITION TO MOTION TO DISMISS        3:14-cv-0099 CVG-RM

JA000130

1   Defendants have failed to show why this factor would favor dismissal.

2   **C.    The Public Interest Factors Weigh Heavily In Favor of Plaintiff**

3   If Defendants establish there is an appropriate alternative forum and prove private interest

4   factors favor dismissal, the Court may consider public interest factors. *See Lacey*, 932 F.2d at 180.

5   Although the Restatement provides persuasive authority, substantial case law delineates public

6   factors for a court's consideration. *See e.g., Id*.; *Lauritzen,* 345 U.S. 571; *Sevison*, 37 V.I. 231. These

7   factors include (1) administrative difficulties from court congestion; (2) local interest in having

8   localized controversies decided at home; (3) interest in having trial of a diversity case in a forum at

9   home with the governing state law; (4) avoidance of unnecessary problems in conflicts of laws; and

10  (5) unfairness of burdening citizens in an unrelated forum with jury duty. *Windt*, 529 at 189.

11  **1.    Avoidance of Unnecessary Problems in the Application of Foreign Law**

12  In federal maritime law, special choice of law rules are applied. *See Sevison*, 37 V.I. at 241.

13  If a maritime case with foreign connections is brought within the U.S., the courts must look at what

14  connection the U.S. has to the dispute. *Id.; see also Lauritzen*, 345 U.S. 571. If the U.S. has an

15  adequate interest, the court must determine whether maritime law applies. Then, if maritime law is

16  applicable, the court must determine whether U.S. or foreign maritime law applies. Some courts have

17  held that if U.S. maritime law is found to be applicable, the case cannot be dismissed on the basis

18  of forum *non conveniens. See Sevison*, 37 V.I. at 242.

19  **a.    U.S. Connection to Dispute**

20  There is U.S. interest in the dispute because the Plaintiff is an American citizen who

21  embarked upon the M/Y Olga charter from the USVI. *See Neely v. Club Med Mgmt. Services Inc.*,

22  63 F.3d 166, 171 (3d Cir. 1995) (finding "American maritime law potentially applicable in [that]

23  case because the plaintiff is an American citizen").

24  **b.    Maritime Connection Test**

25  Defendants contend that BVI law applies because the incident occurred in the BVI territory.

26  However, Defendants fail to address the nature of the tort, namely that it occurred while working on

27  a boat, which can bring the tort within the realm of both statutory and non-statutory maritime law.

28  The proper analysis, the maritime connection test, establishes that maritime law applies to a tort if

- 13 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000131

1   (1) the incident occurs on a vessel on navigable waters, (2) bears a substantial relationship to

2   traditional maritime activity, and (3) has a potential impact on maritime commerce. *Grubart v. Great*

3   *Lakes Dredge & Dock Co.*, 513 U.S. 527, 531-34 (1995).

4   ### i.   Incident Occurred on Navigable Waters

5   Neither party appears to contest that the M/Y Olga was a vessel on navigable waters at the

6   time of the incident. The incident occurred while Plaintiff was obtaining provisions for the docked

7   vessel within her duties as a chef on the M/Y Olga. The fact that the injury occurred in BVI

8   navigable waters does not prevent the court from applying U.S. law because U.S. maritime law has

9   been applied in the territorial waters of foreign states. *See Neely*, 63 F.3d 166 (3d Cir. 1995); *see also*

10  *Sevison*, 37 V.I. at 244 (holding that "navigable waters" is not limited to the territorial waters of the

11  U.S. and U.S. maritime law has been applied in the territorial waters of foreign states).

12  ### ii.   Maritime Nexus - Potential for Disruption

13  First, the court must "assess the general features of the type of accident involved," to

14  determine whether the incident has "a potentially disruptive impact on maritime commerce." *Sisson*,

15  497 U.S. at 362-64 & n. 2. Ordinarily, a tort involving a vessel on navigable waters falls within the

16  scope of admiralty jurisdiction. *See Sevison*, 37 V.I. at 245, *citing Grubart*, 513 U.S. at 534. The

17  injury need not occur directly onboard the vessel while on navigable waters. *Sevison*, 37 V.I. at 246,

18  *citing White v. U.S.*, 53 F.3d 43, 47 (4th Cir. 1995)(holding that a person injured while disembarking

19  a ship docked during repairs "poses a more than fanciful risk to a variety of activities essential to

20  maritime commerce"). As the court found in *Coats v. Penrod Drilling Corp.*, "[w]ithout a doubt,

21  worker injuries...can have a disruptive impact on maritime commerce by stalling or delaying the

22  primary activity of the vessel." 61 F.3d 1113, 1119 (5th Cir. 1995).

23  Plaintiff was a seaman chef hired to work onboard the M/Y Olga. As a necessary part of her

24  job, she was required to disembark the vessel to pick up herbs from the executive chef at Scrub

25  Island. While performing these duties, she suffered injuries as a result of a fall from a set a stairs she

26  was required to traverse to pick up the provisions. Post-incident, the ship was required to obtain a

27  replacement chef and allow Plaintiff to deboard to receive medical treatment. An injury to a seamen

28  employee during a charter clearly implicates maritime commerce and disrupts the vessel's activity.

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000132

### iii.    Maritime nexus – traditional maritime activity

Next, the court must "determine whether the 'general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Sisson*, 497 U.S. at 362-64 & n. 2. The activity giving rise to Plaintiff's claim constitutes a traditional maritime activity. Prior to embarking on any maritime travel, a vessel must have appropriate provisions and the crewmembers must be capable of getting on and off the vessel without injury. The charter provided its passengers food and beverage and Plaintiff was hired as a chef to provide that specific accommodation. To do so, she was required to obtain provisions from the executive chef on Scrub Island and bring the provisions back to the vessel. In doing so, she was injured. This activity of a seaman chef is substantially related to traditional maritime activity

### c.    Maritime Choice of Law Rules

Once maritime law is found to apply, the question of whether U.S. law applies to the maritime claim depends upon a nonexhaustive list of factors set forth by the Supreme Court in *Lauritzen*, 345 U.S. 571 (1953), *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306 (1970), and *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354 (together known as the "*Lauritzen* triad"). *See Neely*, 63 F.3d at 170. These factors include: (1) the place of the wrongful act, (2) the law of the flag, (3) allegiance or domicile of the injured, (4) allegiance of the defendant shipowner, (5) the place of contract, (6) the inaccessibility of a foreign forum, (7) the law of the forum, and (8) the shipowner's base of operations. *Lauritzen*, 345 U.S. at 583-93 and *Rhoditis*, 398 U.S. at 309 (applying these factors to claims arising under the Jones Act); *see also*, *Romero*, 358 U.S. 354 (1959) (applying these factors to claims arising under general maritime law). The consideration of these factors governs choice of law in Jones Act and U.S. general maritime law claims. *Neely*, 63 F.3d at 170.

In *Neely*, the Court interpreted the choice-of-law approach set forth by the Supreme Court as a "substantial contacts" test, which is designed to ensure that U.S. maritime law of personal injuries only applies to injuries that take place in foreign jurisdiction when significant U.S. interests are implicated. 63 F.3d 166, 182 (3d Cir. 1995). Therefore, Plaintiff must first, as a threshold requirement, demonstrate a basis for prescriptive jurisdiction, which provides a state authority to "make its law applicable to the activities, relations, or status of persons, or the interests of persons

- 15 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000133

1    in things...." *Id.* at 184-86. Then, if prescriptive jurisdiction applies, the court may analyze the

2    *Lauritzen/Rhoditis* factors to ensure that the application of U.S. law is reasonable. *Id.*

3                                    **i.    Prescriptive Jurisdiction**

4           Injury to an American seaman provides a sufficient basis for prescriptive jurisdiction. *See*

5    *Neely*, 63 F.3d at 186; *see also Baily v. Dolphin Int'l, Inc.*, 697 F.2d 1268, 1278 n. 25 (5th Cir. 1983)

6    ("[A] sufficient American interest in a particular transaction can rest on the presence of even one

7    substantial contact between the transaction and this country…"). In other words, injury to a seaman

8    who is an American citizen implicates significant American interests rendering application of U.S.

9    maritime law appropriate. *Id.* Plaintiff is an American citizen and was a seaman at the time of the

10   accident, serving as a chef on the M/Y Olga. Therefore, Plaintiff has established prescriptive

11   jurisdiction for this matter.

12                               **ii.    Reasonable Application of American Law**

13          Once prescriptive jurisdiction is established, the Court must analyze the reasonableness in

14   applying U.S. law. *Id.* Reasonableness in a maritime case depends on the balancing of U.S. and

15   foreign interests by considering the factors set forth in the *Lauritzen* triad. *See id.* at 182. In *Rhoditis*,

16   the Supreme Court stressed the factors set forth in the *Lauritzen* triad are not to be applied

17   mechanically, but rather, the significance of each factor depends on the unique facts of the case and

18   those factors are not exhaustive of all potentially relevant considerations. *See* 398 U.S. at 308.

19          In *Neely*, the Third Circuit considered the reasonableness of applying U.S. law after the

20   Plaintiff, a U.S. citizen, was injured by the propellers of her employer's boat in St. Lucia. 63 F.3d

21   at 171. Although the accident occurred in St. Lucian waters, the defendant corporation was organized

22   under the laws of St. Lucia and the injuring vessel was registered in St. Lucia, those factors did "not

23   mean that U.S. law may not reasonably be applied under the circumstances." *Id.* (holding that those

24   facts alone were insufficient to conclude that St. Lucia's interests were "so threatened or strong that

25   U.S.'s interests must be ignored."). The Court emphasized that the U.S. has "an overriding interest

26   in assuring adequate compensation for its injured seamen." *Id.* Therefore, unless "virtually all of the

27   Lauritzen factors point away from the United States, application of American law will be reasonable"

28   given the Plaintiff's American interests. *Id.* at 190.

                                                    - 16 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000134

In conducting the reasonableness inquiry, however, the court must give weight to the relevant factors according to the "context of the incident at the heart of the suit." *Id.* Namely, where seamen are not engaging in "traditional international shipping activit[ies]," some factors take on a heightened significance whereas others will take on a diminished significance. *Id.*; *see also Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1482-83 (9th Cir. 1987); *Chiazor v. Transworld Drilling Co.*, 648 F.2d 1015, 1019 (5th Cir. 1981). The incident at hand is a non-traditional maritime activity because the purpose and nature of the M/Y Olga was not the pursuit of international commerce through the transportation of merchandise, goods or people. Rather, the vessel at issue was chartered for a pleasure cruise. *See Neely*, 63 F.3d at 191 (finding that the transportation of tourists from beach to reef for scuba diving was a non-traditional Jones Act activity). Given the non-traditional nature of the activity at hand, the factors that have a heightened significance within this context specifically include the place of the wrongful act, place of contract, allegiance of the defendant and allegiance or domicile of the injured according to *Neely*. *Id.*

**(a)      Place of the wrongful act**

Although the place of the wrongful act can take on a heightened importance in a non-traditional maritime context, the place of the wrongful act in this case was merely fortuitous. Unlike those cases where a seaman is injured on a permanently stationed vessel or on a vessel that navigates within the same jurisdiction regularly, the M/Y Olga regularly engaged in maritime activities in both the BVI and the USVI. *See e.g.*, *Fogleman*, 920 F.2d at 282 (injury stemmed from work performed on a permanently situated offshore oil rig and therefore the place of injury assumed greater importance); *Neely*, 63 F. 3d at 191 (injury stemmed from work performed on a vessel that only traveled from shore to reef for scuba diving within the same navigable waters).

While Plaintiff's injury did actually take place while the M/Y Olga was docked on the navigable waters of the BVI for provisioning, the incident just as easily could have occurred when the M/Y Olga was docked on the navigable waters of the USVI for similar provisioning and other activities. According to Plaintiff's declaration, within the span of just nine days, the M/Y Olga was within the navigable waters of the USVI for provisioning (December 20-24), pleasure activities (December 28), and for a changeover of guests (December 29). Given the M/Y Olga's regular travel

- 17 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000135

1   between both the BVI and USVI, the actual site of injury was "largely fortuitous when the seaman

2   [was] exposed to the same risks throughout the course of the journey and [the] accident happen[ed]

3   to occur in a particular locale." *Neely*, 63 F.3d at 191.  Therefore, the place of the wrongful act is

4   negligible within the current balancing analysis for the purpose of determining the application of law.

5                      **(b)      Place of Contract**

6           In the traditional shipping context, the place of contracting takes on lesser significance

7   because international shippers take on crew members as needed in various nations' ports. *See*

8   *Lauritzen*, 345 U.S. at 588.  In contrast, the place of contract takes on heightened importance within

9   the non-traditional maritime employment context because employers need not take on crewmembers

10  at random ports and often select their employees in advance. *Neely*, 63 F.3d at 192.

11          Here, the place of contracting was in the U.S. Calot contacted Plaintiff in the U.S. after

12  receiving her information from a Florida broker, Churchill Yachts. All subsequent contractual

13  negotiations between Calot and Plaintiff occurred while she was in Florida. She formed a written

14  contract to work on the M/Y Olga, with offer and acceptance occurring via email, while she was in

15  Florida and the M/Y Olga was docked in Puerto Rico. She also began working per Calot's request

16  while in Florida. This contract provided for her employment to begin in St. Thomas, commencing

17  with the provisioning of the M/Y Olga in the USVI. The place of contracting in the U.S. for her

18  employment to begin in the U.S. supports the reasonableness of applying U.S. law.

19                      **( c)      Allegiance of the Defendant Shipowner**

20          In both traditional and non-traditional maritime employment scenarios, the allegiance of the

21  defendant shipowner, or in this case, the defendant employers, can present an important

22  consideration for the reasonableness of applying U.S. law. *Id.* at 194. In *Neely*, the Third Circuit

23  stated that the court must consider the base of daily operations of the vessel, the corporate bases of

24  the defendants, and the operational contacts of the defendant employers within the U.S.

25          Here, the M/Y Olga's daily operations were not statically based out of the BVI.  Rather, the

26  M/Y Olga docked and traveled in and out of the USVI on a regular basis. Although the vessel is

27  registered in the BVI, 7R Holdings has its principal place of business in Puerto Rico, not the BVI.

28  Further, the allegiance of the defendant shipowner is not controlling. *See id.* (where the court stated

- 18 -

Trotter v. 7R Holdings, et al.            OPPOSITION TO MOTION TO DISMISS            3:14-cv-0099 CVG-RM

JA000136

1   defendant's corporate office connections to the BVI gave the BVI a "weak interest" in applying its

2   law to incidents involving that corporation). In addition to the M/Y Olga's regular base of operations

3   shifting from the BVI and the USVI, it also had significant operational contacts with the U.S. Not

4   only did the M/Y Olga engage in substantial commercial invitation of American tourists, but it also

5   specifically hired the Plaintiff by using the services of a U.S. broker, Churchill Yachts to hire a U.S.

6   chef. That same Florida broker was also responsible for booking the guests on the M/Y Olga charter.

7   Additionally, guests embarked and disembarked at the USVI. Therefore, the U.S. interests' are

8   heavily implicated, which supports the application of U.S. law.

9   **(d)      Allegiance or Domicile of the Injured**

10   Several cases hold that a seaman's allegiance is of increased importance in the consideration

11   of the *Lauritzen* triad in non-traditional non-shipping contexts. *See, e.g., Zipfel*, 832 F.2d at 1483;

12   *Ali v. Offshore Co.,* 753 F.2d 1327, 1331 (5th Cir. 1985); *Zekic v. Reading & Bates Drilling Co.*, 536

13   F.Supp. 23, 25 (E.D. La. 1981). In fact, in both non-traditional and traditional contexts, an injured

14   seaman's connection to the U.S. is considered one of the most important factors that demonstrate

15   the reasonableness of the application of U.S. law. *See Neely*, 63 F.3d at 195. Because U.S. seamen

16   were the primary concern of Congress in enacting the Jones Act, "courts should consider claims

17   brought by U.S. seamen as manifesting by definition much of the necessary substantiality of

18   connection" to U.S. interests. *Id.* at 196.

19   Therefore, because Plaintiff is a U.S. seaman, this factor, in conjunction with the foregoing

20   discussion, clearly demonstrates that the U.S. has more than enough interest in the incident for U.S.

21   law to apply. *See id.* at 197. The remaining *Lauritzen* triad factors; including the law of the flag,

22   inaccessibility of a foreign forum, and law of the forum; were not addressed by Defendant.

23   Nonetheless, as the courts in *Lauritzen* and *Neely* stated, these factors have decreased importance

24   in considering the application of U.S. law in the non-traditional context. *Id.*; *Lauritzen*.

25   **2.      Local Interest in Having Controversies Decided at Home**

26   Although "[t]here is a local interest in having localized controversies decided at home," this

27   case does not present issues solely local to the BVI. *Gulf Oil*, 330 U.S. at 509. In fact, this case

28   presents more issues local to the U.S., specifically the USVI, largely because Plaintiff is a U.S.

- 19 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

JA000137

citizen: "[w]hen a U.S. worker is injured, application of U.S. law will affect the interests and relations of Americans, and there are likely to be substantial effects within the U.S." *Neely*, 63 F.3d at 18.

As previously discussed, Plaintiff is a U.S. citizen and entered into her employment contract for the M/Y Olga in Florida through the use of a Florida broker. The M/Y Olga is a vessel which engages in charters in the navigable waters of the USVI and advertises to U.S. tourists. Plaintiff began performing her contractual duties in St. Thomas where the vessel was already scheduled to dock for provisioning prior to entering her contract. Plaintiff then embarked upon the vessel in St. Thomas and disembarked in St. Thomas as several more passengers arrived for the charter.

Therefore, any local interest of the BVI in deciding this controversy is limited to the vessels registration and the place where the injury occurred. However, regardless of the location of registration, the vessel regularly charters out of the USVI and Florida. The BVI's interests must be appropriately balanced against the U.S. interest "in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Gulf Oil*, 330 U.S. at 509. The U.S.'s strong local interest in this matter also poses less of a burden upon a U.S. jury. At minimum, this fact is in equipoise and dismissal is improper.

## IV. <u>CONCLUSION</u>

This Court should deny Defendants' Motion to Dismiss because the BVI is not an appropriate forum that would allow Plaintiff adequate recourse as a Jones Act seaman. A balancing of both the private and public factors weigh heavily in Plaintiff's favor. It is Defendants' burden to show the BVI is not only an adequate forum, but that Plaintiff's chosen forum is so burdensome that it must be transferred. Defendants' have failed to meet this burden and this Court should affirm Plaintiff's choice of forum.

Dated : March 27, 2015

**LAW OFFICES OF FRIEDBERG & BUNGE**

By: *s/ THOMAS F. FRIEDBERG, ESQ.*
THOMAS F. FRIEDBERG, ESQ. (VI#1006)
Attorneys for Plaintiff, MICHELLE TROTTER
610 West Ash Street, Suite 1400, P.O. Box 6814
San Diego, California 92101
TEL : (619)557-0101 FAX: (619)557-0560
"tom@lawofficefb.com"

- 20 -

**JA000138**

1   **CERTIFICATE OF SERVICE**

2       The undersigned hereby certifies that a true and exact copy of the foregoing **OPPOSITION**

3   **TO MOTION TO DISMISS FOR FORUM** *NON CONVENIENS* was served on the 27th day of

4   March 2015, by causing this document to be filed with the CM/ECF system which will deliver notice

5   to the following:

6   JENNIFER Q. MILLER, ESQ. (VI#1109)
    KELLY CHARLES-COLLINS
7   **HAMILTON, MILLER & BIRTHISEL, LLP**
    50 Southeast Second Avenue, Suite 1200
8   Miami, Florida 33131
    TEL : (305) 379-3686
9   FAX: (305) 379-3690
    "jmiller@hamiltonmillerlaw.com"
10

11

12

13                                          *s/THOMAS F. FRIEDBERG, ESQ.*
                                            Attorneys for Plaintiff, MICHELLE
14                                          TROTTER

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 21 -

Trotter v. 7R Holdings, et al.          OPPOSITION TO MOTION TO DISMISS          3:14-cv-0099 CVG-RM

**JA000139**

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

MICHELLE TROTTER,

    Plaintiff,

    v.

7R HOLDINGS, LLC, LUIS A. RUBI GONZALEZ, M/Y OLGA,

    Defendants.

CIVIL CASE NO.  3:14-cv-0099

JURY TRIAL DEMANDED

Action Filed : November 19, 2014
Trial Date     : None set

**DECLARATION OF MICHELLE TROTTER IN OPPOSITION**

**TO MOTION TO DISMISS FOR FORUM *NON CONVENIENS***

I, MICHELLE TROTTER, respectfully declare as follows:

1.    I am an adult with personal knowledge of the facts herein, and if called as a witness, could competently testify thereto. I am the Plaintiff in the above entitled action.

2.    On November 27, 2012, I was contacted by e-mail by Captain Bernard Calot for a job as a chef aboard the M/Y Olga. Captain Calot stated that he had located me through Churchill Yachts in Ft. Lauderdale, Florida. This is a company that I have an association with from past bookings on yachts in their charter fleet. Captain Calot also called on the telephone at my residence in Florida to discuss the position, including my pay rate, the length of the charter, the number of guests on the vessel and the number of crew members on the vessel. I was informed that the charter would start on December 26, 2012 and go through January 5, 2013, that there would be 10 guests and there were 6 crew persons including myself on the vessel.  Captain Cabot advised me the vessel was currently in Puerto Rico and would be brought to St. Thomas for provisioning on December 19, 2012  and then moved to Scrub Island, British Virgin Islands on December 22, 2012.

3.    On November 30, 2012, Captain Calot contacted me with the guest menu preference sheets and asked me to put together menus and forward the menus to the guests for their approval so that the vessel could be provisioned in advance of the charter. I also discussed when I should join

JA000140

the vessel and it was decided that I should join the vessel 2 to 3 days before the charter began to make sure the galley was properly set up and provisioned for the charter. Captain Calot requested that I oversee the final food provisioning, and since the vessel would be in St. Thomas beginning on December 19, 2012, that I join the vessel in St. Thomas on December 19, 2012.

4.      On December 2, 2012, Captain Calot contacted me to confirm that I had received the guest preference sheets.

5.      On December 3, 2012, I contacted Captain Calot requesting the ages of the guests' children and stated that the menus would be completed within the next several days.  Captain Calot contacted me again on December 3, 2012, with the contact details of his preferred produce supplier which was The Fruit Bowl in St. Thomas.

6.      On December 5, 2012, Captain Calot forwarded the guest lists to me indicating that 10 guests would be arriving by private jet on December 26, 2012, at a location to be determined, 8 guests to depart on December 29, 2012 and 8 new guests to arrive on December 29, 2012 and departing January 5, 2013.

7.      On December 7, 2012, Captain Calot contacted me requesting that I select the meats and fish so that the order could be placed with National Marine in Puerto Rico to provision the vessel while it was in Puerto Rico.  That same day Captain Calot stated that the vessel would likely be moved to St. Thomas on December 20, 2012, and confirmed that I needed join the vessel while it was in St. Thomas. I also contacted National Marine on this day with the meat and fish order.

8.      On December 8, 2012, Captain Calot sent me an inventory of the food currently on board the vessel.

9.      On December 10, 2012, I sent my menu plans to Captain Calot taking into account the changeover of guests on December 29, 2012.

10.      On December 11, 2012, Captain Calot contacted me with the list of galley equipment on board. Captain Calot at this time confirmed that the vessel would be moved from Puerto Rico to St. Thomas on December 19, 2012 and would remain in St. Thomas through December 22, 2012. Captain Calot asked me whether I wanted to join the vessel on December 19 or 20, 2012. I stated that I preferred arriving on December 19, 2012.  I also was contacted on this date by Maggie Vale with

Declaration of Michelle Trotter

Churchill Yachts in Ft. Lauderdale, Florida, to follow up on my employment as a chef aboard the M/Y Olga. At that time, I shared the menu plans with Maggie, who had also arranged for the guests who were chartering the M/Y Olga during the time that I would be serving as the chef.

11. On December 14, 2012, I sent Captain Calot a shopping list for Costco in Puerto Rico. Captain Calot responded that National Marine order would be delivered to the vessel on December 19, 2012.

12. On December 15, 2012, I received an e-mail from Captain Calot with my travel itinerary from Regency Travel which had me arriving in St. Thomas on December 19, 2012 and departing from St. Thomas on January 8, 2013.

13. On December 15, 2012, I e-mailed a second produce order for December 29, 2012, to be provided by the produce supplier in St. Thomas, The Fruit Bowl.

14. On December 17, 2012, I e-mailed a dry good checklist to Captain Calot.

15. On December 19, 2012, Captain Calot e-mailed me requesting that the Fruit Bowl produce delivery take place on December 22, 2012, so that the vessel could be moved to Scrub Island on December 22, 2012.

16. I arrived in St. Thomas on December 19, 2012, at 4:30 p.m. and went to the vessel.

17. Between December 20, 2012 through December 23, 2012, I organized the galley and re-checked the provisioning. The first produce delivery from The Fruit Bowl was received during this time. The food was in poor condition and would not last to December 26, 2012. I then proceeded to shop in St. Thomas to re-provision the vessel with fresh produce.

18. The vessel was moved from St. Thomas to Scrub Island on December 24, 2012. My paid employment started while I was in St. Thomas and included a per diem payment for December 22 and December 23, 2014. The vessel was in St. Thomas during this time.

19. The incident occurred at or near 9:00 a.m. on December 26, 2012, when I was returning from picking up necessary herbs from the executive chef at Scrub Island.

20. On December 28, 2012, the vessel returned to US Virgin Islands waters and anchored off St. John so that the guests could use jet skis, which are not permitted in BVI waters.

21. The vessel docked at Yacht Haven Grand on St. Thomas the evening of December

Declaration of Michelle Trotter

JA000142

28, 2012.

22.     On December 29, 2012, a replacement chef arrived and boarded the vessel in St. Thomas. There was also a changeover of guests as well. I left the vessel in St. Thomas and boarded a flight to Florida that afternoon. The guests that were scheduled to leave the vessel disembarked in St. Thomas and the new guests boarded the vessel in St. Thomas.

23.     To the best of my knowledge, there were no witnesses to the actual fall in which I injured myself. The other crew members of the M/Y Olga were not present. I do not believe that there was anyone else present at the time.

I declare under the laws of the United States that the foregoing is true and correct. This declaration is executed this 23 day of March, 2015, at AUCKLAND NEW ZEALAND

MICHELLE TROTTER

- 4 -

Declaration of Michelle Trotter

JA000143

1

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

2

3

4

5

The undersigned hereby certifies that a true and exact copy of the foregoing **DECLARATION OF MICHELLE TROTTER** was served on the 27th day of March 2015, by causing this document to be filed with the CM/ECF system which will deliver notice to the following:

6

7

8

9

10

JENNIFER Q. MILLER, ESQ. (VI#1109)
KELLY CHARLES-COLLINS
**HAMILTON, MILLER & BIRTHISEL, LLP**
50 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
TEL : (305) 379-3686
FAX: (305) 379-3690
"jmiller@hamiltonmillerlaw.com"

11

12

13

14

_s/THOMAS F. FRIEDBERG, ESQ._
Attorneys for Plaintiff, MICHELLE
TROTTER

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

- 5 -

Declaration of Michelle Trotter

</div>

JA000144

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| MICHELLE TROTTER,<br><br>      Plaintiff,<br><br>      v.<br><br>7R HOLDINGS, LLC, LUIS A. RUBI<br>GONZALEZ, M/Y OLGA,<br><br>      Defendants. | CIVIL CASE NO.  3:14-cv-0099-CVG-RM<br><br>**JURY TRIAL DEMANDED**<br><br>**Action Filed : November 19, 2014**<br>**Trial Date     : None set** |

## <u>NOTICE OF REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO</u>

## <u>MOTION TO DISMISS FOR FORUM *NON CONVENIENS*</u>

Plaintiff MICHELLE TROTTER, through her attorney, hereby requests the Court take judicial notice pursuant to Federal Rule of Evidence 201 of the following:

1.     A yacht charter description of the M/Y Olga listing the yacht's charter locations contained within the website of Charter World, and located at "http://www.charterowrld.com/index.html?sub=yacht-charter&charter=myolga-5705." A true and correct copy of the webpage is attached hereto as Exhibit "A."

2.     A description of and advertisement for rental of the M/Y Olga contained within the website of Barrington Hall Corporation, and located at "http://www.yachtsbhc.com/luxury-yacht-charters/motor-yacht-olga.html."

Dated : March 27, 2015         **LAW OFFICES OF FRIEDBERG & BUNGE**

                   By: *s/ THOMAS F. FRIEDBERG, ESQ.*
                      THOMAS F. FRIEDBERG, ESQ. (VI#1006)
                      Attorneys for Plaintiff, MICHELLE TROTTER
                      610 West Ash Street, Suite 1400,  P.O. Box 6814
                      San Diego, California 92101
                      TEL : (619)557-0101FAX:  (619)557-0560
                      "tom@lawofficefb.com"

Trotter v. 7R Holdings, et al.      REQUEST FOR JUDICIAL NOTICE      3:14-cv-0099 CVG-RM

JA000145

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

1

2   The undersigned hereby certifies that a true and exact copy of the foregoing **NOTICE OF**

3 **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO MOTION TO**

4 **DISMISS FOR FORUM *NON CONVENIENS***  was served on the 27th day of March 2015, by

5 causing this document to be filed with the CM/ECF system which will deliver notice to the

6 following:

7 JENNIFER Q. MILLER, ESQ. (VI#1109)
   KELLY CHARLES-COLLINS

8 **HAMILTON, MILLER & BIRTHISEL, LLP**
   50 Southeast Second Avenue, Suite 1200

9 Miami, Florida 33131

10 TEL : (305) 379-3686
  FAX: (305) 379-3690

11 "jmiller@hamiltonmillerlaw.com"

12

13

14             *s/THOMAS F. FRIEDBERG, ESQ.*

15             Attorneys for Plaintiff, MICHELLE
              TROTTER

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

\- 2 -

</div>

**JA000146**

# EXHIBIT "A"

JA000147

# CHARTERWORLD.COM





Home | About Charter World | Testimonials | Specials | Charter Search | Locations | Yacht Charter |
Luxury Yachts | Sailing Vacations | Boats For Sale | Contact
< Back to Previous | New Search | Send to a Friend
Click Images to Enlarge

# Motor yacht Olga - Crescent

## Yacht Charter Description

Motor yacht is OLGA 36,88m (121') Crescent motor yacht delivered new in 2003.



Motor yacht OLGA is a clean and well cared for composite charter yacht designed by Jack Sarin. She features interior design by Robin Rose which includes a beautiful hard wood interior of Sapele and Pomele Mahogany, complimented by tasteful, upscale furnishings and a spacious country kitchen with granite countertops.

Crescent motor yacht OLGA features a formal dining area that can seat up to ten guests. Al fresco dining on the aft deck also offers seating for 10 and includes a full wet bar with refrigerator, icemaker, hand-held shower and access to the large swim platform. The fly bridge includes a large sun deck area with Spa Pool and BBQ. An additional sun pad area is located on the foredeck.

Motor yacht OLGA comes fully equipped with electronics, audio/visual, surround sound system and complete communications package including 24/7 high speed internet access (V-Sat - KVH7).

M/Y OLGA's Stewardess Marisol is a licensed masseuse and specializes in deep tissue and Swedish massage, Chef Claire is Cordon Bleu trained and Captain Bernard, Mate Clem and deckhand Rafael are enthusiastic and are always eager and ready to assist guests with water sports activites. Motor yacht OLGA has a great selection of extras onboard including a 22'6" Novurania hard bottom inflatable with 150 hp Yamaha outboard. kayaks, Hobie Wave catamaran, snorkel and scuba equipment, dive compressor, water ski's, towable toys and fishing equipment and In addition there are 2 scooters. This well-equipped yacht is set up for fun!

Charter yacht OLGA is powered by twin DD/MTU 16V2000 engines, enabling her to cruise at a speed of a comfortable 18 knots and attain maximum speeds of 21 knots. She boasts Zero speed stabilizers ensure total comfort at anchor. Motor yacht OLGA also received a new exterior paint and interior soft goods were replaced in 2008.

Motor yacht OLGA is also available in tandem with a 61' 2009 Garlington Sportfishing Yacht (shown in photo) on a daily or weekly basis at an additional rate. On a weekly basis "Ambush" can accommodate an extra 2 guests.

Motor yacht OLGA is a well renown charter yacht. Some of the unique features setting this yacht apart is

JA000749/15

her Spa treatments, Zero speed stabilizers, Captain's paella on the beach, High speed internet 24/7 (V-Sat), an on deck Jaccuzi, a Super charming and accommodating crew as well as Scuba diving from the yacht (for certified divers).

## Yacht Charter Accommodation

Motor yacht OLGA offers accommodation for 8 guests in a five stateroom layout. The Master stateroom is located on the lower deck amidships and features a king sized bed, walk-in closet, vanity, settee and ensuite bath with double sinks and spacious shower. The VIP stateroom is located on the lower deck forward and offers a queen sized bed and ensuite bath with shower. The Guest stateroom to port offers a Queen sized bed and two twin cabins, one located starboard aft and the other starboard forward offers a twin bed configuration, one with fixed singles and the other with upper lower bunk beds. All cabins have flats screen plasma TV/Closed Circuit TV/Audio system and ensuite bath with shower

## Yacht Charter Specifications

| | | | |
|---|---|---|---|
| **Type/Year:** | Crescent/2003 | | |
| **Refit:** | 2008/10/12 | **Beam:** | 8.03m (26' 4") |
| **L.O.A.:** | 36.88m (121' ) | **Crew:** | 5 |
| **Charter Guest:** | 8 | **Max Speed:** | 21 knots |
| **Cabins:** | 5 | **Engines:** | 2 x DD/MTU 16V2000 2 x 55 |
| **Cruise Speed:** | 18 knots | **More Yacht Info:** | Yacht Charter Discounts Specials |

**Builder/Designer:** Robin Rose, Jack Sarin, Crescent

**Charter Locations:** Virgin Gorda, US Virgin Islands, St. Vincent, St. Thomas, St. Martin/St Maarten, St. Lucia, St. Kitts, St John, St Barts, Nevis, Miami, Fort Lauderdale, Florida Keys, Florida, CARIBBEAN, Cancun, BVI, British Virgin Islands, Barbuda, Bahamas, Antigua, Anguilla, AMERICA, Abacos

## Charter Amenities and Extras

Charter motor yacht OLGA can has s a great selection of extras on board including a Deck Spa Pool, a 22'6' Novurania with 150 hp Yamaha, Dive compressor, 6 BC's, 8 Wet suits, Snorkel equipment , Hobie Wave Catamaran 13', 2 Scooters, two 2-person kayaks, water skis, knee board, tube, molecule tube, fishing rods, 61' Garlington Sportfish yacht at additional rate. Communications include SatCom, Cell phone, Fax, WiFi, V-Sat - Unlimited Satellite Internet Access - KVH V7. Audio Visual Equipment and Deck Facilities include CCTV and Audio, Sat TV, VCR/CD/DVD/Ipod base, Entertainment center with plasma screen in all staterooms, 50" plasma TV in main salon, Flybridge wet bar, spa pool and BBQ grill, SatCom, Cell phone, Fax, WiFi- New KVH V7, V-Sat - Unlimited Satellite Internet Access.

## Similar Yachts





<u>< Back to Previous</u> | <u>New Search</u>

**Charter Yacht Disclaimer**

This document is not contractual. The yacht charters and their particulars displayed in the results above are displayed in good faith and whilst believed to be correct are not guaranteed. CharterWorld Limited does not warrant or assume any legal liability or responsibility for the accuracy, completeness, or usefulness of any information and/or images displayed. All information is subject to change without notice and is without warrantee. A professional CharterWorld yacht charter consultant will discuss each charter during your charter selection process. Starting prices are shown in a range of currencies for a one-week charter, unless otherwise marked. Exact pricing and other details will be confirmed on the particular charter contract. Just follow the "reserve this yacht charter" link for your chosen yacht charter or contact us and someone from the CharterWorld team will be in touch shortly.

US$ 59,000.00/wk
US$ 59,000.00 - 65,000.00/wk
<u>RESERVE this Yacht Charter</u>



**Motor yacht Olga Enquiry**

Name _____  Email _____  Phone _____

[ SEND a Quick Enquiry ]

**More Yacht Images**







RESERVE this Yacht Charter
Email link or copy & paste                                                                                    [x] close
http://www.charterworld

Locations: Mediterranean yacht charter | Caribbean yacht charter | Europe | America yacht charter | South America yacht charter | Pacific Northwest | South Pacific yacht charter | Asia yacht charter | Indian Ocean | Australia & New Zealand yacht charter
Bookings / Reservations | Contact | Terms and Privacy | About Us | Testimonials | Charter Locations | Yacht Charter Marketing & Management
All content copyright © Charterworld Limited 2015 All Rights Reserved.

# EXHIBIT "B"

JA000155

r yacht Olga charters



Home › Luxury Yacht Charters › Motor Yacht Olga

# Luxury Charters on the 121 Foot Power Yacht Olga

**Motor yacht Olga was designed for unforgettable and luxurious yacht charter holidays.**



The 121-foot motor yacht Olga was manufactured in 2003 by Crescent Yachts and she stills looks and feels brand new.

This like new condition is painstakingly maintained by a magnificent captain and crew who are perfectionists making sure that she is meticulously cared for . They want this yacht to be 100% ready when you choose to come on board for a perfect yacht charter holiday that will not be soon forgotten. Olga is a luxurious super yacht where design meets comfort and sophistication.

Olga is a power yacht designed by Jack Sarin with her interiors created by Robin Rose. As a team they imbued Olga with an ambiance that combines traditional lines and a contemporary flair. Featuring the beautiful hardwoods from Africa, the

## Featured Yachts

### Motor Yacht Starfire



Motor Yacht STARFIRE is 178 feet in length (54M). Her max speed is 15 knots and cruises at 12 knots. STARFIRE has the latest and most technologically advanced communication system in the industry.

### Catamaran Flow



Welcome aboard the luxury catamaran Flow, a 59-foot luxury crewed catamaran based in the world's most

JA000156

Luxury motor yacht Olga charters



magnificent island hopping location, the British Virgin Islands.

### Catamaran Green Flash



Welcome aboard the 47 Feet luxury catamaran Green Flash. Green Flash (the super catamaran) sleeps 4 guests in 2 equal queen sized beds and cabins (she can sleep 5 guests provided one is a child).

Sapele and Pommele Sapele which are reminiscent of mahogany creating a rich and sumptuous setting.

These rich and highly desirable woods are artfully integrated with tasteful upscale furnishings. Last, but not least, is the gorgeous country kitchen that is warm and inviting and finished with stunning granite counter tops.



Olga, a very spacious power boat accommodating 8 guests in 1 king, 2 queen and 1 twin fully air-conditioned en-suite cabins, all with flat-screen televisions. In addition, there is a kids' bunk room, ideal for 2 children.

The cabins and common areas are immaculate and designed for contemporary comfort, where guests can relax and feel right at home.

At anchor, Olga's zero-speed stabilizers ensure guests' total comfort at all times. For guests that demand the best and seek a 5 star power boat, with an attentive crew for their Caribbean power yacht experience, then Olga will be excellent power boat for them to select.

The motor yacht Olga is available for charters in alluring areas including English Harbour, Gustavia, Simpson Bay, Tortola, St Thomas, Panama, Bahamas, Leeward Islands, Virgin Islands, Cartagena, Colombia.

JA000157

Luxury motor yacht Olga charters



If you have another destination idea, feel free to call us on **800-478-2029**. Whether it's the motor yacht Olga or other magnificent vessels and we'll do our very best to accommodate your wants.



Olga is managed by a very talented and professional crew that is dedicated to impeccable service, manners who to attend to each guests' individual wishes. Captain Bernard speaks fluent English, Spanish, French and Italian and is the epidemie of efficiency, is incredibly enthusiastic as well as affable and engaging.

His fondness of fishing, scuba diving and entertaining people is infectious. Very few people learn that his secret passion is cooking and his favorite food to prepare for his guests is a paella as they enjoy themselves on the beach!

Chef Phillippe is Cordon Bleu trained and has been preparing delectable meals for over 12 years for some of the most demanding yacht owners in the industry. He is fond of creating rich, layered and nuanced cuisine that is always best finished with one of his over the top desserts.

The other crew members do their jobs very well, are very attentive, and work together as a cohesive unit whose goal is to ensure your happiness.

The VIP stateroom on Olga is located below forward and offers a queen sized bed and ensuite bath with shower. The guest stateroom to port has a queen sized bed and the guest stateroom to starboard aft has twin beds. There is a fifth guest stateroom starboard forward that is very popular with children equipped with over/under twin beds. All staterooms have flat screen plasma TV/Closed Circuit TV/Audio systems.

Olga features a formal dining area

JA000158

Luxury motor yacht Olga charters



with seating for ten guests. Al fresco dining on the aft deck is available and has seating for 10 and also includes a full wet bar with refrigerator, ice maker, hand-held shower & access to the large swim platform.

Spa treatments are available for those choosing to relax into the hands of luxury. Guests will enjoy Swedish massages with scented oils, a Thai massage or a hot stone massage as well as manicures and pedicures.

The fly bridge on Olga is a fabulous place for a party whether it be under the sun or stars. Guests will pleased with the large sun deck area with with its Jacuzzi and BBQ.



Olga has state-of the-art electronics, audio/visual, surround sound system and complete communications package including 24/7 internet access, VSAT, and Wi-fi. This well-equipped charter yacht is set up for fun on the water including snorkel and scuba equipment, dive compressor, kayaks, Hobie Wave catamaran, water skis, tow-able toys, fishing equipment and a 23' Novurania hard bottom inflatable with a powerful 150 hp Yamaha outboard motor.

Our clients benefit by our vast experience with an in-depth and personal knowledge of yacht charters and perfect destinations. Call us today and reserve your private charter to paradise on **800-478-2029** or visit us on the web at Barrington Hall Yacht Charters.

**Barrington Hall Yacht Charters**

Your source for luxury yacht charters on Power Yachts, Sailing Yachts and Catamarans

2805 East Oakland Park

JA000159

Luxury motor yacht Olga charters

Boulevard #397
Fort Lauderdale, Florida,
33306
**Local Phone:** 954-720-0475
**Tollfree:** 800-478-2029



## Yacht Charters

- About Us
- Corporate Video
- Yacht Charter Videos
- Your Charter Broker
- Newsletters
- Yacht Sales
- Featured Yachts
- Yachting News
- Privacy Policy

## Charter Destinations

- Caribbean Yacht Charters
- Bahamas Yacht Charters
- Greece Yacht Charters
- Mediterranean Yacht Charters
- Power/Motor Yachts
- Luxury Catamarans
- Mono-hull Sailing Yachts

## Luxury Yacht Charters

- Motor Yacht Starfire
- Motor Yacht Northern Lights
- Catamaran Flow
- Catamaran Akasa
- Catamaran Green Flash
- Motor Yacht Viaggio

## Charter Information

- Scuba Diving Sites
- Snorkeling
- Yacht Charter Stories
- Guests Testimonials
- Ultimate Mega Yacht Experience
- Ultimate Catamaran Charter Experience
- Frequently Asked Questions

**Signup for our Newsletters and valuable yacht charter information**

Email Address [ Subscribe ]



BBB Rating: A+
Click for Review

Copyright 2013 Barrington Hall Yacht Charters : By Andrew Buys

Back to Top

JA000160

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

MICHELLE TROTTER,       )
                           )
       Plaintiff,     )
vs.                      )    Civil No. 3:14-cv-0099
                           )
7R HOLDINGS, LLC, LUIS A. RUBI )    JURY TRIAL DEMANDED
GONZALEZ, M/Y OLGA,       )
                           )
                           )
                           )
       Defendants.    )
                           )

## DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR FORUM *NON CONVENIENS*

Defendants, 7R HOLDINGS, LLC, LUIS A. RUBI GONZALEZ, and M/Y OLGA (collectively "Defendants"), by and through undersigned counsel and pursuant to applicable Federal Rule of Civil Procedure 12(b)(3), hereby files their Reply to Plaintiff's Response to Defendants' Motion to dismiss for Forum *Non Conveniens* and states as follows:

### SUMMARY OF FACTS

This case arises out of an alleged personal injury suffered by Plaintiff, Michelle Trotter on board a sailing charter operated by Defendants 7R Holdings, LLC and Luis A. Rubi Gonzalez while the M/Y Olga was docked at the Scrub Island Resort, Spa & Marina in the British Virgin Islands (BVI) on or about December 26, 2012. Plaintiff is an American citizen who was hired to work as a chef onboard the M/Y Olga, which is a vessel registered in the British Virgin Islands. The charter contract for which Plaintiff was employed was to begin in Scrub Island in the BVI.

Contrary to Plaintiff's allegations, the incident alleged in the complaint did not occur on the steps/stairs of the M/Y Olga but rather on stairs that were affixed to the property of the Scrub Island Resort, Spa & Marina, in the British Virgin Islands. Plaintiff received medical treatment for her alleged injuries in the BVI before returning to the vessel.

As set forth in their Motion to Dismiss and this Reply, Defendants' have met their burden of establishing that the BVI is the appropriate forum for this case to be litigated.

## MEMORANDUM OF LAW

### A. The British Virgin Islands is an Adequate Alternative Forum

Plaintiff raises no compelling reason why a court in the U.S. Virgin Islands should assert jurisdiction over this matter. Rather, Plaintiff's reasons for bringing the action in this Court epitomize the sort of forum shopping that warrants dismissal under the doctrine of *forum non conveniens*. The central purpose of a *forum non conveniens* analysis is to determine where trial will be most convenient and serve the ends of justice, not to determine which forum is more advantageous to Plaintiff. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981). To support dismissal for *forum non conveniens*, the foreign court need not be the best possible court but must simply be capable of litigating the dispute. *See Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476-77, 2d Cir. 2002), *quoting*, *Piper Aircraft Co. v. Reyn*, 454 U.S. 235, 255, n.22.

2

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000162

Plaintiff alleges that if this case were litigated in the British Virgin Islands she would be denied the ability to litigate her Jones Act and Maintenance and Cure claims. However, Plaintiff provides no legal support for such a claim. Instead, Plaintiff conclusively asserts that the BVI is not an adequate forum because: (1) the BVI is not required to apply the statutorily provided remedies and procedures under the Jones Act; (2) a general negligence claim requires a higher burden of proof than Jones Act claims and (3) she will be prevented the right to a jury in the BVI.

Plaintiff provides no legal support establishing that the BVI is not required to or that it would not apply the statutorily provided remedies and procedures under the Jones Act. Additionally, Plaintiff's assertion that negligence claims require a higher burden of proof than Jones Act claims does not support that Plaintiff would be denied the ability to litigate her claims in a BVI court. As with most of her arguments, Plaintiff makes these assertions without any authority to support such claims. As Mr. Thorp affirmed in his affidavit, the BVI courts are part of the Court System of the Eastern Caribbean Supreme Court, which has rules of civil procedure which govern civil matters, such as those claimed by Plaintiff.

Additionally, Plaintiff's contention as to being deprived of the right to a jury trial is incorrect. According to BVI law, jury trials are available in some civil actions and all criminal actions. *See* Jury Act, 1914, 19 & 20 Geo., c. 36, as attached as Exhibit "A."

Moreover, the question to be considered in reference to the Affidavit of Mr. Thorp is whether the British Virgin Islands is an adequate alternative forum

3

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000163

where, as here, Defendants will agree to submit to jurisdiction. Mr. Thorp is an attorney in the British Virgin Islands and opines that based on the allegations, the British Virgin Islands courts will assume jurisdiction of the case and will provide appropriate remedies if Plaintiff proves her case. [DE 12-3]. Presently, there is no opinion presented by Plaintiff to the contrary. Further, as noted in the Motion to Dismiss with reference to specific cases, courts in and of the United States have previously found the British Virgin Islands to be an adequate forum. *See e.g., Saud v. PIA Investments Ltd.*, 2007 WL 4457441 (S.D.N.Y. 2007).

Dismissal of a case when an alternative forum has jurisdiction to hear the case is proper when trial in the chosen forum would be oppressive and vexatious to a defendant in a manner out of proportion to the plaintiff's "convenience." *Scholz Design, Inc. v. Annunziata*, 2007 WL 4526589 (D.N.J. Dec. 18, 2007) (quoting *Lacey v. Cessna Aircraft Co.,*, 862 F.2d 38, 42 (3d Cir. 1988) (quoting *Piper Aircraft*, 454 U.S. at 241). This Plaintiff will have to travel to the Caribbean in order to litigate this matter regardless of the jurisdiction; therefore, Plaintiff's "convenience" as far as transmission of documents and travel time or costs if of no consequence. Therefore, Defendants' Motion to Dismiss for *Forum Non Conveniens* should be granted.

**B. The Private Interest Factors Weigh Heavily in Favor of Dismissal**

**1. Relative Ease of Access to Source of Proof**

Plaintiff argues that the "vessel's frequent location in the USVI, the mobility of the vessel, the lack of eye witnesses, the limitations of BVI discovery and the

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000164

nationwide subpoena power of the U.S. all weigh in favor of the USVI as the appropriate forum in this case." [DE 15, p, 8]. While a vessel may be moveable, the stairs/steps affixed to the Scrub Island Resort, Spa and Marina where plaintiff allegedly fell are not.

Furthermore, contrary to Plaintiff's assertions, discovery is available in the BVI. Without any legal support Plaintiff claims that the BVI will make it extremely difficult to obtain evidence outside of the BVI and prevents plaintiff from obtaining deposition testimony of witnesses regardless of their residence. [DE 15, p.9]. However, although the BVI is not a party to the 1970 Convention on the Taking of Evidence Abroad in Civil and Commercial maters, the BVI recognizes the convention and has passed a statute known as the Evidence (Proceedings in Foreign Jurisdictions) Ordinance which adopts the convention. The BVI is therefore able to make Letters of Request to a foreign court seeking its assistance with obtaining testimonial or documentary evidence from a witness abroad. *See* Evidence (Proceedings in Foreign Jurisdictions), 1988, c.24, attached as Exhibit "B".

Finally, Plaintiff allegedly injured herself on the property of the Scrub Island Resort, Spa and Marina (not the M/Y Olga)[1] and upon information and belief, an employee of the property completed an incident report. Plaintiff was then

---

[1] It is curious that Plaintiff provided a detailed affidavit regarding the alleged events but failed to do so when explaining the location of her fall. [DE 15, Trotter Declaration, ¶] Instead, Plaintiff relies on her counsel's artfully plead allegations to disingenuously attempt to bring this claim within the boundaries of the vessel. [DE 15, p. 4] The reason for doing so is that Plaintiff is fully aware that she did not fall on the stairs/steps of the vessel and would be perjuring herself by claiming so in her declaration.

5

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000165

transported to a BVI hospital, where she was treated by BVI hospital personnel. Accordingly, on balance, even if there are no "eyewitnesses," to the alleged fall, because there are witnesses in the BVI, the location of injury is not moveable and because the BVI does afford plaintiff discovery, this factor weighs in favor of dismissal.

## 2. Availability of Compulsory Process for Attendance of Unwilling Witnesses

As discussed above, the BVI provides Plaintiff adequate access through Letters of Request for the attendance of unwilling witnesses. Furthermore, contrary to Plaintiff's assertions, Defendants have identified non-party witnesses in the BVI to wit: at least one Scrub Island Resort, Marina and Spa employee who is believed to have documented Plaintiff's alleged incident, Sebastian Binny, Scrub Island Resort Manager and BVI hospital employees who treated Plaintiff for her alleged injuries. Plaintiff's assertion that the alleged lack of eye witnesses obviates the need for testimony of these employees is ridiculous. It is common knowledge that in receiving medical care or reporting an injury, the alleged victim provides first-hand information regarding the reason for their visit and in this case the nature and mechanism of the injury. Therefore, while not eyewitnesses to the actual event, these hospital and hotel employees are at the very least "ear" witnesses to Plaintiff's rendition of events.

Clearly, the BVI will not deprive the parties of testimony and evidence needed to adequately litigate Plaintiff's claim. Accordingly, this factor also weighs in favor of dismissal.

6

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000166

### 3. Cost of Obtaining Attendance of Willing Witnesses

Plaintiff's arguments regarding this factor are non-sensical. Physical, testimonial and documentary evidence is located in the BVI. Captain Calot and the crewmembers of the M/Y Olga are employed on the M/Y Olga which is registered and operates out of the BVI. Defendants should not have to incur the costs of transporting these witnesses and evidence to the USVI for Plaintiff's convenience. If this case were in the BVI, Defendants would not incur costs of obtaining attendance of willing witnesses. To the contrary, regardless of whether this case is heard in the USVI or the BVI, Plaintiff, her expert witnesses and treating physicians from Florida would have to travel and she would have to incur those costs. Defendants should not be required to incur the costs of retaining additional counsel because Plaintiff selected an inconvenient forum and her argument that she would incur the same additional costs is unpersuasive. Plaintiff should have filed her claim in the BVI, the appropriate forum, and retained BVI counsel. This factor is not equipoise as Plaintiff claims but instead weighs in favor of dismissal.

### 4. Possibility of Viewing Premises

Plaintiff has requested that this Court take judicial notice of: (1) a yacht charter description of the M/Y Olga listing the yacht's charter locations contained within the website of Charter World" and (2) "a description and advertisement for rental of the M/Y Olga contained within the website of Barrington Hall Corporation. [Doc 15, p. 12]. Rule 201 of the Federal Rules of Evidence—which the Virgin

7

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000167

Islands has adopted—permits courts to take judicial notice of certain facts. *People In Interest of J.J.J.*, 2013 WL 3378827, at \*5 (V.I. July 5, 2013). Specifically, the court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned. Fed.R.Civ.P. 201(b).

Plaintiff cannot meet this burden: (1) the websites cited are not owned by the Defendants; (2) there is no evidence Defendants contributed content to the websites and/or approved or ratified the content of those websites; and (3) the information contained in those websites has not been authenticated. Plaintiff has also provided no evidence about who maintained the websites, how the information contained therein was obtained or the accuracy of the information contained therein. Thus, Plaintiff's request to take judicial notice of these websites is improper and should be denied. *See e.g. Estate of Fuller v. Maxfield & Oberton Holdings, LLC*, 906 F.Supp.2d 997 (N.D.Cal. 2102) (court holding that it would not take judicial notice of webpage where manufacturer provided web address, but no information about who maintained website or how information on website was obtained); *Victaulic Co. v. Tiernan*, 469 F.3d 227 (3d DCA 2007) (finding that judicial notice of facts about employer's business could not be based on information contained in website apparently operated by employer; ownership of website could not be assumed and information found therein had not been authenticated); *U.S ex rel. Dingle v. BioPort Corp.*, 270 F.Supp.2d 961 (W.D.Mich 2003), *aff'd* 388 F.3d 209, *cert. denied*, 544 U.S.

8

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000168

949 (finding that court would not take judicial notice of information found on website as it could not verify information found on website for accuracy or authenticity).

## 5. Practical Considerations

There are no witnesses or evidence in the USVI. Plaintiff herself is a foreigner to the USVI. Plaintiff has asserted a claim under the Jones Act and a corresponding maintenance and cure claim. However, as will be discussed below, Plaintiff's claims do not fall within the Jones Act and thus, U.S. federal maritime law would not apply. Instead, to the extent Plaintiff has any viable claims, which Defendants expressly deny, such claims would lie in a general negligence claim, which Attorney Thorp affirms can be adequately litigated in the BVI.

## 6. The Enforceability of a Judgment

To the extent Plaintiff were to receive judgment in her favor in the BVI, she would be able to enforce such judgment through the BVI courts. Plaintiff's argument that it would be easier to enforce judgment in the U.S. is unsupported by any authority or declaration and does not weigh against dismissal.

Based upon the foregoing, it is clear that the private factors are not in, or near equipoise but rather weigh decidedly in favor of dismissal. As such, there is no need for the Court to address the public interest factors. However, because Plaintiff has addressed same in her response, Defendants will likewise address those factors in this reply.

9

**HAMILTON, MILLER & BIRTHISEL, VI P.C.**
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000169

**C. The Public Interest Factors Weigh Heavily in Favor of Dismissal**

If the balance of private interests is in, or near, equipoise, the court must then determine whether factors of public interest tip the balance in favor of a trial in a foreign forum. *See Morse*, 2001 WL 34874967 at *6, citing *Pain v. United Technologies Corp.*, 637 F.2d 775, 784 (D.C. Cir.1980). The public interest factors considered in a *forum non conveniens* analysis include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies resolved at home; (3) the interest in having a trial in a forum that is at home with law that must govern the case, rather than forcing a court in another forum to deal with unnecessary problems of conflicts of law or in application of foreign law; and (4) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *See Gulf Oil Corp.*, 330 U.S. at 508-509. Although the balance of private interests sufficiently weighs in favor of dismissal of this suit, an analysis of the public interest factors further supports this conclusion.

Plaintiff only addressed the fourth factor in her response and thus we will reply[2] in kind. To deny dismissal, the Court must first find that US maritime law applies to this case. Plaintiff carries the burden of demonstrating US maritime is applicable and has failed to do so in this case. *Vasquez v. YII Shipping Co. Ltd.*, 2012 WL 6114840, *1 (S.D.Fla. 2012), *aff'd*, 559 Fed.Appx 841 (11th Cir. 2014). If

---

[2] Defendants addressed the remaining factors in its Motion to Dismiss.

10

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000170

federal maritime law does not apply, the court must consider the traditional criteria of *forum non conveniens* to determine whether it should exercise jurisdiction over the case. *YII Shipping,* 559 Fed.Appx. at 843.

### a. Maritime Law Does Not Apply to This Case

At the outset, Defendants deny that maritime law applies to this case.

> A party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. 46 U.S.C.App. § 740. The connection test raises two issues. A court, first, must "assess the general features of the type of incident involved," 497 U.S., at 363, 110 S.Ct., at 2896, to determine whether the incident has "a potentially disruptive impact on maritime commerce," *id.,* at 364, n. 2, 110 S.Ct., at 2896, n. 2. Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity." *Id.,* at 365, 364, and n. 2, 110 S.Ct., at 2897, 2896, and n. 2.

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534, (1995).

While the M/Y Olga was a vessel on navigable waters at the time of the incident described in the Complaint, the incident described did not occur on navigable waters. The incident occurred on land in the BVI on the property of the Scrub Island Resort, Spa and Marina and was not caused by the M/Y Olga. [Calot Aff. ¶12]. Additionally, contrary to Plaintiff's allegations, she was not obtaining provisions for the vessel because as evidenced by her own affidavit, the vessel had been fully stocked prior to docking in the BVI. (Trotter Aff. ¶¶ 7-17). Furthermore,

11

HAMILTON, MILLER & BIRTHISEL, VI P.C.
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000171

the M/Y Olga does not obtain provisions from the kitchen at Scrub Island Resort, Spa and Marina and did not at any time during the relevant time period. [Calot Aff. ¶6]. Therefore, whatever Plaintiff was doing when she left the vessel to enter upon the Resort's property was personal and unrelated to her employment as a chef on the M/Y Olga. This personal journey cannot be said to bear a substantial relationship to traditional maritime activity.

The Supreme Court set out the factors a court should apply when determining whether US maritime law applies, including in matters involving the Jones Act. *See Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308-10 (1970).; *Lauritzen v. Larsen*, 345 U.S. 571, 582-93 (1953). The seven relevant factors are: (1) place of the wrongful act; (2) law of the flag; (3) allegiance of domicile of the injured; (4) allegiance of the defendant shipowner; (5) place of contract; (6) inaccessibility of a foreign forum; and (7) law of the forum. *See Lauritzen* at 582-93. "Law of the forum is entitled to little weight because 'fortuitous circumstances … often determine the forum." *YII Shipping*, 2012 WL 6114840 at *2. In addition, courts must consider whether the defendant has a base of operations in the United States. *Id.* Furthermore, the most important factors are: (1) the allegiance or domicile of the injured person, (2) the allegiance of the defendant shipowner or operator, (3) whether a foreign forum is available and (4) the defendant shipowner's base of operations. *Sevinson v. Cruise Ship Yours, Inc.*, 1997 WL 530267 *8 (D.V.I. August 15, 1997).

**HAMILTON, MILLER & BIRTHISEL, VI P.C.**
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

JA000172

### *Place of Wrongful Act*

Where, as here, the M/Y Olga was involved in transporting tourists for the purpose of leisure activities, such would be considered a non-traditional Jones Act activity. *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 191 (3d Cir. 1995).

> In non-traditional contexts, however, the vessels at issue do not ply the waters of multiple seas. It may be predicted at the outset that any injuries will likely occur, nonfortuitously, in the locale where the vessel is stationed. Thus, the justified expectations would not be thwarted if the place of the act were considered a significant choice of law factor. *See, e.g., Fogleman,* 920 F.2d at 282 ("When the injury stems from work on a permanently situated offshore oil rig or work platform, however, the place of the wrong assumes greater importance.").

*Id.* In this case, the alleged wrongful act occurred on land on the property of the Scrub Island Resort, Spa and Marina in the BVI. It did not occur on the vessel or any appurtenance thereto. [Calot Aff ¶11]. And indeed, as Plaintiff admits, the alleged incident occurred while the M/Y Olga was docked in the BVI. [DE15, p. 17]. Plaintiff received medical treatment at a BVI hospital. Accordingly, the location of this accident implicates the BVI's regulatory interests in applying its law to this accident and thus, weighs in favor of dismissal.

### *Law of the Flag*

The M/Y Olga is flagged in the BVI.

### *Allegiance of Domicile of the Injured*

According to Plaintiff, she is domiciled in the United States.

### *Allegiance of the Defendant Shipowner and Base of Operations*

<center>13</center>

**HAMILTON, MILLER & BIRTHISEL, VI P.C.**
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

**JA000173**

To carry her burden, Plaintiff must not only show that Defendants have a base of operations in the US but also that such base of operations is "substantial." *YII Shipping,*, 2012 WL 6114840 at *2. "Whether a base of operations is 'substantial' hinges on an examination of the totality of the circumstances." *Id.* Plaintiff, in this case, cannot carry her burden. Defendant Luis A. Rubi Gonzalez who owns the M/Y Olga is domiciled in Puerto Rico but has agreed to consent to the jurisdiction of the BVI. 7R Holdings, LLC is a Puerto Rico company but has agreed to consent to the jurisdiction of the BVI. 7R Charters Limited, which owns the M/Y Olga is a BVI company. The M/Y Olga is flagged in the BVI. Plaintiff's alleged injury occurred while the M/Y Olga was docked in the BVI. The M/Y Olga's base of operations is the BVI. Thus, given the totality of circumstances, it cannot be said that Defendants maintained a substantial base of operations in the US.

### *Place of Contract*

Plaintiff argues that the place of contract is the United States. However, while Plaintiff was allegedly in the US during the negotiations and acceptance of the contract, Captain Calot was in Puerto Rico. Thus, if anything, this factor is equipoise.

### *Inaccessibility of a Foreign Forum*

This factor is not relevant to a choice-of-law analysis. *Lauritzen*, 345 U.S. at 589-90.

14

**HAMILTON, MILLER & BIRTHISEL, VI P.C.**
A U.S. VIRGIN ISLANDS PROFESSIONAL CORPORATION
MAILING ADDRESS: 150 SOUTHEAST SECOND AVENUE, SUITE 1200, MIAMI, FLORIDA 33131 • 305-379-3686 • FAX 305-379-3690

**JA000174**

### *Law of the Forum*

An American forum should not simply apply its own law to a maritime tort. *Id.* at 590-91. Additionally, the law of the forum factor is given little weight in determining choice of law. *Id.*

### Conclusion

Here, Defendants request dismissal of this action in the U.S. Virgin Islands, as the British Virgin Islands is a more appropriate forum to litigate this matter. Further, Plaintiff will have difficulty proving that she will be legally slighted by litigating this matter in the British Virgin Islands instead of the U.S. Virgin Islands. Moreover, as Defendants have demonstrated, US maritime law is inapplicable in this case.

Defendants have provided sufficient information to enable this court to balance the parties' interests. Such evidence weighs in favor of dismissal. Accordingly, Defendant's Motion to Dismiss for Forum *Non Conveniens* is properly granted.

**WHEREFORE**, Defendants, **7R HOLDINGS, LLC, LUIS A. RUBI GONZALEZ, and M/Y OLGA,** by and through their undersigned counsel, and based on the foregoing facts, law and argument, and under the applicable Federal Rules of Civil Procedure, respectfully requests the Honorable Court grant their Motion, and enter an Order dismissing Plaintiff's Complaint, and for such further relief this Honorable Court deems just and necessary.

15

JA000175

Respectfully submitted,

/s/ Kelly Charles-Collins
Jennifer Quildon Miller, Esq.
V.I. Bar No. 1109
Kelly Charles-Collins, Esq.
V.I. Bar No. 1290
Hamilton, Miller & Birthisel, VI P.C.
Counsel for Defendants
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
Telephone 305-379-3686
Telefax 305-379-3690

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 14, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing was served on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.

/s/ Kelly Charles-Collins
Kelly Charles-Collins

## SERVICE LIST

Thomas F. Friedberg, Esq.
*Counsel for Plaintiff*
Law Offices of Friedberg & Bunge
610 West Ash Street, Suite 1400
P.O. Box 6814
San Diego, CA 92101
Telephone: 619-557-0101
Facsmile: 619-557-0560
tom@lawofficefb.com

JA000176

Case 18-1967-00 Document 003112396905 Page: 154 Date Filed 08/01/2016

# CHAPTER 36.

## JURY.

6/1914
9/1927
5/1927
5/1930
30/1937
11/1939
S.R.O. 22/1956
4/1963
5/1968
5/1982

(1*st July*, 1914.)

PRELIMINARY.

**1.** This Act may be cited as the Jury Act.

Short title.

**2.** (1) In this Act—

Interpretion.

"alphabetical order" means alphabetical order of surnames;

"business" includes the cultivation of land:

Provided that, where two or more parcels of land are cultivated as distinct units, the cultivation of each such parcel shall be deemed to be a distinct business;

"civil proceeding" means any proceeding other than a criminal proceeding;

"counters" means slips, disks or pieces of wood, metal, paper, parchment, bone, ivory, or other similar substance;

"juror" means a person whose name is included in a jurors' register for the time being in force;

"jurors' register" when not qualified by the addition of a year, means jurors' register for the time being in force;

"prescribed particulars" means the place of abode and the title, quality, calling, or business, and the property qualification;

"proceeding" includes cause, matter, or issue of fact, in the High Court;

"Registrar" includes representative authorised in writing by the Registrar;

JA000177

"special jurors' list" when not qualified by the addition of a year, means the special jurors' list for the time being in force;

(2) "The prescribed manner" of distinguishing as a special juror in any list made under the provisions of section 8, and in any jurors' register, a person whose name is therein included, is by writing the letters "S.J." in the column headed "Remarks," opposite to the name of such person;

(3) "The prescribed manner" of entering names in a panel of array is by entering the names in alphabetical order; writing opposite to each name the place of abode of the person named; and prefixing the number "1" to the first name, the number "2" to the second name, and so on, in respect of each name, in an arithmetical series.

**Books, ballot box and counters.**

**3.** (1) The Registrar shall, if and when necessary, at the expense of the Territory, provide himself with a jurors' book, a special jurors' book, a preliminary panel book, a ballot box and a sufficient number of counters for carrying out the provisions of this Act.

(2) The counters so provided shall be numbered, respectively, in an arithmetical series, from one upwards, and shall be, as far as possible, exactly similar each to the other, except as regards the numbers, so as not to be distinguishable to the touch.

## PART I.

### QUALIFICATION OF JURORS.

**Qualification of common jurors. 14/1963.**

**4.** Every person, between the ages of 21 and 60 years, who—

(*a*) has in his or her own name, or in trust for him or her, any lands or tenements, in the Territory, of the value of two hundred and forty dollars or upwards; or

(*b*) rents any lands or tenements, in the Territory, of the annual value of forty eight dollars, or upwards; or

(*c*) holds any office or situation, in the Territory, at a salary amounting, with allowances, to the sum of two hundred and forty dollars per annum, or upwards; or

JA000178

    (*d*)  is in receipt of an income, from whatever source derived, of one hundred and forty-four dollars per annum, or upwards,

shall, unless exempted or disqualified under the provisions of sections 6 and 7, be liable to serve as a common juror.

**5.**  Every person, between the ages of 21 and 60 years, who—

Qualification of special jurors.
14/1963.

    (*a*)  has, in his or her own name, or in trust for him or her, any lands or tenements, in the Territory, of the value of four thousand, eight hundred dollars, or upwards; or

    (*b*)  has, in his own name, or in trust for him, any lands, within the Territory, of not less than one hundred acres in extent; or

    (*c*)  holds any office or situation, in the Territory, at a salary amounting, with allowances, to the sum of nine hundred and sixty dollars per annum, or upwards; or

    (*d*)  is in receipt of any income, from whatever source derived, of seven hundred and twenty dollars per annum, or upwards; or

    (*e*)  is the attorney of any tenant or trustee, absent from the Territory of lands, within the Territory, of not less than one hundred acres in extent,

shall, unless exempted or disqualified under the provisions of sections 6 and 7 be liable to serve as a special juror: Provided that every person, liable, for the time being, to serve as a special juror, shall also be liable to serve as a common juror.

**6.**  Each of the persons described in the First Schedule shall be exempt from serving either as a common juror or a special juror.

Exemption.
First Schedule.

**7.**  Each of the following persons shall be disqualified from serving either as a common juror or a special juror, viz—

Disqualification.

    (*a*)  aliens who have not been previously domiciled in the Territory for at least 10 years;

    (*b*)  persons disabled by unsoundness of mind, or by deafness, blindness, or other permanent infirmity of body;

JA000179

(*c*) persons who have been previously convicted of any treason, felony, or infamous crime, and have not received a free pardon; and

(*d*) persons who cannot read and write the English language and understand the same when spoken.

## PART II.

### Jurors' Register and Special Jurors' List.

Jurors' list.

**8.** Between the 1st and 7th days of December of every year, the Registrar—

Second Schedule.

(*a*) shall make out, in the form in the Second Schedule, a list, for the ensuing calendar year, in alphabetical order, of all persons resident in the Territory, who, in his opinion, are liable to serve as common jurors, with the full Christian name and surname, and the prescribed particulars, or each such person set forth, to the best of his knowledge and belief, in the proper columns of the list, and shall also distinguish in the list, in the prescribed manner, such of the said persons as are, in his opinion, also liable to serve as special jurors; and

(*b*) when the list is complete, shall write at the end thereof a notice, in the form in the Second Schedule, stating the day on which the list will be revised by the Magistrate as hereinafter provided; which day shall be the day of the first sitting of the Magistrate's Court after the expiration of 14 days from the day of the publication of the list and notice as hereinafter provided.

Publication of jurors' list.

**9.** (1) As soon as practicable after the Registrar has completed any such list and notice, he shall publish the same by causing a copy of the list and notice to be posted in a conspicuous place at, or near, the door, or one of the doors, of the Court House, and in such other place or places as the Governor may direct.

(2) When the list and notice are published by copies being posted as aforesaid, the copies shall be kept posted until after the list has been revised as hereinafter provided.

Revision of jurors' list.

**10.** (1) When any such list and notice have been made out and published by the Registrar, as aforesaid, then, at the first sitting of the Magistrate's Court which shall be held after

JA000180

the expiration of 14 days from the day of the publication aforesaid—

    (*a*)  the Registrar shall produce to the Magistrate the original list and notice; satisfy the Magistrate as to the day on which the same were published as aforesaid; and answer such questions as may be put to him by the Magistrate touching the list; and

    (*b*)  the Magistrate shall revise the said list and shall upon any evidence which may be adduced before him, or of his own knowledge, information and belief—

    (i)  strike out from the list the name of any person therein included, who, in the opinion of the Magistrate, is not liable to serve as a common juror;

    (ii)  add to the list the name of any person, who, in the opinion of the Magistrate, is liable to serve as a common juror: Provided that where the name of any person is so added, the full Christian name and surname, and the prescribed particulars, of each such person shall be set forth in the proper columns of the list, to the best of the Magistrate's knowledge, information and belief;

    (iii)  decide which of the persons, whose names were originally included in, or have been added by him to the list, are also liable to serve as special jurors, and see that the name of each of the persons, who, in his opinion, are so liable, is distinguished in the list in the prescribed manner, and that the name of no other person included in the list is so distinguished; and

    (iv)  correct any error or omission which shall appear to him to have been made in respect of the prescribed particulars of any person included in the list:

Provided that, before making any alteration in the list, the Magistrate shall hear any objection which the Registrar may make thereto.

(2) Any person may appear at the revision, either personally, or by his counsel or solicitor, and claim, and adduce evidence to show, that he is, or is not, liable to serve as a common juror, or as a special juror, as the case may be, or may,

JA000181

instead of appearing at the revision, give the Magistrate notice in writing of the particulars of his claim, supporting the same by such evidence as he may think fit, and, in this latter case, the Magistrate shall, as far as he reasonably can, inquire into the claim notwithstanding that the claimant does not appear before him:

Provided that, in any case where any claim is made under this subsection, the burden of proof shall lie on the person making it.

(3) The Magistrate may call any evidence which he may think fit with respect to any matter touching the revision.

(4) As soon as the list has been revised by the Magistrate, as aforesaid, he shall write a certificate thereon in the form in the Third Schedule and shall return the list to the Registrar.

Third Schedule.

Jurors' register.

**11.** (1) On the receipt of any such list, so revised and certified as aforesaid, the Registrar shall cause the list, but not the notice and certificate at the end thereof, to be copied into the jurors' book:

Provided that—

(*a*) in the heading, the word "Register" shall be substituted for the word "List."

(*b*) the names of the persons included in the list, as revised by the Magistrate, shall be copied in the jurors' book in alphabetical order.

(2) The copy of the jurors' list so made in the jurors' book shall be the jurors' register for the calendar year stated in the heading.

(3) Every jury register shall continue in force during the calendar year stated in the heading.

(4) Every person, whose name is included in the jurors' register, shall, while the register is in force, be liable to be summoned to, and serve as a common juror, as hereinafter provided.

Special jurors' list.

**12.** (1) As soon as any juror's register has been completed under the provisions of section 11, the Registrar shall cause a list to be made, in the special jurors' book, of the names of the persons included in the register, and therein distinguished, in the prescribed manner, as special jurors. In such list the names shall be copied in alphabetical order, and

JA000182

opposite to each name, shall be written the prescribed particulars, copied from the jurors' register, and the number "1" shall be prefixed to the first name, and the number "2" to the second name, and so on, in an arithmetical series until the last name is numbered. The list so made in the special jurors' book shall be headed "Special Jurors' List for the year      " (filling in the year stated in the heading of the jurors' register) and shall be known as the special jurors' list for that year, and shall continue in force during that year.

(2) Every person whose name is included in the special jurors' list shall, while the list is in force, be liable to be summoned to serve as a special juror as hereinafter provided.


## PART III.

### AMENDMENT OF JURORS' REGISTER.

**13.** (1) At any time while a juror's register is in force— <span style="float:right">Amendment of jurors' register.</span>

(*a*) the Registrar, if he has cause to believe that any person, whose name is included in the register, is dead, or has permanently ceased to reside in the Territory, or is permanently disabled from serving as a juror by unsoundness of mind, or by blindness, deafness, or other bodily infirmity, shall bring the matter to the notice of the Magistrate, at the same time producing the register; and

(*b*) the Magistrate shall thereupon inquire into the matter, and if, either upon evidence adduced, or of his own knowledge, information and belief, he is of opinion that the person is dead, or has permanently ceased to reside in the Territory, or is permanently disabled from serving as a juror by unsoundness of mind, or bodily infirmity, as aforesaid, may cancel the entry in the jurors' register relating to such person, by ruling lines through the entry, and writing in the column of the register headed "Remarks," opposite to the entry, the word "cancelled," together with his signature and the date.

(2) When any entry in a register is cancelled under this section, the Registrar shall thereupon cancel the corresponding entry, (if any), in the special jurors' list, and shall also, if the name of the person to whom the entry relates is included in the last preliminary panel, and is not therein

JA000183

marked "Impanelled," cancel the name where it occurs in the said panel.

## PART IV.

### ARRAYS OF COMMON JURORS.

Time of impanelling. Number to be impanelled.

**14.** (1) Whenever the date approaches for a sitting of the High Court, the Registrar shall, on such a day as will leave sufficient time for the persons impanelled to be duly summoned, as hereinafter provided, impanel in the manner hereinafter prescribed, an array of common jurors to serve at the said Court.

(2) Subject to the provisions of subsection (4) of section 16, every array of common jurors shall consist of thirty persons, but any judge may, by an order in writing under his hand, direct a greater number to be impanelled and, when any such order has been made, the number directed in the order shall be impanelled accordingly.

Certain jurors not to be impanelled.

**15.** (1) Subject to the provisions of subsection (4) of section 16, the Registrar shall not impanel in an array of common jurors any juror, who is known, or believed, by him to be temporarily absent from the Territory, and not likely to return in time to be summoned to attend a sitting of the High Court, and shall not impanel in the same array of common jurors more than one of the jurors, who, to the best of his knowledge, information and belief, are employed, at the time, in the same business:

Provided that where the number of jurors employed in the same business exceeds eight the Registrar may impanel in the same array of common jurors one third of the number of jurors so employed at the time.

(2) Where two or more distinct businesses are carried on by, or on behalf or for the benefit of, the same person, or persons, the fact that a juror, employed in one of such businesses, has been impanelled to serve on an array, shall not excuse another juror, employed in another of such businesses, from being impanelled in the same array.

(3) Any person carrying on, or for the time being in charge of, any business in the Territory, may, from time to time, give to the Registrar a list of jurors employed in the business,

JA000184

and the Registrar, upon receiving the said list, shall, when he next proceeds to impanel a jury, make such enquiries as he may think fit, and act accordingly.

(4) The decision of the Registrar as to whether two or more jurors are, or are not, employed in the same business shall, for the purposes of this section, be final.

**16.** (1) When the Registrar is impanelling an array of common jurors, he shall, subject to the provisions of subsection (4), make in the preliminary panel book a preliminary panel, in the form in the Fourth Schedule, in which he shall, after any names, which under the provisions of section 17, are to be inserted therein, insert as many more names as may be required, taken alternately from the first and the last parts of the jurors' register, as follows, namely— *Mode of impanelling.*

*Fourth Schedule.*

    (*a*) he shall ascertain which of the persons, whose names are included in the first part of the jurors' register, was impanelled last, at the last impanelling of an array of common jurors, whether in the same or the preceding year, and shall insert in the preliminary panel, as the next name, the name which in the register, immediately succeeds the name of such person;

    (*b*) he shall next ascertain which of the persons, whose names are included in the last part of the register, was impanelled last, at the last impanelling aforesaid, and shall insert in the preliminary panel, as the next name, the name which, in the register, immediately precedes the name of such person;

    (*c*) he shall insert in the preliminary panel, as the next name, the name, which, in the register, is the second name below the name of the person first ascertained, as above provided, and as the next name, the name which, in the register, is the second name above the name of the person last ascertained, as above provided, and so on, until as many names as may be required are inserted in the preliminary panel: Provided that, if and whenever, this is no longer possible, he shall insert in the preliminary panel the first name in the register, and next the last name in the register, and next the second name in the register and next the last name but one in the register, and so on, until as many names, as may be required, are inserted in the preliminary panel.

JA000185

(2) As each name is included in the preliminary panel, whether taken from the last preceding preliminary panel, as prescribed in section 17, or from the register, as prescribed in subsection (1) the Registrar shall—

(*a*)  if there is no objection, under section 15 to the person named being impanelled, write the word "Impanelled" opposite the name in the preliminary panel; or

(*b*)  if the person named is known by the Registrar to be temporarily absent from the Territory, and not likely to return in time to be duly summoned for a sitting of the High Court, or is known to be employed in any business in which another person, whose name has already been inserted in the preliminary panel and therein marked "Impanelled," is known by the Registrar to be employed, the Registrar shall write in the preliminary panel, opposite the name of the person so absent, or so employed as first mentioned, instead of the word "Impanelled," the words, according to the circumstances, "Temporarily absent," or "Employed in the same business as                ," (inserting the name previously inserted in the preliminary panel, and therein marked "Impanelled," of the person known by the Registrar to be employed in the same business.)

(3)  When thirty names inserted in the preliminary panel have been marked "Impanelled," as aforesaid, the preliminary panel shall be complete.

(4)  Notwithstanding anything hereinbefore contained, if, when the Registrar is impanelling an array of common jurors to serve at the High Court, the number of jurors, whose names are included in the jurors' register, does not exceed thirty, the Registrar shall impanel, as the array to serve at the said Court, all the jurors whose names are included in the register, and such array shall be good and valid, although the number impanelled is less than thirty.

Preliminary panel.

**17.**  Every preliminary panel shall be made in the preliminary panel book, and shall be signed and dated by the Registrar, and, whenever the Registrar is making out a preliminary panel under this section, if there are any names included, but not marked "Impanelled" in the last preceding preliminary panel the Registrar shall insert such names, or such of them as have not been cancelled under the provisions

JA000186

of section 13 as the first names in the new preliminary panel, in the same order in which they occur in the last preceding preliminary panel.

**18.** (1) As soon as the Registrar has completed a preliminary panel as aforesaid, he shall cause the names, therein marked "Impanelled," to be entered in the prescribed manner in a panel of array.

*Panel of array.*

(2) When an array is impanelled under subsection (4) of section 16 the names of the persons impanelled shall be entered in the prescribed manner in a panel of array.

## PART V.

### ARRAYS OF SPECIAL JURORS.

**19.** In any criminal proceeding, any Judge may, upon the application of the Crown, or the person charged, order the proceeding to be tried by a special jury, and, if he shall think fit, appoint a special day for the trial.

*Special jury in criminal cases.*

**20.** (1) Any party to any civil proceeding, who is entitled to have the same tried by a Judge and jury, may, subject to the provisions of subsection (1) of section 44, have the proceeding tried by a judge and special jury, on giving notice in writing to that effect to the other party to the proceeding, and also to the Registrar:

*Special jury in civil cases.*

Provided that such notice is given not less than 14 days before the day fixed for the holding of the Court at which the proceeding is to be tried.

(2) A Judge may, at any time, on the application of any party to any civil proceeding, order, subject to the provisions of subsection (1) of section 44, that the proceeding be tried by a Judge and special jury upon such terms as he may think fit, and may appoint a special day on which the trial shall commence.

(3) The time specified in subsection (1) may be varied by rules of Court.

**21.** (1) Whenever an order has been made for the trial of any proceeding by a Judge and special jury, or whenever notice has been given pursuant to the provisions of subsection

*Mode of impanelling.*

JA000187

(1) of section 20, the Registrar shall, subject to the provisions of subsection (2), and subsection (1) of section 44, appoint a time for impanelling the array of special jurors pursuant to such order, or notice, and shall give notice of the time so appointed to every party to the proceeding, and, at the time so appointed shall proceed to impanel the array as follows—

(*a*)  he shall put into the ballot box, for every name included in the special jurors' list, a counter inscribed with a number corresponding to the number prefixed to that name in the said list, and, having thoroughly intermixed the counters, shall draw out of the box, one by one, thirty of the said counters, and, as each counter is drawn, write down in a list the number inscribed on the counter and the name in the special jurors' list to which that number is prefixed:

Provided that, if the number of names in the special jurors' list is less than thirty, the Registrar shall first enter in the list all the names included in the special jurors' list, and shall then, fairly and indifferently select, out of the persons of the greatest repute, property and intelligence, whose names are included in the jurors' register such a number, as, in addition to those whose names are already entered in the list then being prepared, will make up the full number of thirty, and shall enter in the last mentioned list the name of each person so selected;

(*b*)  the plaintiff in the proceeding shall then be at liberty to strike out one of the thirty names contained in the said list and the defendant in the proceeding, another, and so on alternately, until eighteen names have been struck out:

Provided that if either the plaintiff or the defendant is absent or unrepresented or does not exercise his right, the Registrar shall strike out on his behalf:

And provided that in the case of a criminal proceeding the word "plaintiff" means the Crown and the word "defendant" the person charged;

(*c*)  the Registrar shall then cause the twelve names remaining in the list to be entered in the prescribed manner in a panel of array;

(*d*)  the persons, whose names are included in the said panel, shall be the array of special jurors to be summoned for the trial of the said proceeding;

JA000188

(*e*) the Registrar shall, on demand of any party to the proceeding, supply him with a copy of the said panel as soon as possible after the panel is complete;

(*f*) any party to the proceeding, who is dissatisfied with the manner in which the array has been impanelled, or with the conduct of the Registrar in impanelling it, may apply to a Judge, who may, if he sees sufficient grounds, set aside the impanelling, and order another array to be impanelled, and give such directions in the matter as he may think fit.

(2) Whenever, in any proceeding, an array of special jurors has been impanelled, the parties to any other proceeding, which is to be tried with a special jury at the same Court as the first-mentioned proceeding, may agree in writing that the array impanelled in the first-mentioned proceeding shall be impanelled as the array in the proceeding to which they are parties, and, on the agreement being filed, the Registrar shall, subject to the provisons of subsection (1) of section 44, impanel the said array accordingly.

## PART VI.

### SUMMONING OF JURORS.

**22.** As soon as an array, whether of common or special jurors, has been impanelled, the Registrar shall proceed to summon each of the jurors included in the array to attend on the day fixed for the holding of the next sitting of the High Court, unless, in the case of an array of special jurors, another day has been appointed by a Judge, in which case the jurors included in the array shall be summoned to attend on that day.

*Day for which jurors to be summoned.*

**23.** A summons to attend as a juror shall be signed by the Registrar, and may be served either—

*Service of summons.*

(*a*) by being delivered to the juror, or left at his usual place of abode, at least six days before the day on which the juror is summoned to attend; or

(*b*) through the post office in the manner and on the conditions following—

(i) the summons and the duplicate thereof shall each be legibly addressed to the juror at his place of abode, as described in the jurors' register, or, at such other address as the

JA000189

Registrar shall, after enquiry, believe to be correct, and the summons and the duplicate thereof shall each have the words "Jury Summons" legibly written thereon on the same side as the address;

(ii) the summons, together with the duplicate thereof, shall be delivered to the postmaster of the principal post office in the Territory at his office during business hours at least eight days before the day on which the juror is cited to attend;

(iii) the postmaster shall compare the address on the duplicate with the address on the summons, and if they both agree, and if the summons and the duplicate both have legibly written thereon the words "Jury Summons," shall stamp the duplicate with the stamp of the post office, and return it to the person who brought it to him, and shall keep the summons for transmission to its address, treating it in all respects as a registered letter except that it shall be forwarded open and that no fee shall be charged;

(iv) if it is reported to the postmaster that any summons so kept by him has not been delivered at its address, the postmaster shall endorse thereon the cause of the non-delivery, and forward it without delay to the Registrar, who shall forthwith endorse on the face of the duplicate the words "Not delivered" and sign and date such endorsement;

(v) a duplicate purporting to be a summons to a juror, stamped as hereinbefore provided and not endorsed "Not delivered," as hereinbefore provided, shall be prima facie evidence that the summons was duly served on the juror:

Provided that no such summons shall be served through the post office in any part of the Territory in the manner herein provided, unless and until the Governor shall, in writing, notify the postmaster that jury summonses may be served through the post office in the Territory or in that part thereof, and the Governor may cancel, alter, or amend such notification at any time.

JA000190

## PART VII.

### TRIALS.

**24.** Every application, made at a sitting of the High Court, for the quashing of an array, shall be heard and determined by the presiding Judge, and no array shall be quashed on the ground of any formal defect, or of any breach of any of the provisions of this Act, unless the presiding Judge is satisfied that it is expedient, on the merits and in the interests of justice, that the array should be quashed.

*Quashing of array.*

**25.** If, at any sitting of the High Court, a proceeding is brought on for trial before the jury impanelled for the trial of any other proceeding have been discharged, the presiding Judge may order another jury to be impanelled from the jurors who are not then impanelled.

*Impanelling of further jury.*

**26.** Every jury impanelled for the trial of any proceeding shall consist of nine persons and no more.

*Number of jury.*

**27.** When a common jury is being impanelled for the trial in the High Court of any person or persons charged with any treason, felony or misdemeanour—

*Peremptory challenges and standing by.*

(*a*) the person charged, or each of the persons charged, may peremptorily and without assigning cause challenge any number of jurors not exceeding three;

(*b*) the Crown shall have the same right as, at the commencement of this Act, it has in England, to ask that jurors stand by until the panel has been "gone through" or perused.

**28.** (1) When a jury is being impanelled for the trial of any proceeding, any juror, whose name has been drawn as hereinafter provided, may be challenged for cause by any of the parties to the issue, and, where any such challenge is made, the same shall be inquired into by the presiding Judge, who, after hearing any evidence which may be adduced, may allow, or disallow such challenge, and the decision of the Judge, as to what is or is not, sufficient cause, shall be final.

*Challenges for cause.*

(2) In this section "cause" means anything which, in the opinion of the presiding Judge, renders it improper, or inadvisable, that the person challenged should be impanelled for the trial of the proceeding.

Mode of
impanelling
juries.

**29.** (1) A jury for the trial of a proceeding shall be impanelled as follows, that is to say—

(*a*) the Registrar shall place in the ballot box, for every name included in the panel of the array, whether it be an array of common or special jurors, a counter inscribed with a number corresponding to the number prefixed to the name in the panel, and, having thoroughly intermixed the counters, shall proceed to draw, one by one, out of the box, nine counters, and, as each counter is drawn, shall write down the number inscribed on the counter, and, opposite to the number, the name in the panel to which that number is prefixed, and call out the name. The juror named shall then enter the jurors' box:

Provided that, if any jurors so drawn and called do not appear and enter the jurors' box, or, in a criminal proceeding, being present, are asked by the Crown to stand by, the Registrar shall proceed in the manner above mentioned until nine jurors have entered the jurors' box. If, from any cause, the full number of nine cannot be made up from the jurors included in the array, the presiding Judge may require as many other jurors present to serve on the jury as may be necessary to complete the full number, and every juror so required shall be liable to serve as a juror for the trial of the said proceeding, and shall, as soon as his name is called, enter the jurors' box.

(*b*) When nine jurors are in the jurors' box, if any challenges are made, whether peremptorily or for cause, as each challenge is made, it shall be heard and determined, and, if the challenge is allowed, the juror challenged shall leave the box, and another juror be selected in the manner above mentioned, and, on his entering the box, the next challenge, if any, shall be made and determined, and, if it is allowed, the juror challenged shall leave the box, and another juror be selected in his stead, in the manner above mentioned, and shall enter the box.

(*c*) As soon as nine men are in the jurors' box, if any are not challenged, or have not been successfully challenged, they shall be the jurors impanelled for the trial of the proceeding, and shall then be counted and sworn.

(*d*) In every criminal proceeding, the person charged shall, before any juror is sworn, be informed of his right, and be given a reasonable opportunity to

challenge whether peremptorily or for cause, before the Registrar begins to administer the oath to any of the jurors, but no challenge shall be allowed after the Registrar has, with the leave of the presiding Judge, begun to administer the oath to any of the jurors impanelled.

(2) Notwithstanding anything hereinbefore contained, where, at any sitting of the High Court, no objection shall be made by any party to a proceeding, the proceeding may be tried by the Judge with the same jury which, at the same Court has previously tried, or been drawn to try, another proceeding, or the Judge may order any of the said jury to whom both parties object, or who is, or are, excused by the Judge, or successfully challenged, to withdraw, and another juror or other jurors to be drawn instead, and may try the first mentioned proceeding with a jury composed of the residue of the original jury and such additional juror or jurors. The Jury, by whom any proceeding is to be tried under this section, shall first be duly sworn for the trial of the proceeding in the same manner as if they had been impanelled under subsection (1).

**30.** Jurors impanelled for the trial of any proceeding shall be sworn in the same manner, subject to the provisions of section 51, and with the same form of oath, in and with which jurors, impanelled in England for the trial of a similar proceeding, might, at the commencement of this Act, be sworn.

*Swearing jury.*

**31.** Whenever, at the trial of any proceeding, the presiding Judge is of opinion that it is expedient, in the interest of justice, that the jury impanelled to try the proceeding should have a view of any place, or of any real or personal property, connected with the proceeding, the Judge may order such view to be made accordingly, under such conditions as to costs, and generally, as he shall think fit.

*View.*

**32.** After a jury has been impanelled and sworn for the trial of a proceeding, they may, in the discretion of the presiding Judge, and subject to such conditions as he may think fit, be allowed, at any time before giving their verdict, reasonable refreshment, to be procured in criminal cases at the expense of the Crown, and in civil cases at their own expense.

*Refreshment to jury.*

JA000193

Death, absence
or incapacity of
juror.

**33.** If, during the trial of any proceeding, not being the trial of a capital charge, one of the jury shall die, or become incapable of serving, or shall absent himself, it shall not be necessary to discharge the jury, or to add thereunto another juror, but the trial shall be proceeded with by the remaining eight jurors notwithstanding such death, absence or incapacity.

Separation of
jury during
adjournments.
5/1968

**34.** (1) Whenever, at any sitting of the High Court, the trial of any person charged with any felony, other than treason, or treason felony, or with any misdemeanour, is adjourned, before the jury begin to consider their verdict, either from one day to another day, or from one hour to another hour of the same day the Judge may permit the jury to leave the Court and separate until the close of the said adjournment, provided the following oath has been previously administered to them in open court—

"You swear that, during any adjournment of this trial of the issue joined between Our Sovereign Lady the Queen and the prisoner at the bar (*or* defendant *as the case may be*) which you have been sworn to try, you will not, whilst separated and until you shall be assembled in Court again, speak with, listen to, or hold any communication, verbal, written or otherwise, with any person whomsoever, other than your fellow jurors impanelled and sworn for the trial of the said issue, on any matter whatever relative to the said trial; and that, upon the termination of every adjournment of the said trial, you will again come into this Court. So help you God."

(2) When the said oath has once been taken by a juror in the course of a trial, it shall not be necessary to administer it to him again during the same trial.

(3) If any juror shall refuse to take the said oath, his refusal shall not prevent the separation or departure of so many of the jurors as shall have taken it, but the juror so refusing shall be kept, during such adjournment by the proper officers sworn, in the usual manner, neither themselves to speak to, nor hold any communication with, such juror touching any matter relative to the said trial.

Verdict.

**35.** A verdict of a jury shall not, in any proceeding, be accepted within two hours after the conclusion of the Judge's summing up, unless it is unanimous; but, after the expiration

of two hours from the conclusion of the summing up, any verdict, in which seven of them agree, may be accepted as the verdict of the whole, unless it is the verdict of guilty, or not guilty, of a capital charge, which shall not be accepted at any time unless it is unanimous.

**36.** If, in any proceeding, no verdict is delivered by a jury within four hours after the conclusion of the summing up of the presiding Judge, and the Judge is satisfied that there is no prospect of the jury agreeing, he may discharge them.

Jury not agreeing may, in certain cases, be discharged.

**37.** Whenever, from any cause, the trial of any proceeding shall prove abortive, the presiding Judge may discharge the jury, and the proceeding may be tried with a new jury, duly impanelled and sworn, either at the same, or, if the Judge so order, at the next sitting of the High Court, in the same manner as if the former abortive trial had not taken place.

New trial in case of abortive trial.

## PART VIII.

### EXCUSES OF JURORS.

**38.** No juror, duly summoned to attend at a sitting of the High Court, shall be entitled to be excused from attendance thereat, on the ground of any exemption, or disqualification, or on any other ground, save and except illness or unavoidable accident, but the Judge presiding at the said Court, or, before the commencement of the sitting, any Judge, or if no Judge is present in the Territory, the Registrar, may, upon reasonable and sufficient cause being shown upon oath, or where the cause is the state of the juror's health, on a certificate purporting to be signed by a duly qualified medical practitioner, exempt a juror summoned to attend thereat from attendance during the whole or any part of the sitting.

Excusing jurors.

**38A.** Any Judge before whom a case is or may be heard may, in his discretion, on an application made by a woman to be exempted from service on a jury by reason of the nature of the evidence to be given or of the issues to be tried, grant such exemption.

Exemption of woman in certain cases.

14/1963.

JA000195

## PART IX.

### FINES OF JURORS.

Fines.

**39.** (1) As soon as may be convenient after the opening of a sitting of the High Court, the names of the jurors impanelled to serve thereat shall be called, and every juror, who, having been duly summoned, does not answer to his name, after it has been thrice called, may be fined by the presiding Judge any sum not exceeding four dollars and eighty cents.

(2) Whenever at any sitting of the said Court a jury is being impanelled and sworn for the trial of any proceeding—

(*a*) every juror duly summoned to attend the Court, provided he has not been excused, and provided he is not at the time serving on a jury for the trial of another proceeding; and

(*b*) every juror present in Court and required by the Judge to serve on a jury under the provisions of subsection (1) of section 29,

who fails to answer to his name when called, or refuses to enter the jury box, or leaves the jury box without the permission of the Judge, or refuses to be sworn for the trial of the proceeding, may be fined by the presiding Judge any sum not exceeding two hundred and forty dollars.

(3) Every juror sworn to try a proceeding at a sitting of the High Court, who shall leave the jury box without the permission of the presiding Judge, or who, when the jury are allowed to separate during any adjournment of the Court, fails to return into Court at the termination of the adjournment, may be fined by the presiding Judge any sum not exceeding two hundred and forty dollars.

Registrar to record fines.

**40.** Whenever a juror is fined under the preceding section of this Act, the Registrar shall record in his minute book the name of the juror and the amount and cause of the fine.

Reduction or remission of fines.

**41.** (1) Whenever a juror is fined under this Act, the presiding Judge may, at any time during, or within one week after the closing of the Court, upon sufficient cause being shown, reduce or remit the fine.

(2) Whenever a Judge, under this section, reduces, or remits, any fine, he shall give due notice of such reduction or

remission, to the Registrar, and the Registrar shall thereupon duly note such remission or reduction, accordingly, in the margin of his minute book, opposite to the entry therein of the imposing of the fine.

**42.** (1) Where any fine has been imposed on a juror under this Act, and the fine has not been remitted, the amount of the fine, or, if the fine has been reduced, the amount to which the fine has been reduced, shall be paid to the Registrar before the closing of the session of the Court then in progress, and, in case of default, the Registrar shall immediately after the closing of the said session issue a warrant, directed to the Provost Marshal, requiring him to levy by distress and sale of the goods and chattels of the juror, the amount of the fine, or, if the fine has been reduced, the amount to which the fine has been reduced, and every such warrant shall be executed in the same manner as a writ of *fieri facias* in the High Court.

<div align="right">Payment and recovery of fines.</div>

(2) Where any such levy is made, the amount of the fine, or, if the fine has been reduced, the amount to which the fine has been reduced, shall, together with the reasonable expenses of the levy, be paid out of the proceeds thereof, and the surplus, if any, of the proceeds of the levy shall be returned to the juror.

(3) In case any warrant is issued, as in this section provided, and no goods and chattels of the juror can be found on which to levy, or, in case any levy is made as in this section provided, and the proceeds of the levy shall be insufficient to pay the reasonable expenses of the levy and the amount to recover which the levy was made, any Judge, on the application of the Registrar, such application being supported by an affidavit, or affidavits, verifying the facts, may, by warrant of commitment under his hand directed to the Provost Marshal and the keeper of the prison, order the juror to be imprisoned for any period not exceeding one month, unless the amount due in respect of the warrant to levy and the execution thereof, is sooner paid, and may issue such further process as may be necessary to enforce the said order:

Provided that, where any application is made under this section for a warrant of commitment, the Judge may adjourn the application and order notice thereof to be served on the juror.

JA000197

## PART X.

### PAYMENT OF JURORS.

Scale in civil proceedings.

**43.** (1) Every juror who attends at the Court for the trial of a civil proceeding in obedience to a summons served upon him in that behalf, under this Act, shall be entitled to receive the sums in this subsection mentioned, that is to say—

(*a*) in the case of special jurors summoned as such and duly sworn for the trial of the proceeding, the sum of one dollar and forty-four cents for each day or part of a day during which they shall serve as jurors;

(*b*) in the case of special jurors summoned as such but not sworn for the trial of the proceeding, the sum of one dollar and forty-four cents only;

(*c*) in the case of common jurors duly sworn for the trial of the proceeding, the sum of ninety-six cents for each day or part of a day during which they shall serve as jurors;

(*d*) in the case of common jurors not sworn for the trial of the proceeding, the sum of ninety-six cents only;

(*e*) in the case of all jurors, the expenses actually incurred in travelling to the Court where the civil proceeding is tried, but not exceeding twelve cents per mile for every mile of the journey travelled:

Provided that jurors not sworn for the trial of a proceeding shall be entitled to receive the expenses incurred for travelling in respect of the first day's attendance only.

(2) Every common juror who attends at the High Court for the trial of criminal proceedings in obedience to a summons served upon him in that behalf under this Act, and who is duly sworn for the trial of a civil proceeding, shall be entitled to receive—

(*a*) the sum of ninety-six cents for each day or part of a day during which he serves as a juror in the civil proceeding.

(*b*) the expenses actually incurred in travelling to the Court where the civil proceeding is tried, but not exceeding twelve cents per mile:

Provided that no juror shall receive an allowance under this enactment who shall be entitled to receive the allowance provided by subsection (1) of section 47.

JA000198

(3) Every juror who by reason of his service as a juror in the trial of a civil proceeding is necessarily absent from his home at night shall be entitled to receive in addition to the sums hereinbefore in this section mentioned, the following sums, that is to say—

(*a*) in the case of a special juror, for each night while so absent, the sum of ninety-six cents;

(*b*) in the case of a common juror, for each night while so absent, the sum of forty-eight cents.

**44.** (1) No array of special jurors shall be impanelled in any civil proceeding, unless the party applying for the impanelling shall first deposit with the Registrar such sum as the Registrar may think fit, for the payment, in accordance with section 43, of such of the jurors, included in the said array, as may afterwards be impanelled as a jury for the trial of the said proceeding.

Deposit in advance of jury money.

(2) No common jury shall be impanelled for the trial of any civil proceeding, unless the party applying for the impanelling has first deposited with the Registrar, such sum as the Registrar may think fit, for the payment of the jury, in accordance with the provisions of section 43.

(3) Where the decision of the Registrar as to the amount of any deposit payable under this section is questioned by the party by whom it is to be paid, then, if or whenever a judge is present in the Territory, the Judge shall hear the Registrar and the party, and decide what shall be the amount of the deposit.

**45.** (1) Where any deposit is made, in any civil proceeding, under the provisions of section 44, the Registrar shall, at the close of each day during which the jury serve on the trial of the proceeding, pay, out of the deposit, to each of the jurors impanelled, the sum to which he is entitled under the provisions of section 43, and, if, after the jury have been discharged, the deposit is not yet exhausted, shall pay the surplus to the party by whom the deposit was made, but, if and whenever, at the close of any day, the money deposited for the payment of the jurors is exhausted, he shall at once report the fact to the presiding Judge, who shall forthwith discharge the jury, unless the party, at whose instance the jury was impanelled, or any other party to the proceeding, shall forthwith deposit with the Registrar such further sum as the Judge shall think fit for the payment of the jury as aforesaid.

Payment of jurors during trial.

JA000199

(2)  Whenever a jury is discharged under the provisions of this section, the trial shall proceed before the Judge alone in the same manner as if the jury had not been impanelled.

**Costs consequent on trial by jury.**

**46.**  (1)  Whenever any civil proceeding is tried by a common jury, and the costs of the trial are awarded to the party to the proceeding at whose instance the jury was impanelled, such costs shall, unless the presiding Judge otherwise order, include the moneys which have been paid to the jury under the provisions of section 45.

(2)  Whenever a civil proceeding is tried by a special jury, and the costs of the trial are awarded to the party to the proceeding at whose instance the special jury was impanelled, the costs so awarded shall not include any of the additional costs occasioned by the proceeding being tried by a special jury instead of a common jury, unless the Judge, before whom the proceeding was tried shall, before the taxation of the costs, certify in writing, under his hand, that the same was, in his opinion, a proper proceeding to be tried by a special jury:

Provided that, in default of such certificate, the party to whom the costs have been awarded, shall unless the Judge presiding at the trial otherwise order, be allowed the sums, which would, under the provisions of section 45, have been paid to a common jury.

**Rules for payment of jurors out of public funds.**

**47.**  (1)  The Governor in Council may make rules authorising the payment, of such allowances, on such scales and in such cases, as he may think fit, to jurors attending at the High Court, in pursuance of summonses under this Act, or impanelled under the provisions of this Act:

Provided that no juror shall receive any allowance, under the said rules, in respect of any day on which he has served on a jury impanelled and sworn for the trial of a civil proceeding.

(2)  The said allowances may include compensation for loss of time, and expenses paid, or incurred, in going to, attending at, and returning from, the said Court.

(3)  All allowances payable under any such rules, shall be paid, on the warrant of the Governor, out of the Treasury.

## PART XI.

### GENERAL PROVISIONS.

**48.** No alien shall be entitled to be tried by a jury *de medietate linguae*, but every alien shall be triable by a jury impanelled and sworn under this Act, in the same manner as if he were a British subject.

*Trial of aliens.*

**49.** Where any person holds the combined offices of Registrar and Magistrate, he may perform the duties imposed on him by this Act in respect of each of the said offices, notwithstanding such combination.

*Combination of offices.*

**50.** Whenever the taking of an oath is required under this Act, the provisions of the Oaths Act shall apply.

*Affirmations in lieu of oath. Cap. 51.*

**51.** Whenever a juror is sworn, under the provisions of this Act, upon a Book, he shall not be required to kiss the Book, but shall hold it in his right hand, while the oath is being administered to him, and when the oath has been administered to him, shall say "I will," or such other words of assent as shall be directed by the presiding Judge.

*Kissing the Book in swearing.*

---

### FIRST SCHEDULE.

5/1982.

S. 6

The Governor and his spouse.

Members of the Executive Council and their spouses.

The Clerk of the Executive Council.

Members of the Legislative Council and their spouses.

The Clerk of the Legislative Council.

Magistrates and their clerks.

Police Officers.

Keepers and other officers of prisons and the masters and officers and nurses of hospitals.

Officers of courts of law, and barristers and solicitors in actual practice and their clerks.

JA000201

Generally recognised Ministers of religion.

Properly qualified medical practioners in actual practice.

Managers of licensed banks.

All consular representatives of foreign powers being of foreign nationality, and any such representatives being of British nationality as the Governor in Council may, by notice published in the Gazette, declare to be exempt from service on juries: Provided that any such exemption may be cancelled by the Governor in Council at any time.

---

SECOND SCHEDULE.

S. 8

JURORS' LIST FOR THE YEAR 19

| Christian and Surname at length. | Place of abode. | Calling. | Nature of Qualification. | Remarks. |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

NOTICE.

The above are the persons whom it is proposed should be inserted in the Jurors' Register for the year 19    . The list will be revised at the sittings of the Magistrates' Court to be holden at                          , on the           day of                          , at            o'clock, and the Magistrate may then make such changes therein as he may think fit, either by adding or striking out names, or otherwise. Any person, whether included or not included in the said list, may then appear personally, or by his counsel or solicitor, and claim that he is, or is not, liable to serve as a common or special juror, as the case may be, or, if unable to attend personally, may give the Magistrate notice in writing of his claim, supporting it by such evidence as he may think fit, and the Magistrate will then, as far as he reasonably can, inquire into the claim. The Magistrate's decision in revising the said list will be conclusive, and all persons included in the said list, after it has been revised by the Magistrate, will be liable during the year 19        to be summoned and serve as common or

JA000202

special jurors, as the case may be, notwithstanding any disqualification or exemption other than illness or unavoidable accident.

Dated this      day of          19 .

Registrar.

---

## THIRD SCHEDULE.

S. 10 (4).

I CERTIFY that this list has been revised by me, and that it is, to the best of my knowledge, information and belief, a true and correct list of the persons who are liable to serve in the Territory as common jurors, and that such, and such only, of the said persons as are also liable to serve as special jurors, are, in the said list, distinguished as such in the prescribed manner.

Dated this      day of          19 .

Magistrate.

---

## FOURTH SCHEDULE.

S. 16 (1).

### PRELIMINARY PANEL

FOR THE SITTING OF THE HIGH COURT TO BE HELD ON THE DAY OF          19 .

| Name of Juror. | Whether taken from last Preliminary Panel or direct from Jurors' Register.* | Whether impanelled and if not, why not. |
|---|---|---|
|  |  |  |

* Put P.P. for last Preliminary Panel and J.R. For Juror's Register.

JA000203

No. 5 of 2005

## VIRGIN ISLANDS

## JURY (AMENDMENT) ACT, 2005

## ARRANGEMENT OF SECTIONS

*Section*
1. Short title.
2. Interpretation.
3. Section 39 amended.
4. Section 47A inserted.

31

| No. 5 of 2005 | Jury (Amendment) Act, 2005 | **Virgin Islands** |

**I Assent**
**THOMAS TOWNLEY MACAN**
**Governor**
**28th March, 2005**

## VIRGIN ISLANDS

### No. 5 of 2005

An Act to amend the Jury Act (Cap. 36).

[Gazetted 14th April, 2005]

ENACTED by the Legislature of the Virgin Islands as follows:

Short title.

1.  This Act may be cited as the Jury (Amendment) Act, 2005.

Interpretation.
Cap. 36

2.  In this Act, "the principal Act" means the Jury Act.

Section 39 amended.

3.  Section 39 of the principal Act is amended

   (a) in subsection (1), by deleting the words "four dollars and eighty cents" and substituting the words "two hundred and fifty dollars";

   (b) in subsection (2), by deleting the words "two hundred and forty dollars" and substituting the words "four hundred dollars"; and

   (c) in subsection (3), by deleting the words "two hundred and forty dollars" and substituting the words "four hundred dollars".

Section 47A inserted.

4.  The principal Act is amended by inserting after section 47, the following section:

"Penalisation of jurors prohibited

47A. (1) All monies paid to a juror under this Act or rules made under section 47 shall be the personal property of the juror.

(2) No employer of a person who is serving, has served or is qualified to serve, as a juror under this Act shall

   (a) require that person to pay any monies paid or to be paid to him under this Act or rules made under section 47 to the employer or any other person;

32

JA000205

(b) deduct any sum from the salary, allowances, emoluments, pension, gratuity, benefits or other remuneration of that person on account of the fact that the person is serving, has served or is qualified to serve as a juror;

(c) require as a term or condition of employment that a sum be deducted from the salary, allowances, emoluments, pension, gratuity, benefits or other remuneration of that person if the person serves or is qualified to serve as a juror; or

(d) directly or indirectly penalise that person in any way, whether

    (i) in the terms of employment which he affords the person,

    (ii) in the way he affords the person access to opportunities for promotion, transfer or training, or to any other benefits, facilities or services, or by refusing or deliberately omitting to afford the person access to them, or

    (iii) by dismissing the person or subjecting him to any other detriment,

on account of the fact that the person is serving, has served or is qualified to serve, as a juror.

(3) On the coming into force of this section, any written or oral term or condition of a contract of employment that is inconsistent with subsections (1) or (2) shall be unlawful and unenforceable to the extent of such inconsistency, whether or not the contract was or is entered into before, on or after the coming into force of this section.

(4) An employer who contravenes subsection (2) commits an offence and is liable on summary conviction to imprisonment for a term not exceeding six months or to a fine not exceeding one thousand dollars, or both.".

JA000206

Passed by the Legislative Council this 8th day of March, 2005.

V. INEZ ARCHIBALD,
Speaker.

ALVA MC CALL,
Ag. Clerk of the Legislative Council.

JA000207

# CHAPTER 24.

## EVIDENCE (PROCEEDINGS IN FOREIGN JURISDICTIONS).

(*1st October,* 1988.)     11/1984.

**1.** This Ordinance may be cited as the Evidence (Proceedings in Foreign Jurisdictions) Ordinance.    *Short title.*

**2.** For the purposes of this Ordinance—    *Interpretation.*

"authorised" in relation to a court or other tribunal, means authorised under the law of the State in which the court or other tribunal exercises jurisdiction;

"civil proceedings" means proceedings in any civil or commercial matter;

"foreign jurisdiction" means a jurisdiction outside the Territory;

"High Court" means the High Court of the Territory;

"property" means any land, chattel or other corporeal property of any kind or description;

"request" includes any commission, order or other process issued by or on behalf of a requesting court;

"requesting court" has the meaning given to it in section 3;

"Territory" means the British Virgin Islands.

**3.** (1) The High Court has all the powers conferred on it by this Ordinance where an application is made to it for an order for evidence to be obtained in the Territory and that Court is satisfied that—    *Application.*

    (*a*) the application is made in pursuance of a request issued by an authorised court or tribunal in a foreign jurisdiction, in this Ordinance referred to as the requesting court; and

JA000208

(*b*) the evidence to which the application relates is to be obtained for the purposes of civil proceedings—

    (i) that have been instituted before the requesting court, or

    (ii) the institution of which before that court is contemplated.

(2) A request referred to in subsection (1) must be written in the English language or in the language normally used in the foreign jurisdiction in which the request originates with an English translation certified as authentic by or on behalf of the requesting court.

**Powers of High Court.**

**4.** (1) Subject to section 5, the High Court may, upon an application made to it under section 3(1), make an order for the obtaining of evidence in the Territory as may appear to it to be appropriate for the purpose of giving effect to the request in pursuance of which the application was made; and any such order may require a person specified therein to take such steps as the court considers appropriate for that purpose.

(2) Without affecting the operation of subsection (1) but subject to section 5, an order made under that subsection may, in particular, make provision for—

    (*a*) the examination of witnesses, either orally or in writing;

    (*b*) the production of documents;

    (*c*) the inspection, photographing, preservation, custody or detention of any property; or

    (*d*) the medical examination of any person.

**Limits.**

**5.** (1) Notwithstanding section 4(2), an order made under that section shall not contain a provision—

    (*a*) requiring any particular steps to be taken in obtaining evidence unless they are steps that can be required to be taken in the High Court in proceedings of the same description as those to which the order relates; or

    (*b*) requiring a person—

    (i) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or

(ii) to produce any documents other than particular documents specified in the order as being documents appearing to the High Court to be, or to be likely to be, in his possession, custody or power.

(2) This section shall not be continued as preventing the making of an order that would require a person to give testimony, whether orally or in writing otherwise than on oath in cases where this is requested by the requesting court.

**6.** A person who, by virtue of an order made under section 4, is required to attend at any place is entitled to payment of any expenses he incurs as a result of the attendance as if he were a witness in civil proceedings before the High Court. *Witness expenses.*

**7.** (1) No person shall be compelled by virtue of an order made under section 4 to give evidence that he cannot be compelled to give— *Privilege.*

(*a*) in civil proceedings before the High Court; or

(*b*) in civil proceedings in the territory in which the requesting court exercises jurisdiction.

(2) Paragraph (*b*) of subsection (1) does not apply unless the claim of the person in question to be exempt from giving the evidence is either—

(*a*) supported by a statement contained in the request for the evidence, whether unconditionally or otherwise; or

(*b*) conceded by the applicant for the order.

(3) Where a claim referred to in subsection (2) is not supported or conceded, that person may, subject to this section, be required to give the evidence to which the claim relates; but that evidence shall not be forwarded to the requesting court if that court, on the matter being referred to it, upholds the claim.

**8.** Notwithstanding anything contained in this Ordinance, no person shall be compelled by virtue of an order made under section 4 to give any evidence that would endanger the security of the Territory and a certificate signed by the Governor to that effect is conclusive evidence of the facts stated therein. *State security.*

JA000210

Judicial aid.

**9.** (1) A reference in this Ordinance to giving evidence includes a reference to the answering of a question and the producing of a document and the reference in section 7(3) to forwarding of evidence has a corresponding meaning.

(2) The rules applicable to the adjudication of civil matters by the High Court shall be construed *mutatis mutandis* for the purpose of giving the necessary effect to this Ordinance.

(3) This Ordinance is enabling and shall, in its application, be given such construction as would as nearly as possible afford it conformity with the Convention contained in the Schedule.

SCHEDULE.

(S. 9)

CONVENTION ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS.

The States signatory to the present Convention,

Desiring to facilitate the transmission and execution of Letters of Request and to further the accommodation of the different methods which they use for this purpose,

Desiring to improve mutual judicial co-operation in civil or commercial matters,

Have resolved to conclude a Convention to this effect and have agreed upon the following provisions—

Chapter I — Letters of Request

Article 1

In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of the State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act.

A letter shall not be used to obtain evidence which is not intended for use in judicial proceedings, commenced or contemplated.

JA000211

The expression "other judicial act" does not cover the service of judicial documents or the issuance of any process by which judgements or orders are executed or enforced, or orders for provisional or protective measures.

### Article 2

A Contracting State shall designate a Central Authority which will undertake to receive Letters of Request coming from a judicial authority of another Contracting State and to transmit them to the authority competent to execute them. Each State shall organise the Central Authority in accordance with its own law.

Letters shall be sent to the Central Authority of the State of execution without being transmitted through any other authority of that State.

### Article 3

A Letter of Request shall specify—

(*a*) the authority requesting its execution and the authority requested to execute it, if known to the requesting authority;

(*b*) the names and addresses of the parties to the proceedings and their representatives, if any;

(*c*) the nature of the proceedings for which the evidence is required, giving all necessary information in regard thereto;

(*d*) the evidence to be obtained or other judicial act to be performed.

Where appropriate, the Letter shall specify, *inter alia*—

(*e*) the names and addresses of the persons to be examined;

(*f*) the questions to be put to the persons to be examined or a statement of the subject-matter about which they are to be examined;

(*g*) the documents or other property, real or personal, to be inspected;

(*h*) any requirements that the evidence is to be given on oath or affirmation, and any special form to be used;

(*i*) any special method or procedure to be followed under Article 9.

A Letter may also mention any information necessary for the application of Article 11.

No legalisation or other like formality may be required.

JA000212

### Article 4

A Letter of Request shall be in the language of the authority requested to execute it or be accompanied by a translation into that language.

Nevertheless, a Contracting State shall accept a Letter in either English or French, or a translation into one of these languages, unless it has made the reservation authorised by Article 33.

A Contracting State which has more than one official language and cannot, for reasons of internal law, accept Letters in one of these languages for the whole of its territory, shall, by declaration, specify the language in which the Letter or translation thereof shall be expressed for execution in the specified parts of its territory. In case of failure to comply with this declaration, without justifiable excuse, the costs of translation into the required language shall be borne by the State of origin.

A Contracting State may, by declaration, specify the language or languages other than those referred to in the preceding paragraphs, in which a Letter may be sent to its Central Authority.

Any translation accompanying a Letter shall be certified as correct, either by a diplomatic officer or consular agent or by a sworn translator or by any other person so authorised in either State.

### Article 5

If the Central Authority considers that the request does not comply with the provisions of the present Convention, it shall promptly inform the authority of the State of origin which transmitted the Letter of Request, specifying the objections to the Letter.

### Article 6

If the authority to whom a Letter of Request has been transmitted is not competent to execute it, the Letter shall be sent forthwith to the authority in the same State which is competent to execute it in accordance with the provisions of its own law.

### Article 7

The requesting authority shall, if it so desires, be informed of the time when, and the place where, the proceedings will take place, in order that the parties concerned, and their representatatives, if any, may be present. This information shall be sent directly to the parties or their representatives when the authority of the State of origin so requests.

JA000213

### Article 8

A Contracting State may declare that members of the judicial personnel of the requesting authority of another Contracting State may be present at the execution of a Letter of Request. Prior authorisation by the competent authority designated by the declaring State may be required.

### Article 9

The judicial authority which executes a Letter of Request shall apply its own law as to the methods and procedures to be followed.

However, it will follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties.

A Letter of Request shall be executed expeditiously.

### Article 10

In executing a Letter of Request the requested authority shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings.

### Article 11

In the execution of a Letter of Request the person concerned may refuse to give evidence in so far as he has a privilege or duty to refuse to give the evidence—

     (*a*) under the law of the State of execution; or

     (*b*) under the law of the State or origin, and the privilege or duty has been specified in the Letter, or at the instance of the requested authority, has been otherwise confirmed to that authority by the requesting authority.

A Contracting State may declare that, in addition, it will respect privileges and duties existing under the law of States other than the State or origin and the State of execution, to the extent specified in that declaration.

### Article 12

The execution of a Letter of Request may be refused only to the extent that—

(*a*) in the State of execution the execution of the Letter does not fall within the functions of the judiciary; or

(*b*) the State addressed considers that its sovereignty or security would be prejudiced thereby.

Execution may not be refused solely on the ground that under its internal law the State of execution claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not admit a right of action on it.

### Article 13

The documents establishing the execution of the Letter of Request shall be sent by the requested authority to the requesting authority by the same channel which was used by the latter.

In every instance where the Letter is not executed in whole or in part, the requesting authority shall be informed immediately through the same channel and advised of the reasons.

### Article 14

The execution of the Letter of Request shall not give rise to any reimbursement of taxes or costs of any nature.

Nevertheless, the State of execution has the right to require the State of origin to reimburse the fees paid to experts and interpreters and the costs occasioned by the use of a special procedure requested by the State of origin under Article 9, paragraph 2.

The requested authority whose law obliges the parties themselves to secure evidence, and which is not able itself to execute the Letter, may, after having obtained the consent of the requesting authority, appoint a suitable person to do so. When seeking this consent the requested authority shall indicate the approximate costs which would result from this procedure. If the requesting authority gives its consent it shall reimburse any costs incurred; without such consent the requesting authority shall not be liable for the costs.

### Chapter II — Taking of evidence by diplomatic officers, consular agents and commissioners

### Article 15

In civil or commercial matters, a diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, take the evidence without compulsion of nationals of a State which he represents in aid of proceedings commenced in the courts of a State which he represents.

JA000215

A Contracting State may declare that evidence may be taken by a diplomatic officer or consular agent only if permission to that effect is given upon application made by him or on his behalf to the appropriate authority designated by the declaring State.

### Article 16

A diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, also take the evidence, without compulsion, of nationals of the State in which he exercises his functions or of a third State, in aid of proceedings commenced in the courts of a state which he represents, if—

(*a*) a competent authority designated by the State in which he exercises his functions has given its permission either generally or in the particular case, and

(*b*) he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

### Article 17

In civil or commercial matters, a person duly appointed as a commissioner for the purpose may, without compulsion, take evidence in the territory of a Contracting State in aid of proceedings commenced in the courts of another Contracting State if—

(*a*) a competent authority designated by the State where the evidence is to be taken has given its permission either generally or in the particular case; and

(*b*) he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

### Article 18

A Contracting State may declare that a diplomatic officer, consular agent or commissioner authorised to take evidence under Articles 15, 16 or 17 may apply to the competent authority designated by the declaring State for appropriate assistance to obtain the evidence by compulsion. The declaration may contain such conditions as the declaring State may see fit to impose.

If the authority grants the application it shall apply any measures of compulsion which are appropriate and are prescribed by its law for use in internal proceedings.

### Article 19

The competent authority, in giving the permission referred to in Articles 15, 16, or 17, or in granting the application referred to in Article 18, may lay down such conditions as it deems fit, *inter alia*, as to the time and place of the taking of the evidence. Similarly it may require that it be given reasonable advance notice of the time, date and place of the taking of the evidence; in such a case a representative of the authority shall be entitled to be present at the taking of the evidence.

### Article 20

In the taking of evidence under any Article of this Chapter persons concerned may be legally represented.

### Article 21

Where a diplomatic officer, consular agent or commissioner is authorised under Articles 15, 16, or 17 to take evidence—

(*a*) he may take all kinds of evidence which are not incompatible with the law of the State where the evidence is taken or contrary to any permission granted pursuant to the above Articles, and shall have power within such limits to administer an oath or take an affirmation;

(*b*) a request to a person to appear or to give evidence shall, unless the recipient is a national of the State where the action is pending, be drawn up in the language of the place where the evidence is taken or be accompanied by a translation into such language;

(*c*) the request shall inform the person that he may be legally represented and, in any state that has not filed a declaration under Article 18, shall also inform him that he is not compelled to appear or to give evidence;

(*d*) the evidence may be taken in the manner provided by the law applicable to the court in which the action is pending provided that such manner is not forbidden by the law of the State where the evidence is taken;

(*e*) a person requested to give evidence may invoke the privileges and duties to refuse to give the evidence contained in Article 11.

### Article 22

The fact that an attempt to take evidence under the procedure laid down in this Chapter has failed, owing to the refusal of a person to give evidence, shall not prevent an application being subsequently made to take the evidence in accordance with Chapter I.

## Chapter III — General clauses

### Article 23

A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.

### Article 24

A Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence. However, Letters of Request may in all cases be sent to the Central Authority.

Federal States shall be free to designate more than one Central Authority.

### Article 25

A Contracting State which has more than one legal system may designate the authorities of one of such systems, which shall have exclusive competence to execute Letters of Request pursuant to this Convention.

### Article 26

A Contracting State, if required to do so because of constitutional limitations, may request the reimbursement by the State of origin of fees and costs, in connection with the execution of Letters of Request, for the service of process necessary to compel the appearance of a person to give evidence, the costs of attendance of such persons, and the cost of any transcript of the evidence.

Where a State has made a request pursuant to the above paragraph, any other Contracting State may request from that State the reimbursement of similar fees and costs.

### Article 27

The provisions of the present Convention shall not prevent a Contracting State from—

(*a*) declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2;

(*b*) permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;

JA000218

(*c*) permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

### Article 28

The present Convention shall not prevent an agreement between any two or more Contracting States to derogate from—

(*a*) the provisions of Article 2 with respect to methods of transmitting Letters of Request;

(*b*) the provisions of Article 4 with respect to the languages which may be used;

(*c*) the provisions of Article 8 with respect to the presence of judicial personnel at the execution of Letters;

(*d*) the provisions of Article 11 with respect to the privileges and duties of witnesses to refuse to give evidence;

(*e*) the provisions of Article 13 with respect to the methods of returning executed Letters to the requesting authority;

(*f*) the provisions of Article 14 with respect to fees and costs;

(*g*) the provisions of Chapter II.

### Article 29

Between Parties to the present Convention who are also Parties to one or both of the Convention on Civil Procedure signed at The Hague on the 17th of July, 1905 and the 1st of March 1954, this Convention shall replace Articles 8–16 of the earlier Conventions.

(1) The United Kingdom is not a party to either of these Conventions.

### Article 30

The present Convention shall not affect the application of Article 23 of the Convention of 1905, or of Article 24 of the Convention of 1954.

(1) The United Kingdom is not a party to either of these Conventions.

### Article 31

Supplementary Agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention unless the Parties have otherwise agreed.

JA000219

## Article 32

Without prejudice to the provisions of Articles 29 and 31, the present Convention shall not derogate from conventions containing provisions on the matters covered by this Convention to which the Contracting States are, or shall become Parties.

## Article 33

A State may, at the time of signature, ratification or accession exclude, in whole or in part, the application of the provisions of paragraph 2 of Article 4 and of Chapter II. No other reservation shall be permitted.

Each Contracting State may at any time withdraw a reservation it has made; the reservation shall cease to have effect on the sixtieth day after notification of the withdrawal.

When a State has made a reservation, any other State affected thereby may apply the same rule against the reserving State.

## Article 34

A State may at any time withdraw or modify a declaration.

## Article 35

A Contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the designation of authorities, pursuant to Articles 2, 8, 24 and 25.

A Contracting State shall likewise inform the Ministry, where appropriate, of the following—

(*a*) the designation of the authorities to whom notice must be given, whose permission may be required, and whose assistance may be invoked in the taking of evidence by diplomatic officers and consular agents, pursuant to Articles 15, 16 and 18 respectively;

(*b*) the designation of the authorities whose permission may be required in the taking of evidence by Commissioners pursuant to Article 17 and of those who may grant the assistance provided for in Article 18;

(*c*) declaration pursuant to Articles 4, 8, 11, 15, 16, 17, 18, 23 and 27;

(*d*) any withdrawal or modification of the above designations and declarations;

(*e*) the withdrawal of any reservation.

JA000220

306      **CAP. 24)**     *Evidence (Proceedings in Foreign Jurisdictions).*

### Article 36

Any difficulties which may arise between Contracting States in connection with the operation of this Convention shall be settled through diplomatic channels.

### Article 37

The present Convention shall be open for signature by the States represented at the Eleventh Session of the Hague Conference on Private International Law.

It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

### Article 38

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 37.

The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

### Article 39

Any State not represented at the Eleventh Session of the Hague Conference on Private International Law which is a Member of this Conference or of the United Nations or of a specialised agency of that Organisation, or a Party to the Statute of the International Court of Justice may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 38.

The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for a State acceding to it on the sixtieth day after the deposit of its instrument of accession.

The accession will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession. Such declaration shall be deposited at the Ministry of Foreign Affairs of the Netherlands; this Ministry shall forward, through diplomatic channels, a certified copy to each of the Contracting States.

The Convention will enter into force as between the acceding State and the State that has declared its acceptance of the accession on the sixtieth day after the deposit of the declaration of acceptance.

## Article 40

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.

At any time thereafter, such extension shall be notified to the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification indicated in the preceding paragraph.

## Article 41

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 38, even for States which have ratified it or acceded to it subsequently.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.

It may be limited to certain of the territories to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

## Article 42

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 37, and to the States which have acceded in accordance with Article 39, of the following—

(*a*) the signatures and ratification referred to in Article 37;

(*b*) the date on which the present Convention enters into force in accordance with the first paragraph of Article 38;

(*c*) the accessions referred to in Article 39 and the dates on which they take effect;

(*d*) the extensions referred to in Article 40 and the dates on which they take effect;

JA000222

(*e*) the designations, reservations and declarations referred to in Articles 33 and 35;

(*f*) the denunciations referred to in the third paragraph of Article 41.

In witness whereof the undersigned, being duly authorised thereto, have signed the present Convention.

Done at The Hague, on the 18th day of March, 1970, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic channel, to each of the States represented at the Eleventh Session of the Hague Conference on Private International Law.

JA000223

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

MICHELLE TROTTER,

      Plaintiff,

vs.

7R HOLDINGS, LLC, LUIS A.
RUBI GONZALEZ, M/Y OLGA

      Defendants.

_____/

Civil No.: 3:14-cv-00099

ACTION FOR DAMAGES

JURY TRIAL DEMANDED

## AFFIDAVIT OF CAPTAIN BERNARD CALOT

I, CAPTAIN BERNARD CALOT, certify as follows based on my personal knowledge and declare the truth of the facts stated below.

     1.    I am the Captain of M/Y Olga. I have worked in this capacity for eight and one-half years. I am employed by 7R Charters Limited, a British Virgin Islands company. 7R Charters Limited is held by 7R Holdings, LLC.

     2.    I am making this affidavit in support of 7R Holdings, LLC, Luis A. Rubi Gonzalez and M/Y Olga's Reply to Plaintiff's Response to Defendants' Motion to Dismiss for Forum *Non Conveniens.*

     3.    Plaintiff, Michelle Trotter, did not sustain the alleged injuries in her Complaint while on the M/Y Olga.

     4.    Plaintiff's alleged injuries occurred on land in the BVI to wit: stairs leading to the resort which are on the property of the Scrub Island Resort, Spa and Marina.

     5.    The location where Plaintiff allegedly injured herself is not a part of, an appurtenance to or in way related to the M/Y Olga.

     6.    The M/Y Olga does not obtain provisions from the kitchen at Scrub Island Resort, Spa and Marina.

     7.    On the date and time of Plaintiff's alleged injury as specified in her complaint, she was not obtaining provisions from the kitchen at Scrub Island Resort, Spa and Marina.

pick up passengers not for provisioning.

8. The M/Y Olga was docked at the Scrub Island Resort, Spa and Marina to

9. On the date and time of Plaintiff's alleged injury, Plaintiff disembarked the M/Y Olga for her own personal reasons and not for any reason associated with her employment as a chef on the M/Y Olga.

10. During the charter, which Plaintiff was employed, the M/Y Olga did not touch land in St. John.

11. None of the injuries alleged by Plaintiff in her complaint occurred on the M/Y Olga or any appurtenance thereto.

12. None of the injuries alleged by Plaintiff in her complaint were caused by the M/Y Olga.

FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: ~~February~~ April 14, 2015

CAPTAIN BERNARD CALOT
M/Y OLGA

SWORN TO AND SUBSCRIBED before me this 14th day of April, 2015, by

_BERNARD  CALOT_, who is personally known to me or who has produced

_Passport_ as identification.



Notary Public

Pierre Charles Dubois, notary

My Commission expires: Life Time

D -0566.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and exact copy of the foregoing

**JOINT APPENDIX (VOLUMES I and II)** was served on September 1, 2016, by

causing this document to be served through the Court's Electronic Case Filing System

to the following parties and counsel:

JENNIFER Q. MILLER, ESQ. (VI#1109)
KELLY CHARLES-COLLINS, ESQ.
MICHAEL J. DONO, ESQ.
**HAMILTON, MILLER & BIRTHISEL, LLP**
50 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
TEL : (305) 379-3686
FAX: (305) 379-3690
 "jmiller@hamiltonmillerlaw.com"
"kcharlescollins@hamiltonmillerlaw.com"
"mdono@hamiltonnillerlaw.com"

The undersigned further certifies that pursuant to L.R.A. 31.1(a), 1 paper copy

of the Joint Appendix was filed with the Clerk of Court for the Third Circuit, 1 paper

copy was file with the Clerk of the District Court of the Virgin Islands and 1 paper

copy was mailed to counsel for Defendants/Appellees.

_s/THOMAS F. FRIEDBERG, ESQ._
Attorneys for Plaintiff/Appellant.,
MICHELLE TROTTER